UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

MEDISIM LTD.,

              Plaintiff,

    - against -

BESTMED LLC,

              Defendant.

-----------------------------------------------------X

**OPINION AND
ORDER**

**10 Civ. 2463 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................ 1

II.    BACKGROUND ............................................. 2
    A.   Undisputed Facts ..................................... 2
    B.   Disputed Facts ....................................... 4
    C.   The Invention ........................................ 5
    D.   Procedural History ................................... 6

III.   LEGAL STANDARD ....................................... 10

IV.   APPLICABLE LAW ....................................... 12
    A.   Unfair Competition and False Designation of Origin Under the
         Lanham Act ....................................... 12
    B.   Unfair Competition Under New York Common Law ............ 17
    C.   False Advertising Under the Lanham Act ................... 17
    D.   False Advertising Under New York Law ................... 19
    E.   Deceptive Acts Under New York Law ..................... 19

-i-

F.       Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
G.      Availability of Statutory Damages for Copyright Infringement
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
H.      Provisional Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
I.       Patent Validity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
J.       Patent Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
K.      Inequitable Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**V.**      **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
A.      Unfair Competition and False Designation of Origin Under the
Lanham Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
      1.      Trade Dress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
            a.     Descriptions of the Claimed Trade Dress . . . . . . . . . . 29
            b.     Evidence of Distinctiveness . . . . . . . . . . . . . . . . . . 32
      2.      The CVS SKU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
B.      Unfair Competition Under New York Common Law . . . . . . . . . . 38
      1.      Likelihood of Confusion . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      2.      Bad Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
C.      False Advertising Under the Lanham Act . . . . . . . . . . . . . . . . . . . 41
      1.      Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
      2.      Falsity and Likelihood of Misleading Consumers . . . . . . . . 43
D.      False Advertising and Deceptive Acts Under New York Law . . . . . 45
E.      Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
F.       Availability of Statutory Damages . . . . . . . . . . . . . . . . . . . . . . . . . 48
G.      Provisional Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
H.      Patent Validity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
I.       Patent Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
      1.      The Apparatus Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
      2.      The Method Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
J.       Inequitable Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
      1.      Pre-Critical Date Commercial Activities . . . . . . . . . . . . . . 63
      2.      Omission of Two Patents from the IDS . . . . . . . . . . . . . . . 66
      3.      Yarden's Representations of the Prior Art . . . . . . . . . . . . . 68

**VI.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

## I.    INTRODUCTION

Medisim Ltd. ("Medisim") brings this action against BestMed LLC ("BestMed") for patent and copyright infringement, unfair competition/false designation of origin under the Lanham Act, false advertising under the Lanham Act, false advertising under New York law, deceptive acts and practices under New York law, unfair competition under New York law, and unjust enrichment.[1] BestMed has brought counterclaims for declaratory judgment of patent non-infringement, declaratory judgment of patent invalidity, false patent marking, and patent unenforceability due to inequitable conduct.[2]

On June 29, 2012, the Court held a pre-motion conference to discuss the parties' proposed grounds for potential summary judgment motions.  The Court spent considerable judicial resources to review the parties' pre-conference submissions and consider the strength of their potential motions.  At the conference, I advised the parties not to move on the grounds for which there was likely a disputed issue of fact.[3]  BestMed ignored my advice and moved for

---

[1]    *See* Complaint and Answer for Jury Trial ("Complaint") ¶¶ 24-69.

[2]    *See* Second Amended Answer, Affirmative Defenses and Counterclaims ("Am. Answer") ¶¶ 81-237.

[3]    *See* 6/29/12 Hearing Tr., at 28:1-6.

summary judgment on *all* of the grounds they raised in their pre-conference letter.[4] For the reasons set forth below, the motions are granted in part and denied in part. Unsurprisingly, summary judgment is denied on all of the claims that the Court advised BestMed to exclude from its summary judgment motion.

## II.   BACKGROUND

### A.   Undisputed Facts[5]

In November 2004, BestMed and Medisim entered into an International Distributorship Agreement ("Distribution Agreement") for BestMed to distribute Medisim's digital, conductive forehead thermometer in the United States and Canada.[6]  Between the signing of the Distribution Agreement and its May 1, 2009 termination, BestMed had access to some technical information pertaining to Medisim's thermometers and received a draft of the thermometer

---

[4]    I note that Medisim raised two grounds for moving for summary judgment in its pre-conference letter.  *See* 6/18/12 Letter from Scott S. Christie to the Court, at 3.  Unlike BestMed, it moved on only one of those grounds.

[5]    The following facts are derived from the Complaint, the Amended Answer, and the parties' Rule 56.1 statements and supporting documents.  The facts are undisputed unless otherwise noted; where disputed, they are construed in the light most favorable to the non-moving party.  *See, e.g.*, *Federal Ins. Co. v. American Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

[6]    *See* Complaint ¶ 9; Am. Answer ¶ 9; BestMed LLC's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("BestMed 56.1") ¶ 23.

user's instructions from Medisim.[7]  On April 7, 2008, Medisim and BestMed

entered into a Purchase Sale Agreement which provided that:

> By executing this Agreement, and as a condition to entering into this Agreement, each party hereby ratifies the two addenda described in the Recitals to this Agreement and the appendices to [the Distribution Agreement], and irrevocably waives and relinquishes any right, claim or cause of action it may have now or in the future, whether known or unknown, now or hereafter existing against the other party and its officers and agents arising from the actual or alleged performance, termination, breach or continuation of [the Distribution Agreement] and the parties' subsequent correspondence relating to [the Distribution Agreement] and the proposed renewal or replacement thereof.[8]

On October 6, 2009, United States Patent No. 7,597,668 ("the '668

Patent") titled "NON-INVASIVE TEMPERATURE MEASUREMENT" was

issued to Moshe Yarden, the Chief Executive Officer and Chief Technology

Officer of Medisim.[9]  The '668 Patent matured from U.S. Patent Application Serial

---

[7]     *See* Complaint ¶ 10; Am. Answer ¶¶ 9, 10.  Medisim further asserts that BestMed had access to "confidential and/or proprietary information belonging to Medisim," but BestMed denies this allegation.  *Id.*

[8]     BestMed 56.1 ¶¶ 27-29.

[9]     Complaint ¶ 8; Am. Answer ¶ 8; Medisim's Local Rule 56.1 Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment of No Inequitable Conduct ("Medisim IC 56.1") ¶ 1; Declaration of Moshe Yarden in Support of Medisim Ltd.'s Motion for Summary Judgment of No Inequitable Conduct ("Yarden Decl.") ¶ 1.

No. 11/444,710 ("the '710 Application"), which Yarden filed on May 31, 2006.[10]

Among the products distributed by BestMed under the Distribution Agreement

were thermometers manufactured by Medisim that practiced some or all of the

claims of the '668 Patent.[11]

**B.    Disputed Facts**

Medisim asserts that while the parties were operating under the

Distribution Agreement, BestMed began secret negotiations with K-Jump Health

Co., Ltd. ("K-Jump") "to replace the Medisim digital, conductive forehead

thermometer with a thermometer that was substantially similar in operation and

technology, to be manufactured in China."[12]  Medisim alleges that BestMed

directed K-Jump to begin manufacturing a thermometer incorporating Medisim's

intellectual property, and that BestMed subsequently terminated the Distribution

Agreement and began purchasing thermometers from K-Jump for distribution in

the United States.[13]  Medisim asserts that compared with its own thermometers,

those manufactured by K-Jump have a similar physical appearance, embody the

---

[10]    *See* Medisim IC 56.1 ¶¶ 2, 3.

[11]    *See* Am. Answer. ¶ 9.

[12]    Complaint ¶ 11.

[13]    *See id.* ¶¶ 11-13.

same features, and execute software enabling it to produce identical audible and visual messages.[14]

When Medisim attempted to sell digital thermometers on its own, several retailers rebuffed it and expressed their satisfaction with the K-Jump-manufactured thermometers they were purchasing from BestMed.[15]  Further, BestMed sells K-Jump-manufactured thermometers to the CVS drug store chain with Stock Keeping Unit ("SKU") number 050428075739 — the same SKU under which BestMed sold CVS digital thermometers manufactured by Medisim.[16] Medisim asserts that BestMed "has unfairly foreclosed Medisim from selling its product to many of the customers that previously bought its products" through its "systematic and willful acts of copying Medisim's product technology and design, and trading on Medisim's good will."[17]  BestMed acknowledges that it used the same SKU to sell CVS digital thermometers manufactured by K-Jump and Medisim, but it otherwise denies all of these allegations.[18]

### C.    The Invention

---

[14]    *See id.* ¶¶ 15-16, 21-22.

[15]    *See id.* ¶ 14.

[16]    *See id.* ¶ 17.

[17]    *Id.*

[18]    *See* Am. Answer ¶¶ 11-16.

"The measurement of a body temperature is useful for assessing the health of a [person]."[19]  Generally, body temperature is measured in one of two ways, each of which has its drawbacks: (1) insertion of a thermometer into a body cavity such as the mouth, armpit, or rectum; or (2) measurement at an external site, such as the forehead or temple.  Insertion of a thermometer into a body cavity is invasive, causes discomfort, and requires the subject's cooperation and adherence to measurement procedures — for example, keeping the thermometer tip under the tongue during oral measurement.  Measurement at external sites is less uncomfortable and less dependent on subject cooperation, but it produces temperature readings more likely to deviate from "core body temperature" (which will be defined below).[20]  The claimed invention in the '668 Patent relates to a digital thermometer that endeavors to achieve the best of both worlds — it is non-invasive, and yet it is designed to use its measurements to calculate core body temperature.[21]

### D.    Procedural History

---

[19]    '668 Patent, Ex. A to Affirmation of Keith J. McWha in Support of Motion for Summary Judgment of No Inequitable Conduct ("McWha IC Aff."), at col. 1 ll. 12-13.

[20]    *See id.* col. 1 ll. 13-38.

[21]    *See id.* col. 1 ll. 54-60.

Medisim initiated this action in March, 2010, following which BestMed promptly moved to transfer venue to Colorado, where BestMed is based. I denied this motion[22] and held a *Markman* hearing[23] after which I construed various phrases in the '668 Patent as follows:

> [In claim 1]:
>
> "Probe" means "portion of thermometer including a membrane and one or more temperature sensors that touches the exterior skin."
>
> "Membrane" means "a layer or sheet of material."
>
> "One or more temperature sensors" means "one or more thermistor or resistance temperature defectors (RTDs), or any form of thermistor, temperature sensor, or thermocouple."
> "Configured to receive a plurality of temperature readings from the one or more temperature sensors" means "configured to receive temperature readings, at least one of which comes from the external body surface, from one or more temperature sensors."
> "Time-dependent parameters of temperature change," means "multiple values of temperature change that vary with time and that are taken at different times."
>
> "To calculate" as "using a computation to estimate, approximate, predict or determine."
>
> "Core body temperature" as "the temperature of blood in the pulmonary artery."

---

[22]   *See Medisim Ltd. v. BestMed LLC*, No. 10 Civ. 2463, 2010 WL 2697073 (S.D.N.Y. July 7, 2010).

[23]   *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384, 390-91 (1996).

In claim 21, the user is "applying a probe . . . to an external surface," while the processing unit is "receiving a plurality of temperature readings"; "determining time-dependent parameters of temperature change"; "calculating a deep tissue temperature" and "calculating a core body temperature."[24]

Following the *Markman* ruling, the parties made cross-motions, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[25] as well as Rules 702 and 403 of the Federal Rules of Evidence, to exclude the testimony of various experts. In my initial *Daubert* opinion and subsequent reconsideration opinion, I made the following rulings:

1) Jack Goldberg — BestMed's expert on the validity of the '668 Patent — is qualified to opine in the area of digital, conductive thermometry. Goldberg may offer the following opinions: (1) that the specification of the '668 Patent does not enable the full scope of the claimed invention; (2) that Medisim's FHT-1 Digital Temple Thermometer ("the FHT-1") calculates core body temperature and therefore anticipated the '668 Patent; (3) that the FHT-1 calculates "deep tissue temperature; and (4) that BestMed has not infringed Medisim's intellectual property. However, I struck Goldberg's opinions on inequitable

---

[24]     *Medisim Ltd. v. BestMed LLC*, No. 10 Civ. 2463, 2011 WL 2693896, at *11 (S.D.N.Y. July 8, 2011) ("*Markman* Op.").

[25]     509 U.S. 579 (1993).

conduct and on whether U.S. Patent 6,095,452 anticipated the '668 Patent.[26]

2) Dr. David Lipson — Medisim's expert on the validity of the '668 Patent — may opine that BestMed's KD-2201 thermometer meets the core body temperature limitation of the '668 Patent.[27]  Lipson may also testify that the KD-2201 thermometer meets the "deep tissue temperature" limitation of the '668 Patent, but only to the extent that he bases his opinion on the 510(k) letters and deposition testimony of K-Jump witnesses referenced in his report.[28]

3) The expert report of Dr. Warren Keegan — who Medisim retained to opine on likelihood of confusion — is excluded in its entirety.[29]

BestMed now moves for summary judgment on: (1) Medisim's Lanham Act unfair competition and false designation of origin claim; (2) Medisim's New York common law unfair competition claim; (3) Medisim's Lanham Act false advertising claim; (4) Medisim's New York false advertising claim; (5) Medisim's New York deceptive acts claim; (6) Medisim's unjust

---

[26]     *See Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 167-74 (S.D.N.Y. 2012) ("*Daubert* Op.").

[27]     *See id.* at 174-76.

[28]     *See Medisim Ltd. v. BestMed LLC*, No. 10 Civ. 2463, 2012 WL 1450420, at *2 (S.D.N.Y. Apr. 23, 2012) ("Reconsideration Op.").

[29]     *Daubert* Op., 861 F. Supp. 2d at 178-80.

enrichment claim; (7) whether Medisim may be entitled to attorney's fees on its copyright infringement claim; (8) whether Medisim is entitled to reasonable royalties for sales during the "provisional rights period"; (9) invalidity of the '668 Patent; and (10) non-infringement.  Medisim moves for summary judgment on Bestmed's inequitable conduct counterclaim.

## III.   LEGAL STANDARD

"Summary judgment is designed to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict."[30]  Thus, summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[31]  "For summary judgment  purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor."[32]   "'A fact is material when it might affect the outcome of the suit under governing law.'"[33]

---

[30]   *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

[31]   Fed. R. Civ. P. 56(c).

[32]   *Sanchez v. Connecticut Natural Gas Co.*, 421 Fed. App'x 33, 34 (2d Cir. 2011) (quoting *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000)).

[33]   *Carter v. Incorporated Vill. of Ocean Beach*, 415 Fed. App'x 290, 292 (2d Cir. 2011) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202

[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[34]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim."[35]

In a summary judgment setting, "[t]he burden is on the moving party to demonstrate that no genuine issue respecting any material fact exists."[36]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."[37]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[38]  The non-moving party "'must do more than simply show that there is some

_____

(2d Cir. 2007)).

[34]     *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citation omitted).

[35]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[36]     *Mavrommatis v. Carey Limousine Westchester, Inc.*, No. 10 Civ. 3404, 2011 WL 3903429, at *1 (2d Cir. Sept. 7, 2011) (citing *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994)).

[37]     *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

[38]     *Id.*

metaphysical doubt as to the material facts,'"[39] and cannot "'rely on conclusory allegations or unsubstantiated speculation.'"[40]

In deciding a motion for summary judgment, a court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"[41] However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[42] "'The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"[43]

## IV.   APPLICABLE LAW

### A.   Unfair Competition and False Designation of Origin Under the Lanham Act

---

[39]   *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[40]   *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

[41]   *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

[42]   *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (emphasis removed).

[43]   *Brod*, 653 F.3d at 164 (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

The Lanham Act provides:

(1)     Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.[44]

A plaintiff asserting a trademark infringement claim must show *first* that its trade dress or trademark is a protectable interest under the Lanham Act, and *second* that there is a likelihood of confusion.[45]  If a plaintiff offers no evidence of a protectable interest, a court need not consider likelihood of confusion.[46]  Moreover, a Lanham Act claimant must describe its protectable interest with some clarity — it

---

[44]     15 U.S.C. § 1125(a).

[45]     *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006).

[46]     *See Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir. 1985) ("If, however, secondary meaning cannot be established, [the product claiming protection] will be ineligible for protection, and our analysis will conclude without having to address the likelihood of confusion. Absent secondary meaning, purchasers will not associate [the product] with a particular source of origin. By definition, there could not be likelihood of confusion as to source.").

-13-

must offer "'a precise expression of the character and scope of the claimed trade dress.'"[47]

In order to succeed on a claim of trade dress infringement under Section 43(a) of the Lanham Act, a plaintiff must demonstrate:  (1) that its claimed mark is either inherently distinctive or has acquired distinctiveness through secondary meaning; (2) that there is a likelihood of confusion between its trade dress and the defendant's; and (3) that the trade dress is non-functional.[48]  Inherent distinctiveness is evaluated as follows:

> [T]rade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful.  Suggestive and arbitrary or fanciful trade dress are deemed inherently distinctive and thus always satisfy the first prong of the test for protection.  A descriptive trade dress may be found inherently distinctive if the plaintiff establishes that its mark has acquired secondary meaning giving it distinctiveness to the consumer.  A generic trade dress receives no Lanham Act protection.[49]

To determine whether a trade dress has acquired distinctiveness through secondary

---

[47]     *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 117 (2d Cir. 2001) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)).

[48]     *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769-70 (1992); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997).

[49]     *Fun-Damental Too*, 111 F.3d at 999-1000 (citing *Two Pesos*, 505 U.S. at 769-70 and *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 76 (2d Cir. 1985)).

meaning, a court should consider six factors: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use."[50]  The Second Circuit generally disfavors summary judgment on questions of distinctiveness.[51]

The likelihood of confusion inquiry "turns on whether 'numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark.'"[52]  "[A] probability of confusion, not a mere possibility, must be found to

---

[50]    *Cartier Inc. v. Jewelry, Inc.*, 294 Fed. App'x 615, 617 (2d Cir. 2008).

[51]    *See Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1069 (2d Cir. 1995) ("Granting a defendant's motion for summary judgment in an infringement action brought under the Act on the issue of whether plaintiff's product is or is not inherently distinctive is not generally favored.  This is the general rule because a producer has endless options when packaging its products, so often trade dress will be arbitrary or fanciful and thus inherently distinctive.").

[52]    *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004) (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 477-78 (2d Cir. 1996)).  *Accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002) ("Where there is a claim of consumer confusion [as] to the association of a product or service with another person's trademark, the central inquiry is whether it is likely that 'an appreciable number of ordinarily prudent purchasers' will be misled as to the source or sponsorship of the product or service in question.") (quoting *EMI Catalogue P'ship v. Hill, Holiday, Conors, Cosmopulos, Inc.*, 228 F.3d 56, 61-62 (2d Cir. 2000)).

exist" in order to support a finding of infringement.[53]   Generally speaking,

establishing that probability is the plaintiff's burden,[54] which means that the

defendant typically does not need to disprove a likelihood of confusion.[55]   In

determining whether there is a likelihood of confusion, an eight-factor balancing

test should be applied.[56]   A finding of confusion need not be based on survey

evidence; confusion may be shown through statements.[57]

---

[53]   *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077
(2d Cir. 1993).  Moreover, regardless of the name given to the infringement claim
– false designation of origin, unfair competition, or simply 'infringement' – the
question under the Lanham Act and state law infringement claims is the same: is
there a likelihood of confusion? *See Two Pesos, Inc.*, 505 U.S. at 780.

[54]   *See Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867,
871 (2d Cir. 1986).

[55]   *See KP Permanent Make-up, Inc. v. Lasting Impression I, Inc.*, 543
U.S. 111, 121 (2004).

[56]   *See Starbucks Corp. v. Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d
Cir. 2009) (citing *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d
Cir. 1961)).  The *Polaroid* factors include: (1) strength of the plaintiff's mark; (2)
degree of similarity between plaintiff's and defendant's marks; (3) the competitive
proximity of the products; (4) the likelihood that either owner will bridge the gap;
(5) the sophistication of the buyers; (6) the quality of defendant's product; (7)
actual confusion; and (8) the existence of bad faith.  *See id.*  None of these factors
is dispositive, and the above list is not exhaustive.  *See Streetwise Maps, Inc. v.
Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).  Instead, they are intended to act
"as a useful guide" in determining if there exists a likelihood of confusion.  *Lois
Sportswear*, 799 F.2d at 872.

[57]   *See Fun-Damental Too*, 111 F.3d at 1003 (affirming a district court's
grant of a preliminary injunction in a Lanham Act action, where the district court
found actual confusion based on a sales manager's testimony regarding consumer

### B.   Unfair Competition Under New York Common Law

The elements of unfair competition under New York law closely

parallel the elements of unfair competition under the Lanham Act.  However, there

are two exceptions: a plaintiff must show "either actual confusion or a likelihood

of confusion, and there must be 'some showing of bad faith' on the part of the

defendants."[58]

### C.   False Advertising Under the Lanham Act

Section 43(a) of the Lanham Act prohibits any person from, "in

commercial advertising or promotion, misrepresent[ing] the nature, characteristics,

qualities, or geographic origin of his or her or another person's goods, services, or

commercial activities."[59]  A claim of false advertising may be based on the theory

"that the challenged advertisement is literally false, i.e., false on its face";

alternatively, it may be based on the theory "that the advertisement, while not

literally false, is nevertheless likely to mislead or confuse consumers."[60]

---

complaints ).

[58]      *Sly Magazine, LLC v. Weider Publ'ns L.L.C*, 346 Fed. App'x 721,
723 (2d Cir. 2009) (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58
F.3d 27, 34–35 (2d Cir. 1995)).

[59]      15 U.S.C. § 1125(a)(1)(B).

[60]      *Time Warner*, 497 F.3d at 153.

Standing to bring a false advertising claim under the Lanham Act requires a plaintiff to establish a "'reasonable interest to be protected'" against the false or misleading claims as well as a "'reasonable basis for believing that this interest is likely to be damaged by the false or misleading advertising.'"[61] "Reasonable interest" includes "commercial interests, direct pecuniary interests, and even a future potential for a commercial or competitive injury."[62]  To demonstrate a "reasonable basis," a plaintiff must show "'both likely injury and a causal nexus to the false advertising.'"[63]  Further:

> [I]n the case of a "misleading, non-comparative commercial which tout[s] the benefits of the product advertised but ma[kes] no direct reference to any competitor's product . . . some indication of actual injury and causation" is necessary "to satisfy Lanham Act standing requirements and to ensure [the] plaintiff's injury [is] not speculative."[64]

---

[61]     *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 169 (2d Cir. 2007) (quoting *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship*, 380 F.3d 126, 130 (2d Cir. 2004)).

[62]     *Id.* (citing *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1111 (2d Cir. 1997)).

[63]     *Id.* (quoting *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 130 (2d Cir. 2000)).

[64]     *Time Warner Cable, Inc. v. DirecTV Inc.*, 497 F.3d 144, 162 (2d Cir. 2007) (quoting *McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988)).

-18-

### D.     False Advertising Under New York Law

New York General Business Law ("GBL") section 350 states:  "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."  A plaintiff must establish "'(1) that the act, practice or advertisement was consumer-oriented; (2) that the act, practice or advertisement was misleading in a material respect, and (3) that the plaintiff was injured as a result of the deceptive practice, act or advertisement.'"[65] Further, "a violation of either [section 349 or section 350] requires that the defendant's conduct deceive a reasonable consumer in a material respect, work a harm to the public at large, and directly cause the plaintiff's injury."[66]  A plaintiff must also demonstrate reliance, which typically means that "the plaintiff must 'point to [a] specific advertisement or public pronouncement' upon which [the consumer] relied."  Finally, "the alleged deception must have occurred in New York."[67]

### E.     Deceptive Acts Under New York Law

New York GBL section 349 makes unlawful "[d]eceptive acts or

---

[65]     *Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005) (quoting *Pelman v. McDonald's Corp.,* 237 F. Supp. 512, 525 (S.D.N.Y. 2003)).

[66]     *Id.*

[67]     *Id.*

practices in the conduct of any business, trade or commerce or in the furnishing of any service."  The New York Court of Appeals has further clarified:

> A plaintiff under section 349 must prove three elements:  first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act. Whether a representation or an omission, the deceptive practice must be "likely to mislead a reasonable consumer acting reasonably under the circumstances."[68]

Although section 349 is consumer-oriented, a *competitor* may bring a cause of action under those statutes if "'the gravamen of the complaint [is] consumer injury or harm to the public interest'" and if "the matter affects the public interest in New York."[69]

## F.    Unjust Enrichment

Under New York law, a plaintiff seeking relief under a theory of unjust enrichment must show "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."[70]

---

[68]    *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995)) (additional citations omitted).

[69]    *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (quoting *Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F. Supp. 1084, 1089 n.6 (S.D.N.Y. 1988)).

[70]    *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 (2d Cir. 2009).

### G.    Availability of Statutory Damages for Copyright Infringement

Monetary remedies for copyright infringement may take the form of either compensatory damages or statutory damages.[71]  Section 504 also permits the recovery of attorney's fees.  However:

> [N]o award of statutory damages or attorney's fees . . . shall be made for . . . (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.[72]

A copyright owner may elect to recover statutory damages (as opposed to actual damages) at any time before final judgment is rendered.[73]

### H.    Provisional Rights

A patent comes with the right to obtain a reasonable royalty from those who "infringed" between the time that the patent application was published and the time that the patent was ultimately issued.[74]  This provisional remedy is not available "unless the invention as claimed in the patent is substantially identical to

---

[71]    *See* 17 U.S.C. § 504(c)(1).

[72]    *Id.* § 412.

[73]    *See id.* § 504(c)(1) ("[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages.").

[74]    *See* 35 U.S.C. § 154(d).

-21-

the invention as claimed in the published patent application."[75]  "This analysis

requires a comparison of the scope of the claims in the patent application and the

issued patent."[76]  Although an "amendment that merely clarifies the terms of a

claim is not a substantial change . . . an amendment that narrows the scope of a

claim is a substantial change."[77]  Because the determination of provisional rights

involves the construction and comparison of the application and the patent and

considers no additional evidence, it, like claim construction, is a question of law.[78]

## I.    Patent Validity

Whether a claim satisfies the enablement requirement of 35 U.S.C. §

112, ¶ 1 is a question of law, but it is based on the underlying facts.[79]  A patent

enjoys a presumption of validity.[80]  A party seeking to destroy this presumption

---

[75]     *Id*. § 154(d)(2)

[76]     *Baseball Quick, LLC v. MLB Advanced Media, L.P.*, No. 11 Civ.
1735, 2012 WL 1071230, at *4 (S.D.N.Y. Mar. 30, 2012) (citing *Laitram Corp. v.
NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998)).

[77]     *Prestige Pet Products, Inc. v. Pingyang Huaxing Leather & Plastic
Co.*, 767 F. Supp. 2d 806, 812 (E.D. Mich. 2011) (citing *Bloom Eng'g Co. v. North
Am. Mfg. Co.*, 129 F.3d 1247, 1250 (Fed. Cir. 1997)).

[78]     *See Laitram*, 163 F.3d at 1347.

[79]     *See AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1238-39 (Fed. Cir.
2003).

[80]     *See* 35 U.S.C. § 282.  Section 282 states that "[e]ach claim of a patent
(whether in independent, dependent, or multiple dependent form) shall be

must do so with clear and convincing evidence of invalidity.[81]  Clear and convincing evidence exists when the movant "place[s] in the mind of the ultimate fact finder an abiding conviction that the truth of its factual contentions are 'highly probable.'"[82] This high burden generally makes summary judgment on validity issues more likely for patentees than accused infringers.

"The 'enablement requirement is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation.'"[83]  Further, "[t]he full scope of the claimed invention must be enabled."[84]  Whether the amount of experimentation necessary is "undue" is also "a question of law that [the Federal Circuit] review[s] de novo, based on underlying

---

presumed valid independently of the validity of other claims; [and] dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim."

[81]    *See Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1281 (Fed. Cir. 2005).

[82]    *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

[83]    *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008) (quoting *AK Steel*, 344 F.3d at 1244).

[84]    *Id.* (citing *Automotive Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1285 (Fed. Cir. 2007)).

factual inquiries that [are] review[ed] for clear error.'"[85]   The Federal Circuit has identified eight factors for courts to consider in making such a determination: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims.[86] A court need not consider all of these "*Wands* factors," but rather only those relevant to the facts of the case.[87]   "[I]t is axiomatic that if no methodology existed by which the invention could be practiced, the claims are not enabled."[88]

### J.    Patent Infringement

Determination of infringement involves two steps:  (1) construing the terms of the asserted claims; and (2) determining whether the accused method

---

[85]    *See ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) (quoting *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1371-72 (Fed. Cir. 1999)).

[86]    *See In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

[87]    *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991).

[88]    *Plant Genetic Sys., N.V. v. DeKalp Genetics Corp.*, 175 F. Supp. 2d 246, 255 (D. Conn. 2001), *aff'd*, 315 F.3d 1335 (Fed. Cir. 2003).

infringes the claims as construed.[89]  Claim construction is a question of law, and infringement is a question of fact.[90]  Infringement occurs when a properly construed claim "reads on" the accused product.[91]  Summary judgment on the ground of non-infringement of a patent may be granted where the patentee's proof is deficient in meeting an essential part of the legal standard for infringement liability.[92]

A plaintiff may establish infringement either by proving literal infringement or by using the doctrine of equivalents.[93]  To prove literal infringement, the patentee must show by a preponderance of the evidence that the device accused of infringement contains *every* limitation in the asserted claims.[94]  This applies to both method claims and apparatus claims.  "For process patent or

---

[89]     *See Metabolite Labs., Inc. v. Laboratory Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004).

[90]     *See Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1376 (Fed. Cir. 2005) (citing *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)).

[91]     *See Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1582 (Fed. Cir. 1995).

[92]     *See Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989).

[93]     *See Windbrella Prods. v. Taylor Made Golf Co.*, 414 F. Supp. 2d 305, 311 (S.D.N.Y. 2006).

[94]     *See PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005).

method patent claims, infringement occurs when a party performs all of the steps of the process."[95]  "An infringement issue is properly decided upon summary judgment when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device."[96]

A plaintiff may demonstrate contributory infringement by proving that the defendant "sells, or offers to sell, a material or apparatus for use in practicing a patented process."[97]  Further, "[t]hat 'material or apparatus' must be a material part of the invention, have no substantial noninfringing uses, and be known (by the [defendant]) 'to be especially made or especially adapted for use in an infringement of such patent.'"[98] A plaintiff may establish induced infringement if it can "show direct infringement, and that the alleged infringer 'knowingly induced infringement and possessed specific intent to encourage another's infringement.'"[99]

### K.    Inequitable Conduct

---

[95]     *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379 (Fed. Cir. 2007).

[96]     *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001).

[97]     *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 850-51 (Fed. Cir. 2010).

[98]     *Id.* at 851 (quoting 35 U.S.C. § 271(c)).

[99]     *Id.* (quoting *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005)).

As the Federal Circuit stated in *Therasense, Inc. v. Becton, Dickinson & Co.*, "[i]nequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent."[100]  Due to its far-reaching consequences, a finding of inequitable conduct "is the 'atomic bomb' of patent law."[101]  It is for this reason that counterclaims of inequitable conduct have become "a common litigation tactic" — claims are "routinely brought on 'the slenderest grounds'"[102] and have "plagued not only the courts but also the entire patent system."[103]

All individuals associated with the filing and prosecution of a patent are under a duty to disclose to the patent examiner all information material to the patentability of the claimed invention.  This duty does not extend, however, to prior art already considered by or known to the patent examiner,[104] who is deemed to have considered a reference listed in a search report if she initials the search history containing the reference, or the actual reference itself in the search

---

[100]    *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011).

[101]    *Id.* at 1288 (quoting *Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, 525 F.3d 1334, 1349 (Fed. Cir. 2008)).

[102]    *Id.* at 1289 (quoting *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988)).

[103]    *Id.*

[104]    *See* 37 C.F.R. § 1.56.

history.[105]

A party that brings a claim of inequitable conduct based on non–disclosure of prior art must present "clear and convincing evidence . . . that the applicant *made a deliberate decision* to withhold a *known* material reference."[106]  Materiality and intent are separate requirements.  With regards to intent, the Federal Circuit has explained:

> Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence. However, to meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence.   Indeed, the evidence must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances.   Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found.[107]

Materiality is generally determined on a but-for basis — an inequitable conduct claim will fail unless "the [United States Patent and Trademark Office ("PTO")] would not have allowed a claim had it been aware of the undisclosed prior art."[108]

---

[105]   *See Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1235-36 (Fed. Cir. 2003).

[106]   *Id.* at 1290 (emphasis in original).

[107]   *Id.* at 1290-91 (emphasis in original) (quotations and citations omitted).

[108]   *Id.* at 1291.

-28-

However, "[w]hen the patentee has engaged in affirmative acts of egregious misconduct," the misconduct is itself material, and the accused infringer need not establish but-for materiality.[109]  This is because "a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that the falsehood will affect issuance of the patent."[110]

## V.   DISCUSSION

### A.   Unfair Competition and False Designation of Origin Under the Lanham Act

#### 1.   Trade Dress

##### a.   Descriptions of the Claimed Trade Dress

Medisim defines its trade dress as its unique product configuration and distinctive packaging design.[111]  Medisim describes its product configuration as:

> [A] predominantly white teardrop[-]shaped device with light blue accents surrounding the elongated probe, and a body in an oval shape on which is centered a square LCD display, with a light

---

[109]   *Id.* at 1292 (finding that "an unmistakably false affidavit" was an affirmative act of egregious misconduct).

[110]   *Id.*

[111]   *See* Memorandum of Law in Opposition to BestMed's Motion for Summary Judgment ("Pl. Mem.") at 1.

-29-

blue on/off switch positioned above the LCD display.[112]

BestMed's forehead thermometer also contains these features.

Medisim also identifies two packaging designs which it asserts are distinctive and unique to forehead thermometers. The first is the packaging in which the digital temple thermometer was sold in CVS stores. Medisim describes its features as follows:

> [On the front] a rectangular box with a device-shaped cutaway covered by clear plastic to facilitate display of the device inside; the name of the product displayed in the upper left hand corner and a banner in the upper right hand corner bearing the word "NEW!" in red with a yellow background; a red band below this text that is pierced by the tip of the probe; promotional information about the product displayed to the right of the device cutaway; and a picture of a child having temperature taken with the device in the bottom right hand corner; [On the back] the name of the product displayed along the top; a rectangular graphic displaying and describing the function of the device; and a recitation of how to use the device corresponding to a labeled photograph of the device.[113]

In addition, the package displays "CVS Pharmacy" in red lettering on a white background on the top left corner of both the front and the back. The second packaging design Medisim identifies as distinctive is the packaging in which the thermometer was sold in Rite Aid pharmacies. Medisim describes its features as

---

[112]   *Id.*

[113]   *Id.* at 2.

follows:

> [On the front] a clear plastic clamshell box having an arch-shaped top, a protruding semicircular base that does not support the device, and a device-shaped recess that displays the device positioned at a 45° angle; the name of the product displayed in the upper right hand corner at a slight upward angle over a similarly oriented rainbow-spectrum band; and the protruding semicircular base displaying promotional language; [On the back] the name of the product in the upper right hand corner at a slight upward angle over a similarly oriented rainbow-spectrum band stating "Non-Invasive;" a rectangular graphic displaying and describing the function of the device; a recitation of how to use the device corresponding to a labeled photograph of the device; and two pictures of a child having temperature taken with the device in the bottom right hand corner.[114]

In addition, the package displays the Rite Aid logo on the top left corner of both the front and back.  In both cases, the packaging in which BestMed sold K-Jump-manufactured thermometers to CVS and Rite Aid respectively contains all of the features articulated by Medisim and has a strikingly similar overall look and appearance.

BestMed asserts that throughout the litigation, Medisim "ignored [its] duty" to articulate the features of its product and packaging that it alleges are distinctive.[115]  BestMed argues that Medisim's articulation of these features in its

---

[114]    *Id.* at 3.

[115]    BestMed, LLC's Reply Memorandum of Law in Support of Its Motion for Summary Judgment ("Def. Reply Mem.") at 1.

opposition to summary judgment is untimely, and that because Medisim failed to describe its allegedly protectable interest sooner, I should ignore its attempts to do so now.  If BestMed believed Medisim's trade dress claims were legally deficient because they were too vague, then BestMed could have moved to dismiss these claims.  Instead, BestMed waited until summary judgment to raise this challenge. BestMed argues that by waiting until the close of discovery to articulate a protectable interest, Medisim "unfairly deprive[d] BestMed of fact and expert discovery on the previously unidentified features."[116]  Yet the lack of fact and expert discovery on these features is a greater impediment to Medisim than BestMed — *Medisim* carries the burden of proving that these features are distinctive, non-functional, and likely to cause confusion.

### b.    Evidence of Distinctiveness

Medisim argues that because its product packaging is inherently distinctive, it is not required to prove secondary meaning in order to obtain protection.[117]  The Second Circuit has explained that because "the varieties of labels and packaging available to wholesalers and manufacturers are virtually unlimited . . . a product's trade dress typically will be arbitrary or fanciful and meet

---

[116]     *Id.*

[117]     *See* Pl. Mem. at 3.

the inherently distinctive requirement for § 43(a) protection."[118]  Still, the Second

Circuit cautioned that this principle "is [not] hard and fast, and analysis will always

require a look at the product and the market in which it competes."[119]  BestMed

asserts that Medisim has skipped this step — that because Medisim has not

provided an analysis of its product packaging's features relative to the marketplace,

it has failed to provide sufficient evidence from which a jury could conclude that

its trade dress is inherently distinctive.[120]  In support of this, BestMed cites *Mana*

*Products, Inc. v. Columbia Cosmetics Manufacturing, Inc.*, in which the Second

Circuit allowed that "where it is the custom in a particular industry to package

products in a similar manner, a trade dress done in that style is likely to be

generic."[121]  *Mana Products* is easily distinguishable, however, in that the trade

dresses at issue were black square/rectangular cosmetic compacts which the

Second Circuit described as "well-established industry custom"[122] for which the

---

[118]    *Fun-Damental Too*, 111 F.3d at 1000 (citing *Mana Prods.* 65 F.3d at 1069).

[119]    *Landscape Forms*, 113 F.3d at 379.

[120]    *See* Def. Reply Mem. at 3.

[121]    *Mana Prods.*, 65 F.3d at 1069-70.

[122]    *Fun-Damental Too*, 111 F.3d at 1000.

design possibilities were "limited" and "commonplace."[123] Here, a virtually

infinite array of colors, shapes, and text descriptions were available to both

BestMed and Medisim.[124]

Still, there is a fatal defect in Medisim's trade dress claim:  the

fundamental test of distinctiveness is whether a trade dress "'serves to identify its

particular source.'"[125]  Medisim's packaging does not identify Medisim as the

source of the digital thermometer — indeed, Medisim is not mentioned anywhere

on the package.  Although in some instances a mark identifying goods as

emanating from a particular anonymous source may be entitled to protection,[126]

---

[123]     *Mana Prods.*, 65 F.3d at 1069-70.  *Accord Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993) (noting that soda industry practice would render green cans generic for the purpose of packaging lime-flavored soda).

[124]     *See Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 405 (S.D.N.Y. 2011) (finding that the packaging for a children's thermometer was inherently distinctive).

[125]     *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) (quoting *Two Pesos*, 505 U.S. at 768).

[126]     *See W.W.W. Pharm. Co. v. Gillette, Co.*, 984 F.2d 567, 572 (2d Cir. 1995) (noting that an assessment of a mark's strength should focus on "'the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, *although possibly anonymous source*.'") (quoting *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979) (emphasis added)).

Medisim's packaging *does* identify a brand: CVS, Rite Aid, or another retailer.[127]

Medisim has provided no evidence that consumers are aware of or care about the

identity of those who *manufacture* products carrying CVS or Rite Aid labels.[128]

Nor has Medisim cited any cases in which a manufacturer's trade dress was held to

be entitled to Lanham Act protection notwithstanding that the trade dress identified

the retailer and not the manufacturer.[129]

---

[127]   *Cf. Tecnimed SRL*, 763 F. Supp. 2d at 404-09 (holding that a thermometer manufacturer was likely to succeed in its trade dress claim against a former distributor because the manufacturer had identified both a protectable interest and a likelihood of confusion in its trade dress *that identified the manufacturer and not a retailer*).

[128]   Medisim also implies that CVS, Rite Aid, and other potential retailers might actually be the "consumers" in question.  In support of this, Medisim offers some evidence indicating that retailers might have been confused as to the source of the thermometers.  *See* Medisim's Local Rule 56.1(b) Response to BestMed's Local Rule 56.1(a) Statement of Undisputed Material Facts ("Medisim Resp. 56.1") ¶¶ 3, 6.  However, to sustain a Lanham Act claim based on this argument, Medisim must offer evidence that the product shape and/or packaging acquired secondary meaning to the *retailers*.  Medisim has failed to offer evidence that the retailers knew who Medisim was or identified the packaging/product shape of Medisim's thermometer with a particular source (other than, perhaps, BestMed).

[129]   The claimed mark is "descriptive" in that it "tells something about a product, its qualities, ingredients or characteristics" or "point[s] to a product's intended purpose, its function or intended use, its size, or its merit."  *See Gruner + Jahr*, 991 F.2d at 1076.  While "[a] descriptive mark is entitled to protection upon proof that it has obtained a secondary meaning, that is to say, an identity that consumers associate with a single source, even though the source itself may be unknown," a plaintiff must still offer proof that the mark "has become identified — as well as being described — as originating from a single source."  *Id.*  Medisim offers no evidence that consumers identified its claimed trade dresses as

With regard to the product configuration, Medisim argues that its trade dress has secondary meaning, rather than being inherently distinctive.[130] While several of the six factors relevant to whether a trade dress has acquired distinctiveness through secondary meaning weigh in Medisim's favor,[131] the same defect persists:  Medisim has provided no support for its contention that its trade dress is entitled to protection even though it identifies the retailer rather than Medisim.  Medisim has failed to provide any consumer studies linking the mark to it, and it is difficult to envision how consumers would identify the packaging with an unidentified manufacturer.[132]

Because Medisim has failed to define a protectable interest under the Lanham Act, I need not consider likelihood of confusion or the functionality of the

---

originating from a single manufacturer.  On the contrary, each claimed trade dress identified a retailer, and each identified a *different* retailer (and thus, a different potential source for the same thermometer).

[130]     *See* Pl. Mem. at 4.

[131]     Medisim provides evidence of commercial success, advertising expenditures, and BestMed's allegedly intentional copying of the packaging.  *See id.* at 4-5.

[132]     Presumably retailers either knew who manufactured the thermometers they sold or they did not care who was the source of BestMed's thermometers.  Medisim has offered no evidence — and no reason to believe — that the retailers made purchasing decisions based on the shape or packaging of individual units.

trade dresses' features.[133]  Accordingly, Medisim's Lanham Act claims based on

their product configuration and packaging are dismissed.[134]

### 2.    The CVS SKU

At the pre-motion conference, Medisim identified the CVS SKU as a

protectable interest.  BestMed articulated a number of reasons why an SKU is

neither inherently distinctive nor a protectable interest under the Lanham Act.[135]

Medisim did not respond directly to these arguments, and only referred to the SKU

as evidence of BestMed's intentional copying.[136]  Because Medisim has offered no

---

[133]    This assumes that consumers are those that Medisim alleges are likely
to be confused.  If Medisim is actually pursuing a Lanham Act claim on the basis
that *retailers* might be confused, its claim is also deficient for two reasons: (1) it
has never claimed that the retailers were confused; and (2) it has offered no proof
of actual confusion or the likelihood of confusion of retailers.  "Retailers are
assumed to be more sophisticated buyers and thus less prone to confusion."
*W.W.W. Pharm. Co.*, 984 F.2d at 575-76.

[134]    *See Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 137 (2d Cir. 1992)
("Where there is no actual secondary meaning in a trade dress, the purchasing
public simply does not associate the trade dress with a particular producer.
Therefore, a subsequent producer who adopts an imitating trade dress will not
cause confusion, mistake, or deception as to the 'origin, sponsorship, or approval'
of the goods. Second, a junior producer's use of imitating trade dress bears no
'false designation of origin' because, in the absence of secondary meaning in the
senior producer's trade dress, the imitating trade dress suggests no particular origin
to the consuming public.").

[135]    *See* BestMed, LLC's Memorandum of Law in Support of Its Motion
for Summary Judgment ("Def. Mem."), at 5-6.

[136]    *See* Pl. Mem. at 5.

evidence either that its SKU is either a protectable interest or that BestMed's use of the same SKU is likely to lead to consumer confusion, any trade dress claim based on the SKU is dismissed.

### B.    Unfair Competition Under New York Common Law

The lack of evidence of secondary meaning is not fatal to Medisim's common law trade dress claim.  However, in addition to likelihood of confusion, Medisim must also provide evidence of bad faith.[137]  BestMed argues that Medisim never pled a New York common law trade dress infringement claim, and cannot add such a claim now.  However, the Complaint did include a claim for unfair competition under New York common law, and it did allege all of the elements of trade dress infringement under New York law.[138]  As trade dress infringement is a species of unfair competition, Medisim has sufficiently pled this cause of action.

### 1.    Likelihood of Confusion

Medisim has no evidence to support findings in its favor for several of the *Polaroid* factors, in  particular the strength of its mark and the quality of

---

[137]    *See Laureyssens*, 964 F.2d at 139 ("[U]nder the New York common law of unfair competition, a plaintiff need not establish secondary meaning in order to prevent a competitor from using a confusingly similar trade dress where the competitor is engaged in palming off, actual deception, appropriation of the plaintiff's property, or deliberate copying of a trade dress.").

[138]    *See* Complaint ¶¶ 61-64.

BestMed's product.  However, Medisim has provided evidence supporting findings

that: (1) there is a high degree of similarity between Medisim's trade dress and

BestMed's trade dress;[139] (2) the products are in competitive proximity;[140] (3) the

gap has been bridged;[141] and (4) BestMed acted with bad faith.[142]   BestMed argues

that because Medisim's expert on likelihood of confusion was excluded, Medisim

cannot demonstrate actual confusion.  Even if BestMed is correct,[143] actual

confusion is only one of the *Polaroid* factors, and the Second Circuit has

---

[139]     *See* Pl. Mem. at 2-3.

[140]     *See* Medisim Resp. 56.1 ¶¶ 7, 8.

[141]     *See id.*

[142]     *See infra* Part V.B.2.

[143]     Medisim asserts that even without the survey generated by its
likelihood of confusion expert, it has evidence of actual confusion.  *See*
Declaration of John Wilson [president of Medisim U.S.A.] in Opposition to
Defendant BestMed's Motion for Summary Judgment, Ex. R to Affirmation of
Keith J. McWha in Support of Memorandum of Law in Opposition to Motion for
Summary Judgment ("McWha Aff."), ¶ 14 ("I further am personally aware of an
incidence of actual confusion regarding a buyer at Walmart confusing the Medisim
product with the BestMed product. On or about August 2008, I presented a
Walmart buyer, now VP of Purchasing (Mr. Yale Martin), with the Medisim
forehead thermometer. In response, Mr. Martin stated that he had 'seen this device
before.' At that time, the only other supplier of a temple forehead thermometer
using a similar product configuration and packaging was BestMed. I later came to
learn that Walmart purchased the BestMed product instead of the Medisim
product."); Deposition of Moshe Yarden, Medisim's 30(b)(6) designee, Ex. K to
McWha Aff., at 179:3-182:1 ("I mean, we are coming to customers asking them
about this product and saying, ooh, we didn't know that this is your product. Oh,
just a second, we just saw another product, it's pretty similar.").

repeatedly stated that no one factor is dispositive.[144]  Accordingly, Medisim has

offered sufficient evidence from which a jury could conclude that there is a

likelihood of confusion between its trade dress and BestMed's.

### 2.    Bad Faith

Medisim offers the following evidence of BestMed's bad faith: (1)

testimony from BestMed that it desired the shape and packaging of the K-Jump-

manufactured thermometers to appear similar to the shape and packaging of

Medisim's product;[145] (2) testimony from BestMed that it asked K-Jump to copy

the exact "beep sequence" of the Medisim device;[146] (3) testimony from BestMed

that it sent K-Jump an instruction manual from a Medisim thermometer so that it

---

[144]    *See Nora Bevs., Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 119
(2d Cir. 2001); *Streetwise Maps*, 159 F.3d at 743.

[145]    *See* Deposition of Stanley Cohen, BestMed's CEO  ("Cohen Dep."),
Ex. F to McWha Aff., at 210:17-25 ("Q. And you further state we need -- 'We'll
need to make a running change with our customers so that product and the
packaging can't look too different from our current model.' Do you see that? A.
Yes, correct. Q. And the current model is the Medisim product; is that right? A. It's
the Medisim product that we were selling, yes."), 267:9-12 ("Q. But the desire was
to keep it as similar as possible rather than create new packaging; is that right? A.
Yes.").

[146]    *See id.* at 214:2-5 ("Did BestMed indicate to K-Jump that it should
have the same number of beeps for the K-Jump product as for the Medisim
product? A. Yes, we requested that.").

could closely copy the device's operation;[147] and (4) BestMed's use of the same SKU to sell its thermometer to CVS.  In sum, there is sufficient evidence from which a jury could conclude that the similarities between Medisim's device/packaging and K-Jump's device/packaging were a result of BestMed's direct and intentional efforts.  Accordingly, summary judgment on Medisim's New York unfair competition/trade dress claim is denied.

### C.   False Advertising Under the Lanham Act

#### 1.   Standing

To demonstrate standing under the Lanham Act, Medisim must articulate both a reasonable interest to be protected and a reasonable basis for believing that this interest will be damaged by BestMed's allegedly false advertising.[148]  Medisim argues that its "reasonable interest[s] to be protected" are: (1) its "commercial and pecuniary interests in selling its products"; and (2) "maintaining its commercial reputation."[149]  Potential future sales are a reasonable

---

[147]    *See* Deposition of Michael Edmonds, BestMed's 30(b)(6) designee, Ex. G to McWha Aff., at 132:3-6 ("Q. You sent the instruction book so that K-Jump would design the product to operate in the same way as the Medisim product; is that right? A. Very similar, yes.").

[148]    *See supra* Part IV.C.

[149]    Pl. Mem. at 11.

interest.[150]  However, because Medisim has no name recognition in the consumer market and its name does not appear on its own trade dress, it has no commercial reputation to be damaged.

Medisim argues that it has a reasonable basis to believe that BestMed's allegedly false advertising will result in damage to Medisim's reputation "because a customer who purchases Medisim's device expects to receive Medisim's high quality product, not BestMed's inferior Accused Device."[151]  This argument is misguided for four reasons.  *First*, Medisim has not provided evidence that it has *any* reputation in the marketplace, let alone a reputation for "high quality product[s]."  *Second*, Medisim has offered no evidence that purchasers of thermometers are repeat customers such that past experiences with products are likely to affect future purchasing decisions.  *Third*, in arguing that dissatisfaction with a BestMed thermometer is likely to impact a consumer's impression of Medisim, Medisim is effectively arguing that there is a likelihood of confusion.  But this is not a false advertising argument.  Rather, it is a backdoor attempt to introduce a trade dress argument.  *Fourth*, Medisim has offered no

---

[150]     *See ITC Ltd.*, 482 F.3d at 169 (finding that "commercial interests, direct pecuniary interests, and even a future potential for a commercial or competitive injury" may satisfy the "reasonable interest" prong).

[151]     Pl. Mem. at 11.

evidence that BestMed's product is inferior.[152]

Aside from its reputational concerns, Medisim also argues that it has a reasonable basis to believe that BestMed's allegedly false advertising will harm its commercial interests by causing it to lose potential sales.  However, the evidence Medisim provides pertains only to potential lost sales stemming from a "likelihood of confusion between Medisim's thermometer and the Accused Device."[153]  This is effectively another trade dress argument, not a false advertising one. And because the allegedly false advertising is "non-comparative" in that it "tout[s] the benefits of the product advertised but ma[kes] no direct reference to any competitor's product," Medisim must offer some evidence of "'actual injury and causation.'"[154] As Medisim has failed to do so, it lacks standing to bring a Lanham Act false advertising claim.

### 2.    Falsity and Likelihood of Misleading Consumers

---

[152]    For evidence of inferiority, Medisim points to testimony that the return rate for K-Jump-manufactured thermometers was greater than the return rate for Medisim-manufactured thermometers.  The cited testimony supports the opposite conclusion.  *See* Cohen Dep. at 275:24-276:10 ("Q.  And do you know whether [the return rate for the Medisim digital temple thermometer] was greater or less than the return rate for the K-Jump products that you were selling[?] A.  I believe it was greater.").

[153]    *See* Medisim Resp. 56.1 ¶¶ 35, 41.

[154]    *Time Warner Cable*, 497 F.3d at 162 (quoting *McNeilab*, 848 F.2d at 38).

-43-

Assuming *arguendo* that Medisim had standing to bring its false advertising claim, it must offer evidence that BestMed's allegedly false advertisement was either literally false or likely to mislead consumers. The only statement that Medisim identifies as a false advertisement is BestMed's statement that its thermometer "rapidly tracks heat flow."[155]

When BestMed distributed Medisim's thermometer, it used the same "rapidly tracks heat flow" phrasing on its packaging. Medisim asserts that this phrase described the "heat flux" method performed by the two-sensor Medisim device. Although BestMed's K-Jump-manufactured device has one sensor and does *not* perform a "heat flux" calculation, its package *also* proclaims that it "rapidly tracks heat flow." Medisim argues that because "rapidly tracks heat flow" is synonymous with "performs a heat flux calculation," BestMed's advertising statement is literally false.[156] BestMed, in turn, argues that Medisim has no evidence or expert analysis supporting its assertion that the statements *are* synonymous.

Even were BestMed's statement literally false, Medisim would still need evidence that it was *material*, *i.e.* that it was likely to influence purchasing

---

[155]   Pl. Mem. at 12.

[156]   *See id.*

-44-

decisions.[157]  Medisim has offered no evidence that consumers are more likely to

purchase thermometers that "rapidly track heat flow" than those that do not.  Nor

has Medisim provided evidence that consumers view that statement as synonymous

with performing a heat flux calculation (let alone that consumers know or care

what a heat flux calculation is).  In sum, Medisim has failed to provide evidence

that BestMed's statement is false in a way that is likely to influence consumer

behavior.[158]

### D.     False Advertising and Deceptive Acts Under New York Law

New York GBL sections 349 and 350 are consumer-oriented statutes.

Medisim's claims under both statutes fail because "'the gravamen of [its]

---

[157]     *See National Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855
(2d Cir. 1997) ("[I]n addition to proving falsity, the plaintiff must also show that
the defendants misrepresented an 'inherent quality or characteristic' of the product.
This requirement is essentially one of materiality, a term explicitly used in other
circuits.") (citations and quotation marks omitted); *American Tel. & Tel. Co. v.
Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1428 n.9 (3d Cir. 1994)
(plaintiff alleging false advertising must prove "that the deception is material in
that it is likely to influence purchasing decisions"); *Taquino v. Teledyne Monarch
Rubber*, 893 F.2d 1488, 1500 (5th Cir. 1990) (deception must be "material, in that
it is likely to influence the purchasing decision").

[158]     Medisim argues that it need not prove literal falsity because it can
prove that the "rapidly tracks heat flow" statement is likely to mislead consumers
into believing they are purchasing Medisim's product.  *See* Pl. Mem. at 13 (citing
*Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, No. 10 Civ. 3998, 2012 WL
3526611, at *15 (S.D.N.Y. Aug. 14, 2012).  As discussed above, this is either a
backdoor trade dress infringement argument or an argument that Medisim's
reputation may be damaged by BestMed's actions.

complaint'" is its harm to Medisim's interests, not "'consumer injury or harm to the public interest.'"[159] Although Medisim made no mention of consumer injury or public harm in its Complaint, it now argues that such harm will result if consumers are misled into buying BestMed's product when they really desire Medisim's product.  Even if Medisim has proof of this contention, it would be insufficient as section 350 requires "'substantial injury to the public *over and above ordinary trademark infringement*.'"[160]  Medisim also speculates that public harm will result if consumers are misled "into buying an inferior thermometer that *may* pose a risk to consumer safety."[161]  Medisim's speculation is not evidence, and Medisim's lack of proof of public harm is fatal to its section 349 and 350 claims, both of which are dismissed.

### E.    Unjust Enrichment

---

[159]    *Securitron Magnalock*, 65 F.3d at 264 (quoting *Azby Brokerage*, 681 F. Supp. at 1089 n.6).

[160]    *Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accesories Ltd.*, No. 07 Civ. 6959, 2009 WL 4857605, at *8 (S.D.N.Y. Dec. 14, 2009) (quoting *National Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 486-87 (S.D.N.Y. 2002)) (emphasis in original).  Medisim cites *Kuklachev v. Gelman*, 600 F. Supp. 2d 437, 476 (E.D.N.Y. 2009) for the proposition that public harm results when consumers are misled.  In *Kuklachev*, the district court declined to dismiss plaintiffs' claims because plaintiffs had pled that the misled customers were dissatisfied.  Here, Medisim offers no evidence that customers have been misled, let alone that misled customers were harmed.

[161]    Pl. Mem. at 14 (emphasis added).

-46-

An unjust enrichment claim requires only that defendant was enriched at plaintiff's expense, and that it would be inequitable to allow defendant to retain the proceeds.  Medisim has presented enough evidence to survive summary judgment on its unjust enrichment claim.  BestMed's sole argument in opposition is that the claim must be dismissed because it is "merely a catch-all for [Medisim's] other causes of action" and therefore preempted.[162]  Where a party's unjust enrichment claim is merely duplicative of its copyright infringement cause of action, it is preempted.[163]  However, the Lanham Act does *not* preempt state law.[164]  Hence, even if Medisim's unjust enrichment claim duplicates its Lanham act claims — Medisim argues that it does not — dismissal of Medisim's unjust enrichment claim is not warranted.

---

[162]     Def. Reply Mem. at 7.

[163]     *See Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (dismissing a plaintiff's unjust enrichment claim where the second and third elements of the claim would constitute copyright infringement).

[164]     *See MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ. 1615, 2012 WL 1107648, at *24 (S.D.N.Y. Mar. 30, 2012) ("Unlike the Copyright Act, however, the Lanham Act does not preempt state law. [Plaintiff]'s unjust enrichment claim is thus not preempted to the extent that it asserts [Defendant]'s violation of [plaintiff]'s trademark rights.").  *Accord 20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 747 F.2d 81, 92 n.15 (2d Cir. 1984) ("[S]ection 43(a) created a new federal statutory tort and made pre-Lanham Act decisions based on the federal common law of unfair competition persuasive, even if not controlling. On this basis we see no reason for the district court not to apply the New York state law of unfair competition.").

### F.    Availability of Statutory Damages

Medisim's copyright registration claims a first publication date of July 1, 2005.[165]  The allegedly infringing work was published in May 2009, and Medisim registered its work on December 2, 2009.[166]  Thus, even if BestMed's thermometer instructions infringe on Medisim's thermometer instructions, the infringement commenced after first publication of the work, but before the registration of the work.  Because the registration was made more than three months after the first publication of the work, neither statutory damages nor attorney's fees are available to Medisim.[167]  BestMed also now argues that Medisim has no evidence that it is entitled to compensatory damages.[168]  I decline to consider this argument as BestMed is making it for the first time in its reply brief, and Medisim has not had the opportunity to respond.[169]  In sum, BestMed's

---

[165]    *See* BestMed 56.1 ¶ 54.

[166]    *See id.* ¶¶ 55, 56.

[167]    *See* 17 U.S.C. § 412.  Medisim now concedes that it is not entitled to attorney's fees on its copyright claim.  *See* Pl. Mem. at 15 n.15.

[168]    *See* Def. Reply Mem. at 7 n.5.

[169]    Further, even if Medisim is not entitled to damages on its copyright claim, it may still be entitled to injunctive relief.  *See Arista Records LLS v. Lime Group LLC*, No. 06 Civ. 5936, 2010 WL 6230927, at *5 (S.D.N.Y. Dec. 28, 2010) ("'there are some remedies available to a plaintiff even against infringements that began before registration, including injunctive relief and actual damages.  Statutory damages and attorney's fees, however, were meant by Congress to reward prompt

claim for statutory damages and attorney's fees is dismissed.

### G.    Provisional Rights

BestMed argues that because the Complaint includes no prayer for relief under section 154(d)(2) of Title 35 of the United States Code, Medisim's provisional rights claim should be denied.[170]  Medisim's failure to specifically reference section 154(d)(2) in the prayer for relief is immaterial, as it is well-settled that "final judgment shall grant all the relief to which a plaintiff is entitled, whether or not demanded in [its] pleadings."[171]

BestMed argues that the '710 application is not substantially identical to the '668 Patent, and that Medisim is therefore not entitled to provisional rights. BestMed refers to "numerous amendments," but gives only one example: the removal of the phrase "using a function comprising time-dependent parameters" from independent claims 1 and 21, and the addition of that phrase to dependent claims 36 and 37.[172]  BestMed asserts that this change necessarily broadened the

---

registration and cannot be made available in violation of that intent to the plaintiff who fails to act promptly.'") (quoting *Love v. City of New York*, No. 88 Civ. 7562, 1989 WL 140578, at *2 (S.D.N.Y. Nov. 17, 1989)).

[170]    *See* Def. Mem. at 13.

[171]    *Fanchon & Marco v. Paramount Pictures*, 202 F.2d 731, 734 (2d Cir. 1953).  *Accord* Fed. R. Civ. P. 54(c).

[172]    *See* BestMed 56.1 ¶¶ 58-67.

scope of the patent because dependent claims are presumed to be narrower than independent claims.[173]  What BestMed failed to mention is that claims 1 and 21 still require the determination of "time-dependent parameters" and refer to conducting calculations based on those parameters.[174]  Medisim argues that the deletions were made to reduce redundancy and — given the ongoing presence of language concerning "time-dependent pararemeters" — did not affect the scope of the claims.  Medisim is correct, and I construe both the '710 application and the '668 Patent as requiring that a thermometer use time-dependent parameters to calculate a local temperature.  Because BestMed has not demonstrated any way in which the '710 application is not substantially identical to the '668 Patent, Medisim may be entitled to damages during the provisional rights period.

## H.   Patent Validity

The asserted claims require the calculation of both deep tissue temperature and core body temperature using temperature readings from "one or more temperature sensors."[175]  In my *Markman* opinion, I construed this phrase to

---

[173]    *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) ("[A] dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

[174]    *See* '668 Patent, col. 10 ll. 9-18, col. 11 ll. 30-41.

[175]    *Id.* col. 10 ll. 9-18, col. 11 ll. 30-38.

-50-

mean "one or more thermistor or resistance temperature defectors (RTDs), or any form of thermistor, temperature sensor, or thermocouple."[176]  BestMed asserts that because the '668 Patent fails to teach the use of a *single* temperature sensor to calculate deep tissue and core body temperature without undue experimentation, the '668 Patent does not enable the *full* scope of its claims and is invalid. However, BestMed cannot win summary judgment unless it meets its "evidentiary burden to show facts supporting a conclusion of invalidity [by] clear and convincing evidence."[177]

The only specific algorithm referred to by the '668 Patent for calculating deep tissue temperature is in U.S. Patent 6,280,397 ("the '397 Patent"). The '668 Patent's reference to the '397 Patent explicitly allows for the possibility that the algorithm might utilize readings from only one sensor:

> The '397 algorithm is based on solving a heat conduction equation by utilizing multiple temperature readings, preferably, *though not necessarily*, from more than one sensor.  Alternatively, algorithms based on prediction and/or heat conduction may be used to determine the local temperature from sensor temperature readings.[178]

---

[176]    *Markman* Op., 2011 WL 2693896, at *11.

[177]    *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1377 (Fed. Cir. 2007) (citing *AK Steel*, 344 F.3d at 1238-39).

[178]    '668 Patent col. 6 ll. 62-67.

In the next column, the '668 Patent makes this more explicit by stating that "[a]lternative empirical formulas may be derived . . . for probes with one sensor."[179]   BestMed argues that these general suggestions that one *could* develop an algorithm are insufficient — that the full scope of the claim is not enabled because the patent does not give any guidance as to *how* to derive an algorithm for a probe with one sensor.  The relevant question is whether one reasonably skilled in the art could derive such an algorithm without undue experimentation.[180]

In support of its argument that undue experimentation would be required, BestMed offers evidence pertaining to several of the *Wands* factors.[181]  Specifically, BestMed offers evidence that: (1) a great deal of experimentation would be necessary[182] (relevant to *Wands* factor 1 — "the quantity of experimentation necessary"); (2) the '668 Patent gives little guidance as to how one would derive an empirical formula for a thermometer with one sensor[183] (relevant to *Wands* factor 2 — "the amount of direction or guidance presented"; (3) the '668 Patent does not provide any working examples of a thermometer using

---

[179]   *Id.* col. 7 ll. 19-21.

[180]   *See Automotive Techs.*, 501 F.3d at 1282.

[181]   *See supra* Part IV.I; *Wands*, 858 F.2d at 737.

[182]   *See* BestMed 56.1 ¶¶ 106-108.

[183]   *See id.* ¶¶ 75-80; *Automotive Techs.*, 501 F.3d at 1284-85.

one sensor to calculate deep tissue temperature[184] (relevant to *Wands* factor 3 — "the presence or absence of working examples"); and (4) the prior art fails to teach how to use a single sensor to determine deep tissue temperature[185] (relevant to *Wands* factor 5 — "the state of the prior art").

There is still a disputed issue of fact, however, for three reasons: (1) BestMed faces a very high evidentiary burden, and even though Goldberg — BestMed's expert — may testify on enablement, Medisim may ultimately discredit that testimony on cross-examination; (2) Yarden — the inventor of the '668 Patent — may testify on enablement; and (3) Lipson — Medisim's expert — may offer his opinion that the '668 Patent enables the full scope of its claims.

Goldberg's opinion that undue experimentation is required does not provide clear and convincing evidence of enablement.  In denying Medisim's motion to strike portions of Goldberg's report, I noted:

> The fact that Goldberg relied on arguably outdated materials provided to him by BestMed does not mean that he used unreliable methods.  Instead, it indicates that his ultimate conclusions may be incorrect.  Such a concern, however, goes to the weight to be accorded an opinion, not to its admissibility. Medisim can fully address its concerns regarding this portion of Goldberg's report on cross-examination, but it will not be stricken

---

[184]    *See* Def. Mem. at 17-18 (citing BestMed 56.1 ¶¶ 79, 80).

[185]    *See* BestMed 56.1 ¶¶ 84-86.

on this motion.[186]

In light of this, it would be inappropriate to grant summary judgment on enablement and deprive Medisim of the opportunity to argue that Goldberg's opinion should be accorded little weight.

BestMed contends that Yarden's testimony on enablement is impermissible expert opinion.[187]  However, inventors may testify about matters within their personal knowledge, even if those matters touch upon technical issues.[188]  At the pre-motion conference, I clarified that while Yarden cannot offer an expert opinion, he can offer testimony on enablement:

> [BestMed] says it is an opinion [Yarden] can't give.  I'm not so sure it is an opinion.  He is the inventor, he can talk about the ability to enable what he writes to practice, to reduce it to practice. That's all enablement is, isn't it?  He can say that is . . . not an opinion, that sounds like a fact.[189]

---

[186]    *Daubert* Op., 861 F. Supp. 2d at 171-72.

[187]    *See* Def. Mem. at 12-13.

[188]    *See Gart v. Logitech, Inc.*, 254 F. Supp. 2d 1119, 1123 (C.D. Cal. 2003); *iRise v. Axure Software Solutions, Inc.*, No. 08 Civ. 3601, 2009 WL 3615075, at *30 n.10 (C.D. Cal. Sept. 11, 2009) ("'[C]ourts regularly allow lay witnesses,' specifically the creators of particular products or inventions, to 'testify with regard to their personal knowledge of [the] particular invention.'") (quoting *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. 03 Civ.1431, 2006 WL 1330002, at *3 (N.D. Cal. May 15, 2006)).

[189]    6/29/12 Hearing Tr., at 28:1-6.

-54-

In his declaration, Yarden offers such testimony.[190]

In my *Daubert* opinion, I held that Lipson relied on appropriate materials and applied the relevant law in reaching his conclusion that the '668 Patent enables the full scope of its claims.[191]  Between my *Daubert* and Reconsideration opinions, I conducted two full rounds of analysis of the expert reports and the parties' arguments as to why they should be excluded.  At the pre-motion conference, I made it crystal clear that I would not do a third round of *Daubert* analysis.[192]  And yet, in blatant contravention of my warning, BestMed *repeatedly* raises *Daubert* arguments,[193] while insisting that it is not.[194]  Indeed, BestMed spends fifteen of the thirty-five pages in its Memorandum of Law addressing Lipson's opinions in one way or another.

---

[190]     *See* Yarden Decl. ¶¶ 5-9.

[191]     *See Daubert* Op., 861 F. Supp. 2d at 177-78 ("BestMed's real complaint [with Lipson's enablement opinion] is that Lipson reached a different conclusion than its own expert.").

[192]     "I think the lawyers are trying to get me to do another round of *Daubert* on Lipson.  I'm not going to do it.  I'm warning you now."  6/29/12 Hearing Tr. at 30:16-18.

[193]     *See, e.g.,* Def. Mem. at 19 ("Medisim's technical expert, Dr. Lipson, simply disregards most of the *Wands* factors"); *id.* at 20 ("Lipson's reliance on the prior art to fill the gaps in the '668 Patent is improper as a matter of law."); *id.* at 26 (referring to Lipson's statement as "scientifically unreliable," his conclusion as "*ipse dixit*," and his opinions as "nothing but empty talk.").

[194]     *See* Def. Reply Mem. at 11.

BestMed appears to be either unwilling or unable to understand the combined effect of my prior rulings. In the *Daubert* opinion, the *only* portion of Lipson's report that I struck was his opinion that BestMed's KD-2201 meets the deep tissue temperature limitation of the '668 Patent.[195] I reconsidered this ruling and ultimately held that Lipson *may* testify that the KD-2201 meets the deep tissue temperature limitation of the '668 Patent, but that he may only do so on the basis of certain materials (and not on the basis of his own empirical testing).[196] The sum of these opinions is that Lipson may testify as to *all* of his conclusions. One of these conclusions is his opinion that "it would not have taken undue experimentation to develop a single sensor thermometer with a predictive algorithm using the teaching of '668 to determine a local deep tissue temperature and correcting that to estimate a core body temperature."[197]

BestMed has not come close to meeting its high evidentiary burden.

---

[195]    *See Daubert* Op., 861 F. Supp. 2d at 180. In a footnote, I also noted that this particular opinion was struck from the rebuttal report as well as the expert report. *See id.* at 178 n.148 ("As his 'deep tissue temperature' opinions in his rebuttal report are the same as those in his initial report, they are excluded for the same reasons.").

[196]    *See* Reconsideration Op., 2012 WL 1450420, at *1-2.

[197]    Rebuttal Expert Report of David Lipson, Ph.D., Ex. G. to Declaration of Brian R. Michalek in Support of Defendant's Motion for Summary Judgment, at 19.

Not only will Medisim have the opportunity to cross-examine Goldberg (BestMed's expert), but the combination of Yarden's declaration and Lipson's report are sufficient to create a material issue of fact on enablement. Accordingly, BestMed's motion for summary judgment on validity is denied.

## I.    Patent Infringement

### 1.    The Apparatus Claim

Claim 1 of the '668 Patent — the apparatus claim — requires that the device "calculate a core body temperature by correcting for a difference between the core body temperature and the deep tissue temperature."[198]  BestMed concedes that its device measures a surface temperature of the skin and calculates a body temperature based in part on the skin's surface temperature.  BestMed argues that Medisim lacks evidence that the temperature produced by the accused device is a reliable estimation or approximation of core body temperature obtained by "correcting for a difference between the core body temperature and the deep tissue temperature."[199]  In response, Medisim offers Lipson's testimony.  In my *Daubert* opinion, I ruled that Lipson *may* testify that the KD-2201 meets the core body temperature limitation of the '668 Patent, and that Lipson's testing methodology is

---

[198]    '668 Patent col. 10 ll. 16-18.

[199]    Def. Mem. at 29.

*not* flawed.[200]  BestMed responds by finely parsing the relevant claim language into three parts: (1) obtaining deep tissue temperature; (2) performing a particular type of calculation; and (3) arriving at a core body temperature.

When it derived the calculation algorithms for the accused device, K-Jump performed clinical trials in which it gathered data on measurements of subjects' skin temperature, oral temperature, and corresponding ambient temperature.[201]  BestMed asserts that core body temperature can only be measured with a pulmonary catheter, and that because it calibrated its algorithm with *oral* temperature measurements, its device does not "correct for a difference between the core body temperature and the deep tissue temperature."  In essence, BestMed is arguing that the accused device calculates only oral temperature, not core body temperature.  This is a distinction without a difference.  In my *Markman* opinion, I defined "calculation" as "using a computation to estimate, approximate, predict or determine."[202]  Medisim has offered ample evidence that oral temperature *is* an approximation of core body temperature.[203]  In arguing that its device does not

---

[200]    *See Daubert* Op., 861 F. Supp. 2d at 176-77.

[201]    *See* BestMed 56.1 ¶¶ 127, 128.

[202]    *Markman* Op., 2011 WL 2693896, at *11

[203]    *See* Medisim Resp. 56.1 ¶¶ 130, 168, 169.

infringe the '668 Patent because it only approximates core body temperature, BestMed is ignoring the holding of my *Markman* opinion.

BestMed also implies that Lipson's expert testimony does nothing to support Medisim's infringement claim. It is undisputed that one way to obtain a deep tissue temperature is through the zero heat flux method, which requires two sensors. Lipson's opinion that it is *also* possible to measure deep tissue temperature via a thermo-equilibrium method such as that employed by BestMed's one-sensor thermometer rests on two bases: (1) his own empirical testing; and (2) the 510(k) letters.[204] In my *Daubert* rulings, I held that Lipson could offer his opinion but only based on the 510(k) letters.[205] In the 510(k) letters and in their own testimony, BestMed and K-Jump provide evidence that the K-Jump-manufactured device measures something close to deep tissue temperature, and operates in a way that is "technically identical" to Medisim's.[206] In sum, Medisim

---

[204]    *See* Reconsideration Op., 2012 WL 1450420, at *1-2.

[205]    *See id.*

[206]    Deposition of Yen-Ming Hsu, employee of K-Jump, Ex. H to McWha Aff., at 88:14-24 ("Q. And if you turn to page -- the next page, K-J 00086 in this 'Substantial Equivalence' section, it indicates that the KD-2200 product and the predicate device, that is the Medisim product, are technologically identical; do you see that? A. Yes, I see that. Q. Do you know what that means when it, when it refers to the devices as being technologically identical? A. I think it means that, likewise, you can obtain the -- your oral temperature reading by way of touch, from the temporal skin."); Medisim Resp. 56.1 ¶¶ 152-154.

has offered sufficient evidence from which a jury could conclude that the accused device infringes every limitation of claim 1 of the '668 Patent.[207]

### 2.     The Method Claim

The first step of the method detailed in Claim 21 is "applying the probe . . . to an external surface of a body of a subject."[208]   In order to directly infringe a method claim, a party must perform every claimed step.[209]   BestMed argues that because the first step is carried out by a *user* and because the remaining steps are carried out by the *thermometer's processing unit*, "no party can perform all of the claimed steps and there can be no direct infringement."[210]   Not only does this argument defy common sense, it is also unsupported by either the law or the facts.

*First*, Medisim provides direct evidence that BestMed employees

---

[207]     Because Medisim has provided sufficient evidence from which a jury could find infringement on a theory of literal infringement, I need not address BestMed's contention that Lipson's opinion does not present a limitation so as to create a triable issue of fact under a doctrine of equivalents theory.  *See Medinol Ltd. v. Guidant Corp.*, 417 F. Supp. 2d 280, 309 n.149 (S.D.N.Y. 2006) ("'[t]he doctrine of equivalents only comes into play when there is no literal infringement'") (quoting *Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 828-29 (Fed. Cir. 1984)).

[208]     '668 Patent col. 11 ll. 25-29.

[209]     *See Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993).

[210]     Def. Mem. at 31-32.

tested the accused device on themselves.[211]  Such evidence supports an inference that BestMed "applied the probe . . . to an external surface of a body of a subject," performed every step in the claimed method, and thus infringed the '668 Patent.  In addition, BestMed's *own packaging* offers an example of a BestMed representative carrying out all steps of claim 21: the packaging depicts a child applying the K-Jump-manufactured thermometer to his forehead, and the thermometer in the image is providing a reading.  This illustrates that the other steps of the claimed method have been carried out.[212]

   *Second*, even were there no evidence that BestMed directly infringed, there is evidence that it instructed its customers to do so and that it therefore may be liable for contributory infringement and induced infringement.  "[D]irect evidence of infringement, as opposed to circumstantial evidence, is not necessary[,]"[213] and Medisim has provided circumstantial evidence that customers

---

[211] *See* Cohen Dep. at 73:18-19 ("When we -- when we first received samples [of the K-Jump-manufactured thermometers], we took our own temperatures . . ."), 282:23-25 ("Q. What was your basis [for] the statement [that] it was a 'more advanced algorithm' [that the K-Jump-manufactured thermometer used]? A. Personal use of the product.").

[212] *See* Expert Report of Andrew W. Carter, Ex. C to McWha Decl., at 12.

[213] *Symantec Corp. v. Computer Assocs. Int'l Inc.*, 522 F.3d 1279, 1293 (Fed. Cir. 2008) (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986)).  This is especially the case where, as here, customers can

who bought the K-Jump-manufactured device infringed the method claims at

BestMed's direction.[214]   In sum, Medisim has not only offered evidence that

BestMed infringed claim 21, but it has also offered evidence of both contributory

and induced infringement.[215]   Accordingly, BestMed's motion for summary

judgment of non-infringement is denied.[216]

### J.   Inequitable Conduct

Medisim is moving to dismiss BestMed's claim that Medisim engaged

---

*only* use the device in an infringing matter.  *See id.*

[214]   The instructions for use that BestMed included within each package of the accused device directed customers to use the thermometer in a manner that infringed every step of claim 21.  *See* Medisim Resp. 56.1 ¶ 165.  A jury could infer from this that at least one customer infringed on the method claim.

[215]   *See supra* Part IV.J; *i4i Ltd. P'ship*, 598 F.3d at 851-52 (finding that evidence of instructions for use — coupled with expert testimony that following the instructions for use would infringe the method claim — was sufficient to support a jury verdict on inducement); *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1056-61 (Fed. Cir. 2008) (affirming a district court's determination that a set of instructions for use directing users to practice the claimed method supported a finding of inducement).

[216]   This is not a surprising result; at the pre-motion conference, I cautioned BestMed "I have already decided that [Lipson may testify that the accused device infringes the '668 Patent].  By making the decision to let him testify I have been there, done that.  I can't change my mind.  I won't change my mind.  It is not worth briefing.  I can tell you right now if you really go through with this [motion for summary judgment on Medisim's infringement claim] you're wasting your client's money.  I'm going to direct you to show this transcript to your client because I'm going to say having decided he can testify there is a disputed issue of fact and I can't revisit it."  6/29/12 Hearing Tr., at 11:17-24.

in inequitable conduct.  BestMed alleges that Yarden engaged in inequitable

conduct by: (1) not disclosing Medisim's pre-critical date[217] commercial activities

regarding the FHT-1 and FHT-2 to the PTO; (2) omitting two patents from his

Information Disclosure Statement ("IDS") to the PTO; and (3) misrepresenting the

prior art that he did disclose.  A party seeking to establish inequitable conduct

faces a heavy burden,[218] and BestMed has not provided evidence sufficient to meet

this burden with regard to any of its three allegations.

### 1.    Pre-Critical Date Commercial Activities

BestMed asserts that Medisim's FHT-1 and FHT-2 thermometers

were prior art that either fell within the claims of the '668 Patent or rendered them

obvious.  BestMed further contends that Yarden intentionally withheld information

regarding Medisim's pre-critical date sales of the FHT-1/FHT-2 devices so as to

dupe the PTO into issuing the '668 Patent.[219]  However, BestMed has failed to

provide any evidence from which a jury could reasonably infer that Yarden: (1)

---

[217]    The "critical date" before which relevant information is considered
"prior art" is one year prior to the date of the patent application.  *See* 35 U.S.C. §
102(b).

[218]    *See supra* Part IV.K.

[219]    *See* BestMed, LLC's Memorandum in Opposition to Medisim's
Motion for Summary Judgment of No Inequitable Conduct ("Def. IC Mem."), at 4-
7.

believed the FHT-1/FHT-2 were material to the '668 Patent; or (2) intentionally concealed commercial activities from the PTO.

Yarden has repeatedly and consistently testified to his belief that the FHT-1 and FHT-2 devices do *not* calculate deep tissue temperature — and therefore are not the invention embodied in the '668 Patent.[220]  BestMed argues that the devices *do* calculate deep tissue temperature, and it cites to Goldberg's expert report.[221]  Goldberg's opinion may be relevant to whether Yarden was wrong, but it is irrelevant to whether Yarden believed the devices were covered by the '668 Patent and *intentionally* withheld information regarding their sales so as to deceive the PTO.[222]  BestMed then asserts that Yarden has been inconsistent and at least once indicated a belief that the FHT1 calculates deep tissue temperature. However, none of the evidence that BestMed cites in support of this assertion mentions "deep tissue temperature,"[223] and thus none of the evidence BestMed

---

[220]    *See* Medisim IC 56.1 ¶¶ 15, 17, 26.

[221]    *See* Def. IC Mem. at 7.

[222]    *See Therasense*, 649 F.3d at 1290.

[223]    *See* Medisim, Ltd's Revised Reply to BestMed's Responsive Local Rule 56.1 Statement of Undisputed Material Facts in Support of Medisim Ltd's Motion for Summary Judgment of No Inequitable Conduct ("Medisim IC Reply 56.1"), ¶¶ 15, 17, 26.  For example, Yarden testified that the FHT-1 "receives a value based on [an] algorithm that it is implementing the heat flow calculation . . . it takes this temperature that was coming out of the algorithm of the heat flow and

offers supports an inference that Yarden made a deliberate attempt to deceive the

PTO.  Moreover, it is undisputed that the '397 Patent covers the technology

utilized by the FHT-1 and FHT-2 thermometers.  If Yarden believed that the FHT-

1/FHT-2 — and by extension the '397 Patent — were prior art that either fell

within or made obvious the '668 Patent, then he would not have felt it necessary to

apply for the '668 Patent at all.  The fact that he applied for the '668 Patent, and

specifically referred to the '397 Patent in the specification, indicates a belief that

the '668 Patent covers new technology not within the ambit of the '397 Patent.  In

sum, BestMed has not provided evidence sufficient to "*require* a finding of

deceitful intent in the light of all the circumstances."[224]

BestMed lacks not only evidence of a deliberate attempt to mislead

the PTO but also of materiality.  During the prosecution of the '668 Patent,

Medisim disclosed the FHT-1 through U.S. Provisional Patent Application No.

---

puts it into a third order polynomial which produces the [core] body temperature."
Deposition of Moshe Yarden, Ex. 4 to Declaration of Brian R. Michalek in Support
of BestMed's Opposition to Medisim's Motion for Summary Judgment of No
Inequitable Conduct ("Michalek IC Decl."), at 162:6-22.  BestMed's contention
that Yarden described the scientific process of calculating deep tissue temperature
is misleading; Yarden described the scientific process of calculating *a* temperature
— it is hotly contested whether the FHT-1 calculates deep tissue temperature, and
Yarden's testimony does nothing to contradict his stated belief that it does not.

[224]    *See Therasense*, 649 F.3d at 1290-91 (emphasis in original).

60/572,651 ("the '651 Provisional").[225]  Medisim has offered evidence that the

PTO examiner considered the '651 Provisional, establishing that he was aware of

the FHT-1.[226]  Even if Yarden believed the FHT-1 was material prior art, and even

if he intended to deceive the PTO, there can be no "but for" materiality when the

patent issued *over* the disclosed reference.[227]

### 2.   Omission of Two Patents from the IDS

BestMed asserts that U.S. Patents 5,199,436 ("the '436 Patent") and

6,059,452 ("the '452 Patent") were material and prior art.  Even if BestMed is

correct, it must also produce evidence establishing that (1) these patents were

material; and (2) Yarden was aware of these patents and knew that they were

material.

As evidence that Yarden intentionally hid these two patents from the

PTO, BestMed asserts that the patents were found "after a patent search conducted

---

[225]   *See* Medisim IC 56.1 ¶¶ 18, 19.

[226]   *See id.*

[227]   *See Young v. Lumenis, Inc.*, 492 F.3d 1336, 1349-50 (Fed. Cir. 2007) ("[W]e cannot agree that there was inequitable conduct resulting from the 'failure to disclose material information' when that information was disclosed to the PTO in time for the examiner to consider it.  The essence of the duty of disclosure is to get relevant information before an examiner in time for him to act on it, and that did occur here.").

at the behest of Yarden by [Medisim employee] Ilan Vadai,"[228] and that "Yarden instructed a Medisim employee to order and purchase [the two patents]."[229]  The only evidence that BestMed offers for these assertions is an e-mail from Vadai to Medisim employee Yona Sasson forwarding a patent search order form.[230]  This is only proof that Vadai — not Yarden — requested that these patents be ordered. The e-mail fails to support BestMed's assertions that Yarden directed Vadai to conduct a patent search or that Vadai ever shared copies of these patents with Yarden.

Even were Vadai's lone e-mail sufficient to support an inference that Yarden knew about the '436 and '452 patents, any duty to disclose them to the PTO was obviated by the fact that the PTO examiner found and considered them on his own, as indicated in his search notes.[231]  There is no duty to disclose

---

[228]    Def. IC Mem. at 8.

[229]    BestMed, LLC's Response to Medisim's Local Rule 56.1 Statement of Undisputed Material Facts Opposing Medisim's Motion for Summary Judgment of No Inequitable Conduct ("BestMed IC 56.1"), ¶ 60.

[230]    *See* 1/4/04 E-mail from Vadai to Sasson, Ex. 3 to Michalek IC Decl., at MED015393.

[231]    *See* Search Notes, Ex. K to Supplemental Affirmation of Keith J. McWha in Support of Motion for Summary Judgment of No Inequitable Conduct, at MED000215, MED000256, MED000290.

references of which an examiner is already aware.[232]  BestMed's assertion that "Yarden would not even have had the examiner's internal Search Notes, and therefore, would never have seen the '436 or '452 Patents mentioned therein" is undercut by the fact that the search notes were appended to the July 9, 2008 office action rejection that was mailed to Yarden's counsel during the prosecution of the '668 Patent.[233]  Accordingly, BestMed has failed to provide evidence demonstrating that Yarden knew about these patents, believed them to be material, and deliberately withheld them from the PTO.

### 3.    Yarden's Representations of the Prior Art

During the prosecution of the '668 Patent, the PTO rejected the claims as anticipated or obvious in view of U.S. Patent Application Publication 2005/0043631 by Fraden ("Fraden").[234]  Medisim's attorney responded with arguments as to why Fraden did not anticipate the '668 Patent.[235]  When the PTO again rejected the claims, Medisim's attorney responded with arguments that

---

[232]    *See Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1457 (Fed. Cir. 1984).

[233]    Medisim IC Reply 56.1 ¶ 78.

[234]    *See* BestMed IC 56.1 ¶¶ 79-85.

[235]    *See* excerpts from the file history of the '668 Patent, Ex. 2 to Michalek IC Decl., at MED00181.

BestMed asserts were inconsistent with its prior arguments.[236]  Even were BestMed

correct, inconsistency in attorney arguments are not factual misrepresentations and

cannot serve as the basis of an inequitable conduct claim.  As the Federal Circuit

explained in a similar situation:

> The district court found, with limited discussion, that '[w]ithout question, [the inventor's] statements are affirmative misstatements of material fact.'  We do not agree.  Those statements are attorney argument, attempting to distinguish the claims from the prior art, not gross mischaracterizations or unreasonable interpretations of the [a particular reference].
>
> The examiner had the [reference] to refer to during the reexamination proceeding and initially rejected [the claim] based on that reference. [The inventor] argued against the rejection, and the examiner was free to reach his own conclusions and accept or reject [the inventor's] arguments. We therefore fail to see how the statements in the [inventor's response to the initial rejection], which consist of attorney argument and an interpretation of what the prior art discloses, constitute affirmative misrepresentations of material fact.[237]

As BestMed has failed to provide any evidence of an attempt to deceive,[238] its

---

[236]     *See* Def. IC Mem. at 12-13; BestMed IC 56.1 ¶¶ 86, 87, 89, 90. Medisim vigorously disputes that its later arguments were inconsistent with its prior ones.  *See* Reply in Support of Medisim's Motion for Summary Judgment of No Inequitable Conduct, at 8-10.

[237]     *Young*, 492 F.3d at 1349.

[238]     *See Rothman v. Target Corp.*, 556 F.3d 1310, 1329 (Fed. Cir. 2009) (distinguishing arguments that "attempt to characterize the prior art in a manner favorable to the attorney's client" are "far from deception" and that "no reasonable jury could rely on [such] statements as clear and convincing proof of inequitable

inequitable conduct claim is dismissed.

## VI.    CONCLUSION

For the reasons set forth above, the following claims brought by Medisim are dismissed: (1) Lanham Act Unfair Competition and False Designation of Origin; (2) Lanham Act False Advertising; (3) New York False Advertising; (4) New York Deceptive Acts.  BestMed's inequitable conduct claim is also dismissed. Partial summary judgment is granted with respect to Medisim's copyright claim, in that Medisim is not entitled to statutory damages or attorney's fees.  Summary judgment is denied with respect to the following Medisim claims: (1) New York Unfair Competition; (2) Unjust Enrichment; (3) damages during the provisional rights period; (4) the validity of the '668 Patent; and (5) patent infringement.  The Clerk of the Court is directed to close these motions (Docket Nos. 89 and 94). Given the zealousness of BestMed's efforts in bringing *all* of these attacks — despite the Court's pre-motion discussion — BestMed's counsel should think long and hard before making a motion for reconsideration.  The Court has now twice considered BestMed's arguments.  A third consideration will be useless unless BestMed can meet the high standard required in such a motion (i.e. that the Court overlooked controlling decisions or data that might reasonably be expected to alter

conduct").

its conclusions).[239]  A conference is scheduled for December 3 at 4:30pm in

Courtroom 15C.

---

[239]     *See In re BDC 56 LLC*, 330 F.3d 111, 123 (2d Cir. 2003).

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             November 28, 2012

-72-

- Appearances -

**For Medisim Ltd.:**

Gerald Levy, Esq.
Keith J. McWha, Esq.
Mark H. Anania, Esq.
Scott Christie, Esq.
McCarter English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

**For BestMed LLC:**

Nicholas L. Coch, Esq.
Kramer, Levin, Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9118

Talivaldis Cepuritis, Esq.
Joseph M. Kuo, Esq.
Anita M. Cepuritis, Esq.
Brian R. Michalek, Esq.
Olson & Cepuritis, LTD.
20 North Wacker Drive, 36th Floor
Chicago, Illinois 60606
(312) 580-1180