D1T5med1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MEDISIM,

                    Plaintiff,

              v.                            10 Civ. 2463 (SAS)

BESTMED,

                    Defendant.

------------------------------x

                                            January 29, 2013
                                            10:10 a.m.
Before:

                    HON. SHIRA A. SCHEINDLIN,

                                            District Judge

                              APPEARANCES

MCCARTER & ENGLISH
        Attorneys for Plaintiff
BY:  SCOTT CHRISTIE
        MARK ANANIA
        MATTHEW SKLAR
        KEITH MCWHA

OLSON & CEPURITIS
        Attorneys for Defendant
BY:  JOSEPH KUO
        TALIVALDIS CEPURITIS
        BRIAN MICHALEK

D1T5med1

```
 1            (Case called)
 2            THE COURT:  Do you want the jury selection on the
 3    record?  Typically we don't but sometimes lawyers want it.  We
 4    need to know so that the court reporter knows whether to stay
 5    or to leave.
 6            MR. CHRISTIE:  I think we are good without it, Judge.
 7            THE COURT:  Okay.
 8            (Jury voir dire conducted off the record)
 9            THE COURT:  Mr. Christie, is the jury satisfactory?
10            MR. CHRISTIE:  It is satisfactory to the plaintiff,
11    yes.
12            THE COURT:  Mr. Kuo, is the jury satisfactory?
13            MR. KUO:  Yes.
14            THE COURT:  Good.  Then I'm going to now swear the
15    jury.
16            (A jury of eight was impaneled and sworn)
17            THE COURT:  Ladies and gentlemen, what I'm going to do
18    now is give you preliminary instructions.  They're a little
19    longer than usual because this is a patent case so it is a
20    little complicated.  My preliminary instructions actually
21    include a little bit of a video to give you some background in
22    this area.  After I finish the preliminary instructions we are
23    going to take our luncheon recess.  When you come back from
24    lunch we'll have the opening statements.  Okay?  Everybody can
25    hear me?
```

D1T5med1

1              THE JURY:  Yes.

2              THE COURT:  Okay, good.

3          So now that you have been sworn I want to tell you

4    something about your duties as jurors and give you these

5    preliminary instructions.  At the end of the trial I will give

6    you more detailed instructions and it is those instructions

7    that will control your deliberations.  At the end of the

8    presentation of all of the evidence and my final charge to you

9    it will then be your duty to decide from the evidence what the

10   facts are.  You, and you alone, are the judges of the facts.

11   You will hear the evidence, decide what the facts are, and then

12   apply those facts to the law which I will explain to you and

13   that's how you will reach your verdict.  In doing that you must

14   follow the law whether you agree with it or not.

15          You must not take anything I may say or do during the

16   trial as indicating what your verdict should be.  Don't be

17   influenced by what I'm writing on the computer, that is not

18   your concern.  You shouldn't say that must be important, she's

19   writing.  It may have nothing do in fact with what is going on

20   with the trial so don't be concerned with it.

21          You will decide what the facts are from the evidence

22   that will be presented here in the courtroom.  That evidence

23   will consist of the testimony of witnesses, documents and other

24   things that are received into evidence as exhibits and any

25   facts on which the lawyers may agree or stipulate to or that I

D1T5med1

1    may instruct you to find.

2            There are two kinds of evidence; direct evidence and

3    circumstantial evidence.  Direct evidence is testimony by a

4    witness about what that witness personally saw or heard or did.

5    Circumstantial evidence is indirect evidence, that is, it is

6    proof of one or more facts from which you can find another

7    fact.

8            You may consider both direct and circumstantial

9    evidence in deciding this case.  The law permits you to give

10   equal weight to both direct and circumstantial evidence or no

11   weight to it for it is up to you to decide how much weight, if

12   any, to give to any piece of evidence.

13           As the sole judges of the facts, you must determine

14   which of the witnesses you believe, what portion of their

15   testimony you accept, and what weight you attach to it.

16           At times during the trial I may sustain objections to

17   questions that are asked.  When that happens, I will not permit

18   the witness to answer or, if the witness has already answered,

19   I shall instruct you that the answer be stricken from the

20   record and that you disregard it and dismiss that particular

21   answer from your minds.

22           In reaching your decision you may not draw any

23   inference from an unanswered question so the question, of

24   course, is not evidence, only the answer, nor should you

25   consider any testimony that I have ordered stricken from the

D1T5med1

1    record.

2              The law requires that your decision be made solely

3    upon the evidence before you.  The items I exclude from your

4    consideration will be excluded because they are not legally

5    admissible as evidence.

6              The law does not, however, require you to accept all

7    of the evidence that I do admit.  In determining what evidence

8    you will accept you must make your own evaluation of the

9    testimony given by each of the witnesses and of the documents

10   presented to you and determine the weight that you choose to

11   give to each witness' testimony or exhibit.  There is no

12   magical formula by which you should evaluate either testimony

13   or exhibits.  I will, however, give you some guidelines for

14   determining the credibility of witnesses at the end of the

15   case.

16             At this time, suffice it to say, that you bring with

17   you to this courtroom all of the experience and background of

18   your lives.  You do not have to leave your common sense outside

19   the courtroom.  The same types of tests that you use in your

20   everyday dealings are the same kinds of tests you will use

21   during your deliberations.

22             As I have explained, the questions and objections of

23   the attorneys are not evidence, nor is any testimony that I

24   tell you to disregard.  The statements and arguments of the

25   attorneys during any part of the trial are also not evidence.

D1T5med1

```
 1    Further, anything you may see or hear when court is not in

 2    session, even if what you hear or see is said or done by one of

 3    the parties or one of the lawyers or one of the witnesses,

 4    that's not evidence, only what is admitted into evidence here

 5    when the court is in session and all of the parties and jurors

 6    are present, only that is competent evidence.

 7         Now, I want to caution you about certain principles

 8    governing your conduct as jurors.  First, please do not

 9    communicate with each other about this case or with anyone

10    involved with this case until the end of the case when you go

11    to the jury room to decide on your verdict.

12         Second, do not communicate with anyone else about this

13    case or with anyone who is involved with this trial until the

14    trial has ended and you have been discharged as jurors.  The

15    term "anyone else" does include members of your family and your

16    friends.  You of course can say to them that you were picked as

17    a juror and you can say it is a civil case; you can probably

18    even say it is a patent case, but that's it.  You shouldn't

19    discuss the case, you shouldn't discuss anything about the case

20    until you have been discharged.

21         Additionally -- and this is very important in today's

22    world -- do not post any information on the internet about your

23    service as a juror or any information about the case on

24    Facebook, MySpace, Twitter, blogs, web services that would

25    violate your duty as jurors.
```

D1T5med1

1          Third, do not let anyone talk to you about the case or

2     with anyone who is involved with the case.  I'm sure it

3     wouldn't happen in this case of case but if anyone should talk

4     to you, that would be improper; you can report it to my clerk

5     and my clerk will tell me.

6          The lawyers and their clients all know that they're

7     not supposed to speak to any juror or even acknowledge you with

8     hello or good morning outside the courtroom.  Therefore if you

9     bump into one of these lawyers in the morning and they're not

10    nice to you, it is because they're told not to say anything to

11    you.  They're certainly not rude but know they shouldn't have

12    any contact with you.  The reason is simple:  Someone watching

13    from a distance might not hear what is said between an attorney

14    and juror so even a pleasantry like good morning would create a

15    misimpression.

16         Fourth doesn't apply to this case, I don't know why

17    I'm saying it:  Don't read anything in the newspaper about this

18    case.  But there won't be anything in the newspaper about this

19    case.  It is not that kind of case.

20         Fifth, and this is important:  Do not do any research

21    or investigation about the case on your own.  That would

22    violate your duty as a juror.  It is tempting to go home on the

23    internet and start Googling these companies.  You must not do

24    that.  Everything you learn about a trial you learn in the

25    courtroom and these days it is hard to police that because it

D1T5med1

 1   is easy to do.  I can only tell you you mustn't do that.  In
 2   the old days people, to violate my instruction, had to go to
 3   the library and it would be a trip.  Now you can go to your
 4   computer.  The reason is simple:  The parties are entitled to
 5   you have personally render a verdict in this case on the basis
 6   of your independent evaluation of the evidence presented here
 7   in the courtroom after you deliberate together with the other
 8   jurors.  Obviously if you speak to anyone else including your
 9   family and friends about the case outside of the deliberation
10   process, or if you tried to find evidence on your own, that
11   compromises your service and your fairness to the parties.

12          Now, because this is a civil case you may have heard
13   of a term that doesn't apply here.  In a criminal case there is
14   a phrase called "proof beyond a reasonable doubt."  That's only
15   for criminal cases.  That requirement does not apply to civil
16   cases, you should put that phrase out of your mind.

17          In civil cases the burden of proof is different, it is
18   called proof by a preponderance of the evidence.  When a party
19   has the burden of proof on any claim or defense by a
20   preponderance of the evidence it means simply that the evidence
21   must persuade you that the claim or the defense is more
22   probable than not.  As to some claims and defenses the parties
23   have a different burden.  Sometimes we have a burden here
24   called proof by clear and convincing evidence.  That's higher
25   than a preponderance of the evidence.  When a party has the

D1T5med1

1    burden of proving any claim or defense by clear and convincing

2    evidence it means the evidence has persuaded you that the claim

3    or defense is highly probable.  So, such evidence requires a

4    higher standard, as I said, than proof by a preponderance of

5    the evidence, and of course I will explain this to you much

6    more fully and all over again in my final charge.

7            Now, this case involves a dispute over a United States

8    patent.  Before summarizing the positions of the parties and

9    the legal issues involved in this dispute I want to explain

10   what a patent is and how one is obtained.

11           The United States Constitution grants Congress the

12   power to enact laws to promote the progress of science and

13   useful arts by securing, for limited times, to authors and

14   inventors, the exclusive right to their respective writings and

15   discoveries.  Using this power, Congress has enacted the patent

16   laws.

17           Patents are granted by United States Patent &

18   Trademark Office which we call the PTO.  A valid U.S. patent

19   gives the patent-holder the right for up to 20 years from the

20   date of the patent application was filed to prevent others from

21   making, using, offering to sell or selling the patented

22   invention within the United States or from importing it into

23   the U.S. without the patent-holder's permission.  A violation

24   of the patent-holder's rights is called infringement.  The

25   patent holder may try to enforce a patent against persons

D1T5med1

believed to be infringers by a lawsuit filed in federal court.

        The process of obtaining a patent is called patent prosecution.  To obtain a patent, one must file an application with the PTO.  The PTO is an agency of the federal government and employs trained examiners who review applications for patents.  The application includes a section called the specification which must contain a written description of the claimed invention telling what the invention is, how it works, and how to make and use it so that others skilled in the field will know how to make and use it.

        The specification concludes with one or more numbered sentences and these are the patent claims.  When the patent is eventually granted by the PTO the claims define the boundaries of its protection and give notice to the public of those boundaries.  Claims can be independent or dependent.  An independent claim is self-contained.  A dependent claim refers back to an earlier claim and includes the requirements of the earlier claim.

        After the applicant files a patent application, a PTO patent examiner reviews it to determine whether the claims are patentable and whether the specification adequately describes the invention claimed.

        In examining a patent application the patent examiner reviews records available to the PTO for what is referred to as prior art.  The examiner will also review prior art if it is

D1T5med1

submitted to the PTO by the applicant.  Prior art is defined,

by law, and at a later time I will give you specific

instructions on what constitutes prior art.  However, in

general, prior art includes things that existed before the

claimed invention that were publicly known or used in the

publicly accessible way in this country, or that were patented

or described in a publication in any country.  The examiner

considers, among other things, whether each claim defines an

invention that is new, useful and not obvious when compared

with the prior art.  A patent lists the prior art that the

examiner considers.  This list is called the cited references.

        After the prior art search and examination of the

application, the patent examiner then informs the applicant, in

writing, what the examiner has found and whether any claim is

patentable and thus will be allowed.  This writing, from the

patent examiner, is called an office action.  If the examiner

rejects the claims, the applicant then responds and sometimes

changes the claims or submits new claims.  This process which

takes place only between the examiner and the patent applicant

may go back and forth for some time until the examiner is

satisfied that the application and claims meet the requirements

for a patent.

        The papers generated during this time of communication

back and forth between the patent examiner and the applicant

make up what is called the prosecution history.  All of this

D1T5med1

1    material becomes available to the public no later than the date

2    when the PTO grants the patent.  Just because the PTO grants a

3    patent does not necessarily mean that any invention claimed in

4    the patent is in fact legally entitled to the protection of a

5    patent.  However, a patent is presumed to be valid.

6    Nonetheless, the examiner may not have had available all the

7    information that will be presented to you during this trial.

8          A person or company accused of infringement has the

9    right to argue, here in federal court, that a claimed invention

10   of the patent is not entitled to patent protection because it

11   does not meet the requirements for a patent.  In other words,

12   an accused infringer may defend a suit for patent infringement

13   on the grounds that the patent is invalid.

14         Now I'm going to be playing for you a 17-minute video

15   that was designed to show to jurors in patent jury trials.  It

16   contains important background information that was intended to

17   help jurors understand what patents are and why they're needed

18   and how inventors obtained them, the role of the PTO, and why

19   disputes about patents often arise.  The video is entitled an

20   introduction to the patent system.  It was developed with the

21   assistance of an advisory committee of district judges --

22   judges like myself -- and patent attorneys working together.

23         Special care was taken to ensure that it provides an

24   impartial and objective view of the patent process.  However,

25   although the video I'm about to show you was crafted with great

D1T5med1

1   care, it was not created with this specific trial in mind.

2   Because of that, it might contain information that is not

3   relevant to the case that is about to be presented to you.  For

4   example, the video is going to discuss something called the

5   best mode requirement which is not relevant to this case.  It

6   will also discuss proof by a preponderance of the evidence

7   which is relevant to some portions of this case but it will not

8   discuss proof by clear and convincing evidence which is

9   relevant to some portions of this case.  Furthermore, this

10  video was created in 2002 and some points of law might have

11  changed a bit since then.

12          In light of all of this you should take the video for

13  what it is:  A general induction to the patent system -- but

14  you must rely on my instructions at the end of the case, not

15  anything contained in the video, for all the points of law that

16  you will need to decide this case.

17          Now, while playing the video there is a handout of

18  sort of a sample patent that was designed to be given to you as

19  you watch the video.  So, my clerk is going to give you the

20  handout and then the parties will start playing the video.

21          Are we ready?  Are we teed up to play it?  Okay.

22          SPEAKER:  What a patent is.  We hope to answer that

23  concern with this brief video which will give you some of the

24  background needed to do your job.

25          This case will involve some special issues that the

D1T5med1

1    Judge and lawyers will explain to you but all patent cases

2    involve some basics that you will learn about.

3           This video will discuss what patents are, why we have

4    them, how people get them, and why there are disputes that

5    require us to call in a jury like you.  We will also show you

6    what patents look like.

7           The United States Constitution gives Congress the

8    power to pass laws relating to patents.  It allows Congress to

9    promote the progress of science and useful arts by securing,

10   for limited times to authors and inventors, the exclusive right

11   to their respective writings and discoveries.  A patent then is

12   an official grant by the United States government that gives

13   its owner certain rights to an invention.  Those include the

14   right to keep others from making, using, selling or offering

15   for sale the invention that is described in the patent.

16          A patent lasts for a specific period of time, usually

17   20 years, and represents a bargain made between the government

18   and the inventor.  In return for the right to keep others from

19   using the invention, the inventor must enhance the public

20   knowledge -- or what we sometimes call the state of the art --

21   by adding something new and useful to it.  An example is Thomas

22   Edison's invention of the light bulb.  During the lifetime of

23   the patent its disclosure may inspire new inventions and after

24   it expires, the invention is free for anyone to use.  It is

25   this giving of something new and valuable to the public that

D1T5med1

1   justifies giving a patent to the inventor.

2          A patent is in many ways like a deed to a piece of

3   property.  It grants the owner the right to keep people off the

4   property or to charge them a fee like rent for using it.  And

5   just as a deed sets limitation of the rights on the landowner,

6   a patent sets limits on the rights of an inventor.

7          The patent system works because the inventor is

8   required to describe the invention in clear and specific terms

9   so that the public knows what the boundaries of the invention

10  are.  Once a patent is issued by the government it becomes

11  available for public inspection.  In that way anyone who learns

12  of the patent and is interested can read it and understand

13  exactly what the inventor has claimed to have invented.

14         Now that we understand what a patent is, let's take a

15  closer look at the term invention.

16         An invention is a new way of solving a problem.  The

17  patent process begins in the mind of the inventor and, in

18  particular, when the invention is formulated in the mind of the

19  inventor.  Patent lawyers call this conception.  This is when

20  the idea occurs to the inventor clearly enough that he or she

21  can write it down and explain it to someone.

22         To qualify for a patent the invention needs to be new

23  and useful.  Also it must not be obvious to one of ordinary

24  skill in the field.  If the inventor believes these

25  requirements are met, he or she will prepare an application for

D1T5med1

| | |
|---|---|
| 1 | filing with the United States Patent & Trademark office in |
| 2 | Washington, D.C.  The patent and trademark office, often called |
| 3 | the PTO, is the agency of the federal government whose job it |
| 4 | is to examine patent applications to make sure they are in |
| 5 | proper form and comply with the requirements of the law.  The |
| 6 | inventor can prepare the application for filing with the PTO |
| 7 | but usually it is drafted by an attorney who specializes in |
| 8 | this work or by a patent agent who is not an attorney.  The |
| 9 | attorney or agent works with the inventor to be sure the |
| 10 | invention is described and claimed in a way that complies with |
| 11 | the law and the regulations of the PTO. |
| 12 | As you can see, the application is basically a |
| 13 | typewritten document in which the inventor describes the |
| 14 | invention he or she is trying to protect.  When the PTO |
| 15 | receives the inventor's application, it assigns a patent |
| 16 | examiner -- a staff person -- with a background in the field or |
| 17 | art the invention falls within to examine the application and |
| 18 | decide whether a patent can be granted. |
| 19 | You've been given a sample patent to refer to as you |
| 20 | watch this video so you already have a sense of what a patent |
| 21 | looks like, but now let's take a closer look at the three main |
| 22 | parts to a patent. |
| 23 | To begin with there are some basic identifying |
| 24 | information on the first page.  This material is highlighted in |
| 25 | your handout.  On the upper right side of the page is the |

D1T5med1

1    number assigned to the patent by the government.  On the left

2    side is a title that describes the invention, the names of the

3    inventors and sometimes the company they have assigned the

4    patent to and the date when the patent application was filed.

5    There is also more detailed information on the first page

6    including a list of numbers following the caption field of

7    search.  These numbers identify previously issued patents the

8    examiner looked at or searched to make sure the applicant's

9    claimed invention really is something new, not obvious, and

10   thus patentable.  Also listed on the first page are what we

11   call references; that is previous patents or articles that

12   describe the technology or prior art known at the time the

13   application was filed.

14        It may seem strange to you that we call this

15   pre-existing technology prior art even though it has nothing to

16   do with artists.  We use the word art in its broadest sense to

17   include inventions and other subject matter reasonably related

18   to the claimed invention.  We also refer to the latest

19   technology as state of the art and we say if someone who can

20   understand and apply the technology that he or she is skilled

21   in the art.

22        The second major part of the patent is what we call

23   the specification or written description.  As is the case in

24   your sample, it is usually the longest part of the patent.  It

25   includes an abstract which is a brief summary of the invention,

D1T5med1

1    a background section that describes the nature of the problem

2    the invention is supposed to solve, one or more drawings called

3    figures that illustrate various aspects of the invention, and a

4    detailed description of one or more embodiments of the

5    invention.  An embodiment is a specific device or method that

6    uses the invention such as a particular form of light bulb.

7         The third and most important part of the patent is the

8    claims.  These are the numbered paragraphs that appear at the

9    end.  The claims are what give the public notice of the

10   boundaries of the invention.  They are similar to the

11   description of property you may have seen in a deed referring

12   to precise measurements taken on the ground.

13        Now that we've discussed the main parts of a patent

14   let's take a look at how the PTO processes patent applications.

15   This process which is called prosecution of the patent

16   application begins when the inventor's application arrives at

17   the PTO mail room.  There it receives a stamp that establishes

18   its filing date.  Every year the PTO receives over 300,000

19   applications and issues more than 150,000 patents.

20        Applications go from the mail room to the office of

21   initial patent examination which looks them over to make sure

22   all the required parts are there.  This office also decides

23   what field of technology an application relates to and assigns

24   it to the appropriate examining group.  Soon it is assigned to

25   an individual patent examiner for handling.  It then gets put

D1T5med1

in a stack to wait its turn for examination.  The reason is

that examiners have to review the applications assigned to them

in the order in which they have been filed.  In time, the

examiner turns to our inventor's application and begins by

reading it, especially the specification and claims in order to

come to a conclusion about whether the inventions described in

the claims are patentable.  A patent might contain one claim or

many claims and the examiner must make this conclusion about

each individual claim.  In order to make that decision the

patent examiner usually looks at patents that have been issued

previously in the same or very closely related fields of art.

In most areas of technology the examiner also has computer

databases that contain limited additional information.

        Another part of the job is to decide if the inventor's

description of the invention is complete and clear enough to

meet the requirements for a patent including the requirement

that the description enables someone of ordinary skill in the

field to actually make and use it.  It is important to note

that the process of patent examination is private.  That is,

the public does not know that someone has applied for a patent

on an invention until the patent issues or, in some cases,

until the application has been pending for at least 18 months.

The reason for this secrecy is to give the inventor a chance to

get the examiner's reaction to the application and decide

whether to withdraw it for whatever reason and keep the

D1T5med1

invention as confidential information.  However, because the

process occurs mostly in private and because the job of

examining so many applications is very challenging, the law

requires the applicant to tell the examiner whatever he or she

knows about the prior art that might be important to the

examiner's decision on whether to allow the patent.  We call

this the applicant's duty of candor.  One way the applicant can

satisfy this duty is by bringing certain prior art to the

attention of the examiner either in the original application or

in other submissions called information disclosure statements.

In this way the decisions of the examiner are based on both the

information provided by the applicant and on the information

the examiner is able to find during the examination process.

Sometimes the examiner concludes the application meets all the

requirements we've discussed and allows the patent to issue at

this first stage but more frequently the examiner will reject

the application as deficient in some respect.  At that point

the applicant usually prepares a written response either

agreeing or disagreeing with the examiner.  An applicant who

agrees with the examiner can submit amendments to the

application designed to overcome the examiner's objection and

an applicant who disagrees with the examiner can explain the

reasons for the disagreement.  This exchange of office actions

and responses goes on until the examiner issues a final office

action which may reject or allow some or all of the applicant's

D1T5med1

claims.  Once a final PTO office action has occurred and one or
more claims have been allowed, the applicant is required to pay
an issuance fee and the patent is granted.

        Then, on the date shown in the upper right corner of
the first page of the patent, it is issued by the PTO and the
inventor receives all the rights of a patent.  That date is
highlighted on your sample.  By the time a patent issues and
the public can take a look at it, the record of what the
examiner did is also made public.  This is the patent's file
which we call the prosecution history.  The file history
contains the original application and all the communications
between the applicant and the patent examiner including a
record of any rejections, the applicant's responses, and any
amendments.

        Once a patent is issued, the inventor or the person or
company the inventor has assigned the patent to can enforce the
patent against anyone who uses the invention without
permission.  We call such unlawful use infringement.  But, the
PTO and its examiners do not decide infringement issues.  If
there is a dispute about infringement it is brought to the
Court to decide.  Sometimes in a court case you are also asked
to decide about validity, that is, whether the patent should
have been allowed at all by the PTO.

        A party accused of infringement is entitled to
challenge whether the asserted patent claims are sufficiently

D1T5med1

new or non-obvious in light of the prior art, or whether other

requirements of patentability have been met.  In other words, a

defense to an infringement lawsuit is that the patent in

question is invalid.

You may wonder why it is that you would be asked to

consider such things when the patent has already been reviewed

by a government examiner.  There are several reasons for this:

First, there may be fact or arguments that the examiner did not

consider such as prior art that was not located by the PTO or

provided by the applicant.  Another reason may be the failure

by the applicant to disclose the best way of making or using

the invention which is another requirement for getting the

patent.  In addition there is, of course, the possibility that

mistakes were made or important information overlooked.

Examiners have a lot of work to do and no process is perfect.

Also, unlike a court proceeding, prosecution of a

patent application takes place in private without input from

people who might later be accused of infringement.  So, it is

important that we provide a chance for someone who is accused

of infringement to challenge the patent in court.

In deciding issues of infringement and validity it is

your job to decide the facts of the case.  The judge will

instruct you about the law which may include the meaning of

certain words or phrases contained in the patent but it is up

to you, as exclusive judges of the facts, to apply the facts as

D1T5med1

1    you find them to the law and decide the questions of

2    infringement and validity in the case before you.  To prove

3    infringement the patent holder must persuade you that it is

4    more likely than not that the patent has been infringed.  To

5    prove that a patent is invalid the law requires a higher

6    standard of proof since the PTO is presumed to have done its

7    job correctly.  The party accused of infringement must persuade

8    you that it is highly probable that the patent is invalid.

9           Good luck with your task and thank you for your

10   service.

11          THE COURT:  Okay.  So I hope that video was somewhat

12   helpful.  I'm going to continue with my instructions now.  I

13   don't think I will be able to finish them before the luncheon

14   break but I will get as far as I can.  Let me tell you more now

15   about this case.

16          This case, as you know, involves a dispute between two

17   parties -- the plaintiff Medisim, as you know, the defendant

18   BestMed, as you know.  Also, there is a company called K-Jump

19   Health Company which is not a party to the lawsuit but you will

20   hear about them too and so I wanted you to know their name.

21          To help you follow the evidence I want to give you a

22   summary of the positions of the parties.

23          The case here involves U.S. patent number 7,597668.

24   We call it the '668 patent.  It was obtained by Moshe Yarden --

25   you met him before -- he is the CEO of Medisim and was

D1T5med1

transferred by Mr. Yarden to Medisim.  For your convenience we

are all going to call it the '668 patent.

        Medisim filed suit in this court seeking money damages

from BestMed for allegedly infringing the '668 patent.  Medisim

claims that BestMed directly infringed claims 1, 8, 9, 10, 11,

12, 15, 19 and 36 of the '668 patent by making, importing,

using or selling or offering for sale certain thermometers in

or into the United States.  Medisim also asserts that BestMed

indirectly infringed these claims by inducing the infringement

of these claims by other parties.  Claims 1, 8, 9, 10, 11, 12,

15, 19 and 36 of the '668 patent may be referred to as

apparatus claims because they concern an apparatus or device,

namely a thermometer.

        Medisim also contends that BestMed infringed claims

21, 27, 32, 35 and 37 of the '668 patent.  Medisim alleges that

BestMed infringed these claims only indirectly, that is, by

inducing others to infringe on these claims and/or by

contributing to the infringement of these claims by others.

Claims 21, 27, 32, 35 and 37 of the '668 patent may be referred

to as method claims because they concern a method of performing

a particular process, namely operating or using a thermometer.

The products and methods that are alleged to have infringed

involved thermometers manufactured by K-Jump and imported into

and sold by BestMed in the United States.

        BestMed denies that it either directly or indirectly

D1T5med1

1   infringed any claims of the '668 patent.  BestMed also contends

2   that claims of the '668 patent are invalid for several reasons.

3           I will instruct you later as to the ways in which a

4   patent may be invalid.  In general, however, a patent may be

5   found to be invalid if it is not new or is obvious in view of

6   the state of the technology at the relevant time, or if the

7   description in the patent does not meet certain requirements.

8           Your job will be to decide whether or not claims of

9   the '668 patent have been infringed and whether or not those

10  claims are invalid.  If you decide that any claim of the '668

11  patent has been infringed and that the patent is not invalid,

12  you will then need to decide the amount of any money damages to

13  be awarded to Medisim to be compensated for this infringement.

14  You will also need to make a finding as to whether the

15  infringement was willful.  If you decide that any infringement

16  was willful, that decision should not affect any damages award

17  you give.  I will take willfulness into account at a later

18  time.

19          Furthermore, you will need to decide if Medisim has

20  proven that BestMed infringed Medisim's rights of copyright,

21  engaged in unfair business competition with Medisim or was

22  unjustly enriched at the expense of Medisim.  All of these

23  claims relate to the thermometers imported, used, and sold by

24  BestMed.

25          These preliminary statements that I just gave you

D1T5med1

```
1    should not be taken as an indication that I have any view

2    regarding issues such as infringement and invalidity.  They are

3    solely to introduce you to the parties' contention.  The

4    decision on whose positions are correct is up to you, the jury.

5           Now, in deciding the issues I just discussed you will

6    be asked to consider specific legal standards.  I will give you

7    a quick overview of those standards now but will review them in

8    greater detail at the time that you are instructed to reach a

9    verdict.

10          The first issue you will be asked to decide is whether

11   BestMed has infringed the '668 patent.  Infringement is

12   assessed on a claim by claim basis.  Therefore, there may be

13   infringement as to one claim but not infringement as to another

14   claim.

15          There are a few different ways that a patent may be

16   infringed.  I will explain the requirements for each of these

17   types of infringement to you in detail at the conclusion.  In

18   general, however, a person might infringe a patent by making,

19   using, selling or offering for sale in the United States or by

20   importing into the United States a product or by using a method

21   meeting all the requirements of a claim of another person's

22   patent.  A person may also indirectly infringe a patent by

23   contributing to the infringement of another or by inducing

24   another person or entity to infringe.  I will provide you with

25   more detailed instructions on these requirements for each of
```

D1T5med1

```
 1    these types of infringements at the end of the case.
 2              Another issue you will be asked to decide is whether
 3    the '668 patent is invalid.  As an initial matter, a patent
 4    issued by the PTO is presumed under the law to be valid.
 5    However, a patent may be invalid for a number of reasons
 6    including because it claims subject matter that is not new or
 7    is obvious.
 8              All right.  At this point I think I should pause
 9    because I can't finish in time.  When you return I just have a
10    few more minutes and we will go right into the parties' opening
11    statement.  And, I hope by the time you return it is much
12    cooler.  I know it is a little better but I would like it to be
13    a lot better.
14              So, if you would please return at five after 2:00,
15    that gives you an hour and a quarter we will pick up there.
16              Have a good lunch.  Thank you.
17              A JUROR:  Is there somewhere to go in the building or
18    do you have to leave the building?
19              THE COURT:  There is a rule on not using the
20    cafeteria.  I think you were instructed on that.  I don't
21    believe in the rule, I'm sure the lawyers wouldn't talk to you
22    and I will tell you a secret:  It is on the 8th floor.
23              A JUROR:  One other question.  I see everybody else
24    has water.  Can we bring water back?
25              THE COURT:  Yes.
```

D1T5med1

1          A JUROR:  Thank you.

2          A JUROR:  I have a question:  Are we supposed to keep

3   this or give it back?

4          THE COURT:  You can leave it here.  That's fine.

5   Thank you.

6          A JUROR:  Okay.

7          THE COURT:  All right, folks.  5 after 2:00.  I have

8   less than five more minutes and we will go right into opening.

9          (Jury not present)

10         (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1TZMED2

1              A F T E R N O O N     S E S S I O N

2              (In open court; jury not present)

3              THE DEPUTY CLERK:  All rise.

4              2:10 p.m.

5              THE COURT:  They're not back.  They're here?  Okay.

6              (Jury entering the courtroom)

7              THE COURT:  Who is opening for the defense?  Mr. Kuo,

8    are you opening?

9              MR. KUO:  Mr. Cepuritis.

10             THE COURT:  Oh.  And you're opening, Mr. Christie?

11             MR. CHRISTIE:  Yes, Judge.

12             (Jury present)

13             THE COURT:  All right, everyone please be seated.

14        I know it's just the first day, and probably hard for

15   you to judge how long it would take to eat out, but we were all

16   here at 2:05, so please, in the future, please try and get back

17   at the appointed time.  I know you weren't in charge of the

18   restaurant, but.

19        We'll pick up where left off.  So just to give you the

20   context, I'll repeat one of the paragraphs I read before to

21   give the introduction.  I think I said another issue you will

22   be asked to decide is whether the '668 patent is invalid.  As

23   an initial matter, a patent issued by the PTO is presumed,

24   under the law, to be valid.  However a patent may be invalid

25   for a number of reasons, including because it claims subject

D1TZMED2

matter that is not new or is obvious.  For a claim in '668

patent to be invalid because it is not new BestMed must show,

by clear and convincing evidence, that all of the elements of

the claim are present in a single previous device or method or

sufficiently described in a single previous printed publication

or patent.

As I stated earlier, these are called prior art.  If a

claim is not new, it is said to be anticipated.  Another way

that BestMed could prove that a claim of the '668 patent was

invalid is by proving by clear and convincing evidence that it

was obvious.  Even though every element of a claim is not shown

or sufficiently described in a single piece of prior art, the

claim may still be invalid if it would have been obvious to a

person of ordinary skill in the field of technology described

in the '668 patent at the relevant time.

You will need to consider a number of questions in

deciding whether the inventions claimed in the '668 patent are

obvious.  Of course, I will provide you with detailed

instructions on these questions at the conclusion of the case.

A patent may also be invalid if the description of the

invention given in the specification section of the patent does

not meet certain requirements.  One such requirement is called

the "written description requirement."  In order to meet the

written description requirement, the description of the

invention in the specification portion of the patent must be

D1TZMED2

detailed enough to demonstrate that the applicant actually
invented the invention claimed in the claims portion of the
patent.

     In order to be valid, a patent must also meet the
enablement requirement.  To meet this requirement, the
description of the invention given in the patent has to be
sufficiently full and clear to have allowed persons of ordinary
skill in the field of technology of the patent to make and use
the invention without undue experimentation at the time the
patent application was originally filed.  The written
description requirement and the enablement requirement are
separate and distinct.  For example, a patent might meet the
enablement requirement because a skilled artisan would be able
to build the invention based on the patent's written
description but, nonetheless, fail to meet the written
description requirement because the written description failed
to demonstrate that the inventor actually invented the
invention claimed.

     If you decide that any claim of the '668 patent has
been infringed and that the patent is not invalid, then you
will decide about whether to award money damages to Medism to
compensate it for the infringement.

     In addition to its claims of patent infringement,
Medisim claims that BestMed has infringed its right of
copyright.  In order to prevail on its copyright infringement

D1TZMED2

claim, Medisim must prove two things.  First, Medisim must

prove that it is the owner of a work protected by the copyright

act; second, that BestMed has infringed one or more of the

rights in that work granted to Medisim by the Copyright Act.

Each of these aspects has several elements that I will explain

to you at the conclusion of the case.

         Medisim also claims that it is entitled to damages

because BestMed has violated New York State laws.

Specifically, Medisim claims that BestMed's acts constitute

unfair competition under New York State law, and that BestMed

has been unjustly enriched at the expense of Medisim.

         Now, I will conclude simply by telling you the stages

of a trial.  First, each party here, I think, intends to make

an opening statement.  An opening statement is neither the

evidence nor argument.  It is an outline of what that party

intends to prove, and it's offered to help you follow the

evidence.

         Next, the plaintiff will present witnesses, and the

defendant has a right to cross-examine those witnesses.  Then,

if desired, the defendant will present witnesses and the

plaintiff may cross-examine them.

         Here at this trial some of the witnesses that

plaintiff will call are also defendant's witnesses, so they'll

just testify once.  Even though the plaintiff calls them, the

defendant will also, in essence, be calling them at the same

D1TZMED2

1      time.

2              I may also permit at the end of the case the plaintiff

3      to present additional witnesses to rebut any evidence that the

4      defendant may put in, but that's very unusual and unlikely to

5      happen.

6              After that, the attorneys will make closing arguments

7      to summarize and to give you their interpretation of the

8      evidence.  Like opening statements, the closing arguments are

9      not, themselves, evidence.

10             After those arguments, then I will instruct you on the

11     law, and then you will retire to deliberate on your verdict.

12     Please do not make up your mind about what the verdict should

13     be until after I've instructed you on the law at the end of the

14     case and you've gone to the jury room and you and your fellow

15     jurors have discussed the evidence.  Please keep an open mind

16     until then.  The parties deserve and the law requires that you

17     give them an opportunity to be fully heard before you decide

18     the case.

19             So with that, Mr. Christie, do you wish to make an

20     opening statement?

21             MR. CHRISTIE:  I do, Judge.  Thank you.

22             May I proceed?

23             THE COURT:  Please.

24             MR. CHRISTIE:  Thank you.

25             Ladies and gentlemen, good afternoon.  My name is

1    Scott Christie.  You and I spoke -- well, I actually didn't

2    speak, but you saw me earlier.  We represent Medisim in this

3    case.

4            This is a case about patent infringement, but it's not

5    about a stranger who infringed the patent.  It's about an

6    infringer who was a business partner, people who were in a

7    business relationship with each other.  So not only is this

8    case about patent infringement, as you heard from the Judge,

9    but it's also about deception and betrayal in a business deal.

10   It was a business partner who was really a business competitor.

11           You heard about the parties in this case.  We

12   represent Medisim.  Mr. Moshe Yarden is here, you saw him

13   earlier, he's the president and the CEO of Medisim, but he's

14   also an inventor.  And you will hear that he is the inventor of

15   the patent at issue in this case which is going to be referred

16   to as the '668 patent.

17           Medisim is a small startup company located in Israel.

18   And you will hear about their products.  You'll hear about

19   their efforts to sell their thermometer products in the U.S.

20   market, which brought them in relationship to BestMed, the

21   defendant here.

22           You will also hear from John Wilson who was BestMed's,

23   I'm sorry, who is Medisim's U.S. president for the U.S.

24   operations.

25           So as you heard the Judge say, Medisim is a plaintiff

in this case and the legal claims here are against BestMed for

patent infringement, for unfair business competition, for

unjust enrichment, and for copyright infringement.

          The defendant in this case is called BestMed.  They're

located in Colorado, and they're a larger company who

distributes medical devices and sells them in the U.S,

including thermometers.  And they sell many of their products

to large chains chain store, pharmacies and big box retailers

like CVS, Rite Aid, Walmart, and Walgreens.  And you'll see

during the course of the trial that many of the devices

actually carry the Walgreens or the Walmart name on them.

That's called private labeling.  It's not selling the product

under the brand name of the manufacturer, but under the brand

name of the retailer.

          So in the medical device industry, and especially in

the thermometer industry, it's quite common for a Walgreens or

Walmart to have a device, including a thermometer, private

labeled that has their own name on them.  So just because it

has the name of Walgreens or Walmart doesn't necessarily mean

that Walmart manufactured it or that Walgreens manufactured it.

          Stan Cohen is the CEO of BestMed and Michael Edmonds

is the president of BestMed, and you will hear them testify

here as well.

          As the Judge mentioned, you will also hear about a

company named K-Jump.  K-Jump is a Chinese company located in

D1TZMED2                        Opening - Mr. Christie

Taiwan, and, again, they are not a party to this case.  There
are no legal claims against them, but their name is going to
come up frequently.  And that's because the accused devices or
the accused products were manufactured by K-Jump, imported into
the U.S. and sold by BestMed.  So because K-Jump is the
manufacturer of the products that are at issue, you will hear
quite a bit of information about them.

        And in particular you'll hear from their president
Mr. Daniel Tseng, T-s-e-n-g, and you'll hear from their
research and development special assistant, Mr. Yen-Ming Shsu,
but you won't hear from them live.  They will appear by
videotape.  And you will see the videotape of their sworn
testimony in the trial.

        And even though again K-Jump is not a party to this
case, you will hear, and the evidence will show that there was
a strong business relationship between K-Jump and BestMed.  A
Mr. Tseng, the president of K-Jump owns a 10 percent interest
in BestMed.  BestMed largely is a distributor of K-Jump
products in the U.S., and as a result they have a very close
working and business relationship.

        So what is this case about?  Well, it starts back 2003
or thereabouts, and this is before the '668 paint issued.
Medisim again, small Israeli company manufacturing
thermometers.  They were looking to distribute their product in
the U.S.  And they had never done that before, and they needed

D1TZMED2                     Opening - Mr. Christie

 1    a partner because they didn't have the capabilities of doing it

 2    themselves.  And at that time their most recent technology

 3    thermometer was called the FHT-1, FHT standing for four head

 4    thermometer.  And there on the screen you'll see what the FHT

 5    device looks like.  I have a version of it here in my hand.

 6    And it's a thermometer that you use to take your temperature at

 7    your temple; hold it to your temple, press the button, hold it

 8    for a few seconds, and the display reads out your temperature.

 9         So, again, at the time in the late -- in the early

10    2000s, that was the most recent technology thermometer that

11    Medisim had.

12         You will also hear that thermometer referred to as the

13    Medisim DTT standing for digital temple thermometer.  And that

14    was the name that BestMed chose for it at a later point in

15    time.

16         The evidence will show that this device, the FHT-1,

17    does not practice the invention of a '668 patent.  You will

18    hear that it is covered by another patent, which goes by the

19    number 6280397, and will probably be referred to commonly as

20    the '397 patent.  Just to be clear, Medisim is not claiming

21    that anyone has infringed the '397 patent in this case, just

22    the '668 patent.

23         So in early 2003, again Medisim is looking for a

24    distributor of its thermometer products.  They're located in

25    Israel.  They're a small company.  They don't have experience

D1TZMED2                         Opening – Mr. Christie

in the U.S. market.  So they learn about BestMed and make an

inquiry to BestMed, and ask to come over to Colorado to

demonstrate to BestMed what they're capable of and what their

products are.

          So the evidence will show that BestMed agreed.  There

was a meeting in the spring of 2003.  And you know BestMed was,

I think by all indications, pleased with what they saw, and

wanted to move forward with the relationship.  So Mr. Yarden

provided BestMed with samples of the FHT-1 device.  And

BestMed, as you'll see, and as the evidence will show, realized

that that is a revolutionary product, a category changing

product.  In fact, BestMed was so excited about being able to

sell the FHT-1, that soon after the meeting it arranged a

meeting with a buyer at Walgreens to try and sell this FHT-1

product.

          But at that time BestMed was jumping the gun, because

there was no agreement between Medisim and BestMed.  There was

no production model of the thermometer.  It was still in its

sample form.  And Medisim had no production capabilities.

Nevertheless, BestMed went ahead with the meeting and, as

expected, Walgreens was excited about this product and wanted

to place a significant order, more than 10,000 units.

Mr. Yarden was unsophisticated about the U.S. market, and he

had never sold thermometers in the U.S.  So his dealings with

BestMed were his first experience in this area.  And he didn't

D1TZMED2                   Opening - Mr. Christie

1    know that this meeting with Walgreens was likely to lead to an

2    immediate purchase order.  When he learned about it, he was

3    overly optimistic about being able to meet the production

4    schedule, because he wanted to have a good relationship with

5    BestMed, and he didn't fully appreciate all of the technical

6    hurdles that would come to making this product a production

7    model.  He was relying upon BestMed's judgment in this regard

8    and he wanted to maintain a good relationship because he needed

9    a business partner in the U.S. to distribute his product.

10             When this meeting with Walgreens happened and there

11   was a miscommunication about the significance of the meeting,

12   Mr. Yarden was a little uncomfortable with BestMed.  He wasn't

13   too thrilled about the judgment that they exercised in making

14   this business pitch before there was a written agreement,

15   before there was a production model of the thermometer, and

16   before there was even production capabilities set up to meet

17   the demand of Walgreens.  So in November of 2003 he pulled back

18   a little bit.  He said, you know, Mr. Cohen at BestMed, please

19   don't show my product, the FHT-1, to anyone else for a while, I

20   need to think about my business options here, so please don't

21   do that any more.

22             So you will also hear then, the evidence will show,

23   that about June 2004, after giving consideration to all of the

24   business opportunities he had available, Mr. Yarden decided he

25   was still going to go with BestMed, and he told BestMed that he

D1TZMED2                    Opening - Mr. Christie

1    would allow BestMed to market and sell the FHT-1 thermometer in

2    the U.S. on behalf of Medisim.

3          Several months thereafter, in November 2004, BestMed

4    and Medisim signed an agreement called the international

5    distribution agreement.  And you will see a copy of that

6    document in evidence in this case.  It has lot of terms in it,

7    but primarily it was an agreement to allow BestMed to be the

8    exclusive distributor of the FHT-1 thermometer for Medisim in

9    the U.S.

10         So Mr. Yarden completes the production model of the

11   thermometer, it's fully tested, and production starts rolling

12   off the production line.  So by mid 2005, Medisim begins

13   supplying the FHT-1 thermometer to BestMed so that BestMed

14   could try to sell it to Walgreens and CVS and Walmart and all

15   the other big box retailers.

16         But it took Mr. Yarden awhile to get up to speed with

17   regard to production, you'll hear.  Again, it's a startup

18   company, and he was new to meeting large quantity purchase

19   orders, and there were some growing pains in the relationship

20   between BestMed and Medisim.

21         Mr. Yarden was not used to producing thousands of

22   units at a time for shipment and distribution.  And you'll

23   hear, and we don't deny, there were some late shipments to

24   BestMed.  You'll hear there are some product returns, but

25   nothing extreme or nothing unusual in this industry, in this

D1TZMED2                          Opening - Mr. Christie

field.  And Mr. Yarden tried to make good by providing some

product for free, and absorbing some of the additional costs.

But again Mr. Yarden was an unsophisticated businessman in the

U.S. and he was trying to ramp up as best he could, and there

were unforeseen things along the way.  But you'll also hear

that soon after production started, Medisim moved some of its

production capability to China, and by virtue of doing that

many of these issues were largely resolved.

        But more importantly, the FHT-1 quickly became a best

seller for BestMed.  They were selling them quicker than they

could get ahold of them.  They were selling thousands and

thousands and thousands of these thermometers to Walgreens,

Walmart, CVS, the big retailers that we spoke about, and

Medisim was looking forward to long mutually beneficial

relationship with BestMed.

        But you'll see, and the evidence will show, that

BestMed had other ideas.  BestMed realized that K-Jump could

make a thermometer similar to the FHT-1 in China and charge

BestMed less per device than Medisim was charging.  And that,

of course, would give BestMed a higher profit margin.

        So you'll see and you'll hear from the evidence that

BestMed wasn't concerned about its loyalty to Medisim.

BestMed's loyalties were for sale to whoever made BestMed the

most money.

        You'll also hear that way back in 2003, even before

D1TZMED2                        Opening - Mr. Christie

1    there was a signed agreement, Mr. Cohen asked K-Jump to produce

2    a thermometer like the FHT-1 thermometer for BestMed way back

3    in 2003.

4          Jumping ahead a few years, as I mentioned earlier,

5    production started in 2005, and even soon after the production

6    started rolling into BestMed, BestMed was already planning to

7    replace Medisim with K-Jump as its supplier of the thermometer.

8          In August and September of 2005, BestMed sent K-Jump

9    samples of the FHT-1 thermometer.  In November of 2005, BestMed

10   again talked to K-Jump about supplying a thermometer to replace

11   the FHT-1.  And at that time you will hear, and the evidence

12   will show, that K-Jump already had a working sample of a

13   replacement thermometer for the FHT-1.  And at that time you

14   will also hear that Mr. Cohen told Mr. Daniel, the president of

15   K-Jump that he, Mr. Cohen, was interested in purchasing that

16   thermometer from K-Jump when the agreement between BestMed and

17   Medisim expired.  So even before the ink is try dry on the

18   agreement, Mr. Cohen is talking to K-Jump about being a

19   replacement supplier.

20         So to assist K-Jump in its efforts, BestMed also

21   supplied K-Jump with design information and technical

22   information about the FHT-1 thermometer that it had received

23   from Medisim, including information about putting the

24   thermometer in a test mode, and testing protocols, and it even

25   included the instruction manual for the FHT-1 thermometer.

1          So while BestMed is conspiring with K-Jump behind

2     Medisim's back, Mr. Yarden is in the process of inventing and

3     creating a new temperature measurement technology, which is the

4     subject of the patent at issue in this case, and that

5     ultimately is the technology that becomes the '668 patent.  And

6     I'll get into that in a little bit and provide more detail.

7          And ultimately, as you'll hear  Mr. Yarden applies for

8     a patent about this invention, and he does inform Mr. Cohen,

9     the president, I'm sorry, the CEO of BestMed about the

10    invention and about the patent application.

11         And this new technology was embodied, as the evidence

12    will show, in a successor product to the FHT-1 thermometer, a

13    device called the FHT-1A.  Now your eyes aren't playing tricks

14    on you, because you'll see, and the evidence will show that

15    looking at the FHT-1 and the FHT-1A. side by side, it would be

16    incredibly hard to tell the difference.  The difference is

17    inside.  The difference is the technology that runs the

18    thermometer.  It's like an upgrade of the software to your cell

19    phone; the housing remains the same, but the way it functions

20    is different.  So you'll see and you'll hear, that despite the

21    fact that they look almost identical, it's the secret sauce

22    inside that makes them different.

23         You'll also hear that even with BestMed's help, it

24    took K-Jump awhile to create its own replacement temple touch

25    thermometer, which ultimately became known as the KD-2201

D1TZMED2                    Opening - Mr. Christie

1    model.  And part of the reason for the delay in K-Jump getting

2    its production up and running, was that it had to complete the

3    creation of a production model and also had to test the

4    product.  And you'll also hear that BestMed was very very

5    particular about how this replacement product should look and

6    how this replacement product should operate.  BestMed

7    specifically told K-Jump that it wanted this new model, the

8    KD2201, to look and function just like the FHT-1; copy the

9    exterior design, copy the color scheme, copy the startup beep

10   sequence, copy the error codes, copy the instruction manual,

11   copy the packaging, copy everything.  And K-Jump was happy to

12   comply.  And you'll see the results of K-Jump's efforts in

13   evidence at trial.

14       What you're seeing on the screen now is the KD-2201.

15   Also part of the reason for the delay in K-Jump getting its

16   manufacturing up and going was it even, after it created a

17   production model, and even after it tested it, K-Jump had to

18   get approval from the Food and Drug Administration, the FDA.

19   Because you'll hear that you can't just import a medical device

20   in the U.S. and sell it.  The FDA is there to try to protect

21   consumers from medical devices that are unsafe, and they have a

22   process that you have to go through in order to get approval to

23   sell them.  And you'll hear a shorthand for that, which is

24   called the 510K process.  The 510K process is a process which

25   just, in general, requires the manufacturer to submit detailed

D1TZMED2                      Opening - Mr. Christie

1   technical report describing the product and how it works.  And

2   the FDA can request further information, and ultimately at the

3   end of this process the FDA blesses the product and allows it

4   to be sold in the U.S.  So all medical devices require the 510K

5   approval from the FDA in order to be sold in the U.S., again in

6   order to ensure that unsafe medical devices are not hurting

7   consumers.

8           But there was a problem, you know.  K-Jump had

9   submitted its paperwork to the FDA, but it was taking an

10  unusually long period of time.  And BestMed couldn't sell the

11  K-Jump product until the 510 approval was completed.  But they

12  were running out of time because the agreement between BestMed

13  and Medisim was due to expire in May 2007.  And BestMed   need

14  an uninterrupted supply of these thermometers to keep its

15  customers happy.

16          So even after the agreement expired in May 2007,

17  BestMed kept ordering these thermometers, the FHT-1, and

18  ultimately the FHT-1A, and Medisim continued to supply them.

19  But there was no followup agreement in place.  Nevertheless,

20  BestMed led Medisim to believe that it was going to renew the

21  contract and that it was a mere formality.  BestMed wanted

22  Medisim to believe that it was a reliable business partner,

23  when the evidence will show they were just waiting for the

24  chance to kick BestMed, I'm sorry, to kick Medisim out and

25  replace Medisim with K-Jump.  But even with BestMed stalling

1    Medisim, telling them that an agreement would be signed and

2    then not following through, K-Jump still couldn't get its act

3    together quickly enough.

4            In June of 2007, K-Jump did receive FDA approval to

5    sell its replacement thermometer in the U.S.  But even with

6    that approval, it couldn't ramp up production quickly enough to

7    satisfy BestMed's needs.  So you'll hear that many many months

8    after the original agreement lapsed in May 2007, BestMed did

9    sign another distribution agreement with Medisim, but only

10   after Medisim exerted some pressure on BestMed to do that.  It

11   was for a shorter period of time, and this agreement expired,

12   as you will hear, in May of 2009.  And under the second

13   agreement, Medisim was selling to BestMed not only FHT-1, but

14   the FHT-1A model as well.

15           It isn't until early 2008, that Medisim learns for the

16   first time about Medisim's disloyalty.  After stalling for so

17   many months about renewing the contract, Mr. Cohen finally

18   admits to Mr. Yarden, we intend to replace you with K-Jump.

19   We're going to move the production of this thermometer from

20   Medisim to K-Jump.  It was only then, early 2008, that Medisim

21   finally appreciated that BestMed was not a reliable business

22   partner.  Nevertheless, Medisim didn't have a lot of options.

23   It was a small company, it had to -- to sell its product in the

24   U.S. and it held its nose and followed through on the second

25   agreement because that was the most effective and efficient way

D1TZMED2                        Opening - Mr. Christie

1    to do it from a business perspective.

2            So despite all the shenanigans that went on Medisim

3    continued to supply and met the terms of the second

4    distribution agreement.

5            But you will also hear that immediately after the

6    second distribution agreement ended in May 2009, BestMed

7    dropped Medisim like a hot potato and started selling the

8    K-Jump replacement thermometer.

9            As you'll see, it looks almost identical to the

10   best -- to the Medisim model.  You will see that it had an

11   instruction manual that is, again, almost identical.  And

12   you'll be able to compare and contrast, yourselves, the two

13   instruction manuals for the FHT-1 and for the K-Jump product,

14   the KD-2201.

15           Medisim has a copyright registration on the

16   instruction manual for the FHT-1, meaning that it applied to

17   the U.S. copyright office and received copyright protection for

18   that document.  And you'll see that in evidence in this case.

19           So BestMed begins selling the KD-2201, the replacement

20   thermometer, under the FDA approval that K-Jump received in

21   June of 2007.

22           In the meantime, Mr. Yarden is still innovating and

23   he's applying for the patent as we indicated, the '668 patent.

24   And you'll hear that in October of 2009, the patent office

25   issued the patent at issue, that's at issue in this case, the

D1TZMED2                    Opening - Mr. Christie

1    '668 patent.

2           And the evidence will show, ladies and gentlemen, that

3    the KD-2201 model, the K-Jump device, infringes the claims of

4    the '668 patent.  But BestMed continued to make sales of these

5    infringing thermometers after the issuance of the '668 patent,

6    and continues to do so to the present day.

7           So to understand the novelty of the '668 patent, you

8    will also hear some technical testimony about older thermometer

9    technologies, principles of thermometry, and the progression of

10   technology that led to the '668 patent.

11          The evidence will show as following, ladies and

12   gentlemen.  And it should come as no surprise to you that, you

13   know, getting a reliable body temperature is important to

14   diagnosing and treating disease.  It also should come as no

15   surprise that core body temperature is widely considered to be

16   the most reliable body temperature.  And core body temperature

17   is a very precise type of temperature.  It's the temperature of

18   blood in the pulmonary artery.  And the pulmonary artery is the

19   artery between the heart and the lungs.

20          But you can imagine that taking core body temperature

21   directly is not something you would want to do every day.

22   Because in order to do it and measure it directly, you would

23   have to pierce the skin.  And you would have to actually place

24   a temperature sensor in the blood of the pulmonary artery.

25   Again, as you can imagine, not something that people want to do

D1TZMED2                    Opening - Mr. Christie

1    under most circumstances.

2           So I can also imagine the history of thermometry, in

3    part, has been devoted to measuring temperature to approximate

4    the core body temperature in a reasonable and reliable way, in

5    a manner that doesn't require you to actually pierce the body

6    and measure it, the blood in the pulmonary artery.  So, for

7    example, using an analogy, you have a pot roast and you want to

8    tell what the temperature of the pot roast is.  A reliable way

9    to do that is to take a meat thermometer and stick it in the

10   pot roast.  It'll probe to the center of the pot roast and

11   you'll get a pretty accurate temperature.  Again, not a perfect

12   analogy, but that would be something similar to measuring core

13   body temperature in a human being.  It would be invasive, there

14   might be complications, and something to generally avoid.

15          So again, you know from your own personal experience

16   when you were a child, or when you were a parent or both, about

17   taking temperatures, especially with children.  You know from

18   your own personal knowledge that historically measuring

19   temperature at certain parts of the body has been proven

20   reasonably reliable, and doctors and clinicians have relied

21   upon those measurements.

22          So, for example, it's probably clear that taking a

23   rectal temperature, especially with a Mercury thermometer, is

24   something that some of you remember when you were younger.

25   And, you know, one of the issues though, of course, is that you

D1TZMED2                          Opening - Mr. Christie

1    have to put the thermometer inside a body cavity, and you have

2    to wait a long time, as you know, in order to get a reliable

3    temperature.

4            Oral temperature, taking your temperature by putting a

5    thermometer under your tongue, you know, goes back decades and

6    decades.  Again, that has been perceived to be a reliable

7    approximation of core body temperature in the field.

8            Likewise the axilla, which is a fancy medical term for

9    the under arm, your armpit, that has also been historically

10   used as a means of getting a reasonable approximation of core

11   body temperature.  And one of the reasons that these parts of

12   the body have proven reliable is because they are in a

13   protected area.  The rectum, the mouth, the armpit, are

14   protected cavities in the body that are not subject to external

15   environmental influences like some of the other points on the

16   body where you would measure temperature.  And, again, as I

17   mentioned, the evidence will show that, especially taking oral

18   temperature in the mouth is a reliable means of approximating

19   this core body temperature that we've spoken about.

20           But, again, it's invasive.  You need to put the

21   thermometer in the mouth, in the rectum, under the armpit, and

22   you have to wait a period of time.  And especially if you have

23   a young child, you may have to hold the child down in order to

24   get a reasonable and reliable temperature.

25           And using a Mercury thermometer has its own risks,

D1TZMED2                          Opening - Mr. Christie

1  because Mercury is a toxic substance.  And if a thermometer

2  breaks or if the child bites the glass thermometer, then you

3  have a whole other medical emergency.  It's inconvenient for

4  children, especially if they're sleeping.

5          So as a result of these drawbacks or these downsides

6  thermometer technology moved into the predictive area.  How can

7  we get a reasonable approximation of core body temperature

8  quickly and noninvasively thermometer in a body cavity.

9          So what you'll see, ladies and gentlemen is that there

10 is, again, the traditional invasive methods of thermometry, as

11 we indicated.  It takes time; one minute, two minute, three

12 minutes, and you're waiting and you're waiting, and four

13 minutes, and five minutes, and finally round about six minutes,

14 if you're patient enough, you'll hit the equilibrium or the

15 steady stay temperature.  The Mercury won't go up any further

16 in the thermometer.  You'll hit the equilibrium point.  And,

17 again, with the interest in predictive technology, thought was

18 given to other sites in the body other than the mouth, other

19 than the rectum, other than the armpit, where a reliable

20 temperature could be taken to a reasonably approximate core

21 body temperature.

22         And more recently it's been the forehead, the temple

23 and the ear.  And I'm sure you ever some familiarity with

24 products that measure temperature by taking those measurements

25 at those sites.  There are differing types of technology that I

D1TZMED2                        Opening - Mr. Christie

1    need to briefly go over with you, because you'll hear them in

2    the course of the trial.

3              Infrared technology.  You'll hear that infrared

4    technology requires, as do other technologies, a sensor.  But

5    for infrared the sensor does not contact the skin.  What it

6    does is like a camera, it takes a snapshot of the skin and it

7    senses the infrared radiation or heat that's leaving the skin.

8    So if you see the graphic, you see the camera taking a

9    snapshot, and then you see the heat, which are the red lines

10   flowing upward to the sensor in a rough approximation of how

11   infrared technology works.

12             Critically, infrared technology does not measure the

13   temperature of -- the temperature beneath the skin surface,

14   just the heat that flows up from the skin surface out into the

15   environment.  Now, it usually takes about 30 seconds or a

16   minute in order to get a reliable reading.

17             And you've undoubtedly seen thermometers that use this

18   technology, the forehead scan.  You scan it over your forehead

19   and you get a reading.  You've probably seen a thermometer that

20   you place in your ear, place it in your ear and the infrared

21   measurement comes from the tympanic membrane in the ear drum

22   and you get a reading here.  So these products would use

23   infrared technology in order to measure temperature.

24             But, again, there are downsides to infrared as well.

25   It can be uncomfortable in the ear canal, could be difficult to

D1TZMED2                        Opening - Mr. Christie

1    use on a sleeping patient especially a child.  It requires some

2    technical skill to use it accurately.  The electronics can be a

3    little complicated.  And in the scheme of things, they're

4    relatively more expensive than other types of thermometers.

5         Infrared temperature measurement technology is

6    completely different from conduction temperature measurement

7    technology.  Conduction requires the sensor, the temperature

8    sensor to contact the skin.  And what it does is not sense the

9    heat leaving the skin, but it continuously measures the

10   temperature generated at the skin under the surface of the

11   skin, the heat under the surface of the skin.

12        So you see from the diagram the distinction between

13   those two forms of temperature measurement technology.

14        You'll further hear a little bit more information at

15   trial about two different types of conduction, measurement

16   technology.  And one of them is called prediction, the

17   prediction method.  This is an older technology.  It's been

18   around awhile, and it's a time-based technology.  Again, over

19   simplifying just for the sake of giving you an overview, what

20   you do is you have one sensor and you take repeated short

21   measurements over short periods of time, and by plotting those

22   first few direct measurements, you are able to predict what the

23   equilibrium or the steady state temperature will be and, you're

24   able to do it in six seconds, and not six minutes.

25        You'll also hear about a form of conduction

D1TZMED2                    Opening - Mr. Christie

1    technology called the heat flux method.  And as opposed to the

2    prediction method being a time-based method, the heat flux

3    method is a distance-based method.  And, again, you will hear

4    more detail about this than I'm going to give you now, but in

5    general, heat flux is the amount of heat per unit area.  And if

6    you know the distance between two sensors on the screen T1 and

7    T2, and that distance is fixed and it doesn't change, you can

8    measure temperature through the heat flux method.

9            So, ladies and gentlemen, the evidence will show that

10   the FHT-1 model, the earlier model of thermometer that Medisim

11   sold to BestMed, measures temperature through the heat flux

12   method.  But while the FHT-1 model was reasonably accurate, it

13   became clear over time that it had some accuracy problems,

14   especially in extreme environments, in extreme cold and in

15   extreme heat.  And the evidence will show that the problems

16   with the FHT-1 were part of a larger confusion in the field of

17   thermometry.  Because there had been a misconception that

18   measuring temperature, other than in the traditional areas, the

19   oral, rectal and axillary, the under arm, would yield roughly

20   the same result; so that if you measure temperature in a place

21   other than those three that are done traditionally, you would

22   expect to receive about the same result as if you put it in the

23   rectum, in the mouth or under the armpit.  And that was

24   understandable, because oral temperature was widely understood

25   to be a reliable approximation of core body temperature.  But

D1TZMED2                    Opening - Mr. Christie

in reality some body parts are better for achieving a

reasonable approximation of the core body temperature than

others.

          The temple is a good place, but not as good as oral,

but it's better than the bottom of your foot.  And Mr. Yarden's

flash of inspiration was that in other patents and in other

scientific publications what you've heard is called the prior

art, there had been this belief that if you're taking a direct

measurement from the skin, what you are measuring is the core

body temperature.  But in fact it wasn't.  It was something

completely different.  And Mr. Yarden realized that it's not

core body temperature which is the temperature of the pulmonary

artery.  It's something called local or deep tissue

temperature, which is the temperature under the skin.  That's

what you're directly measuring when you are applying the

thermometer to the temple and taking the temperature

measurement.  So Mr. Yarden grasped this misperception, and he

further grasped there was a reliable correlation between the

deep tissue or local temperature and core body temperature, so

that if you can measure the local or the deep tissue

temperature and apply a mathematical algorithm to it to

correct, you can reach a reasonable approximation of the core

body temperature.  And that was what was wrong with the FHT-1

model, because it was a temple touch thermometer.  As you know,

you touch it to your temple.  But because the temperature was

D1TZMED2                    Opening – Mr. Christie

taken on the exterior surface of the skin, it was subject to
environmental factors which skewed the reading at higher and
lower temperatures.  So if you were in a hot environment, in
the direct sunlight, you wouldn't necessarily get a reliable or
as reliable a reading.  Because unlike the mouth, which is a
closed -- again, a closed environment, which is protected from
environmental factors largely, the exterior of the skin is not.
So, this led Mr. Yarden to apply for and receive the patent at
issue in this case, the '668 patent.

          And you'll hear a lot about the '668 patent.  And
there are a number of claim limitations in it.  But some of the
more important ones are that it requires calculation of a local
temperature of the body using a function, including the time
dependent parameters, and to calculate a core body temperature
by correcting for a difference between the core body
temperature and the local temperature.

          So, in essence, ladies and gentlemen, it's a two-step
process.  You directly measure the local or deep tissue
temperature and you apply a mathematical algorithm to achieve
the core body temperature.  In essence, that's what this
convention stands for.

          The evidence will show, ladies and gentlemen that the
FHT-1, the predecessor device that Medisim sold, had two
temperature sensors.  And you'll also hear that the '668 patent
requires one or more temperature sensors.

D1TZMED2                    Opening - Mr. Christie

1          You'll also hear that the FHT-1, as you heard earlier

2     in my opening, measures temperature only through the heat flux

3     method.  But you'll learn that the '668 patent permits

4     temperature measurement through the heat flux method or through

5     prediction.  And we talked about prediction a little earlier.

6     But critically what you'll hear is that the FHT-1 thermometer

7     is a one step process, it is not a two step calculation

8     process.  For the FHT-1, you take the measurement and you

9     directly calculate approximation of core body temperature;

10    whereas, as we've indicated, and as the evidence will show, the

11    '668 patent requires the two step process.  You directly

12    measure local or deep tissue temperature, and you correct in

13    order to receive the core body temperature.

14         You'll hear a great deal more about the '668 patent,

15    the claims, the specification in trial, and this is just

16    designed to give you an overview of some of the important

17    aspects of it.

18         You'll hear, and Medisim alleges, that BestMed and its

19    KD-2201 device that it's selling for K-Jump infringes a number

20    of claims of the '668 patent.

21         And as the Judge told you, there are some claims that

22    are called apparatus or device claims, meaning how a specific

23    thermometer works and how it measures temperature.  And you'll

24    hear, the evidence will show that the KD-2201 model, the K-Jump

25    model that's manufactured and sold by BestMed, had only one

D1TZMED2                    Opening - Mr. Christie

temperature sensor, not two, not three, just one. But, again, as you will also hear, and as the evidence will show, the '668 patent doesn't require two or more sensors. One sensor is just fine. One or more sensors meets the claim limitations of the '668 patent.

You will also hear, and the evidence will show, that the KD-2201 model doesn't use heat flux, it uses the prediction measurement technology that we talked about briefly earlier. And, again, as you heard a few minutes ago, the '668 patent permits that the measurement can be done through heat flux or through prediction. Either one is fine.

And, critically, you will also hear, and the evidence will show, that the KD-2201 model does in fact practice the two step calculation process. It does take a direct calculation of the local or deep tissue temperature and it does apply a correction in order to achieve approximation of core body temperature. Again, ladies and gentlemen, this is a summary, and you'll hear much more evidence about this, but these are some of the things to pay particular attention to when you are hearing the testimony and looking at the documents.

In addition to the device claims or the apparatus claims, there are some things that are called method claims. And Medisim contends that BestMed infringed some of the method claims of the patent which are not how a specific thermometer works, but a process of taking a temperature, and you'll hear

D1TZMED2                     Opening - Mr. Christie

much more information about that later on.

You saw the KD-2201, but that's not the only thermometer device at issue in this case.  You'll see that there are other infringing devices, and you'll hear evidence to that effect.  The one on the left, which has a Rite Aid brand on it, is another K-Jump model, the KD-2210.  The one on the right, the CVS branded model is another K-Jump model, the KD-2220.  The allegation in this case is that all three, the 2201, the 2210, and the 2220 are accused or infringing devices of the '668 patent.

And as the Judge told you, you know, patent infringement requires you to look at the claims of the patent, and to do a claim-by-claim analysis.  It's not an all or nothing proposition.  You can find one or more claims are infringed, and one or more claims that are not infringed.  But if the infringed, if the accused product or the accused process meets all of the requirements of one of the claims of the patent, then there is infringement.

Medisim's burden is to prove infringement by the preponderance of the evidence.  And you heard that the preponderance of the evidence is often described as more likely true than not.  And again as the Judge told you, it's not beyond a reasonable doubt like you hear on Law and Order or in a criminal case.

To assist you in understanding the issues related to

D1TZMED2                    Opening - Mr. Christie

1    patent infringement, you'll hear not only from Mr. Yarden, the

2    inventor of the '668 patent, but you'll hear from Dr. David

3    Lipson.  Dr. Lipson is a distinguished Professor at Cornell

4    University.  He is experienced in the field of thermometry, and

5    he will be Medisim's expert on technical issues in this case.

6            You heard earlier in my opening about the instruction

7    manual.  And that forms another, the basis for another legal

8    claim of Medisim's in this case.  Because as I mentioned,

9    Medisim has a copyright registration with the instruction

10   manual for the FHT-1 thermometer.  And the evidence will show

11   that the K-Jump instruction manual is almost an exact copy of

12   the instruction manual for the FHT-1.

13           And, again, you'll be able to compare the two

14   instruction manuals yourself during trial and see for yourself.

15   Medisim also believes that it has been unjustly enriched -- I'm

16   sorry -- that BestMed has been unjustly enriched because

17   BestMed received revenue from the sale of these three products,

18   the KD-2201 the KD-2210 and the KD-2220, at the expense of the

19   Medisim product, and more recent Medisim thermometer models,

20   and that requires BestMed to make restitution of its profits to

21   Medisim.  So that's underlying the unjust enrichment claim in

22   the case.

23           (Continued on next page)

24

25

D1T5med3                        Opening – Mr. Christie

1          MR. CHRISTIE:  Finally, as you've heard, Medisim

2     claims that BestMed committed unfair competition under New York

3     Law and this legal claim is based upon the high degree of

4     similarity between the exterior design of the Medisim product

5     and the K-Jump replacement product.  The fact that these are

6     competitive products and the fact that Medisim was acting --

7     I'm sorry, that BestMed was acting in bad faith.

8          This is some of the evidence that you will see in

9     support of the unfair competition claim in this case and I just

10    want to make it clear that you will not hear testimony that

11    these two products were sold side by side at a store at the

12    same time.  But, you will hear that the product on the left is

13    the Medisim product and that was sold first in time, and you

14    will hear that the product on the right, the K-Jump product,

15    was sold afterward in the same stores and in this case in Rite

16    Aid.

17         The same with this comparison, ladies and gentlemen;

18    no claim that these two products were sold side by side on the

19    same store shelves but that the Medisim product on the left was

20    sold first and the K-Jump/BestMed product on the right was sold

21    afterward at CVS.

22         So, in addition to hearing from Dr. Lipson on the

23    technical issues you also will hear from Andrew Carter.

24    Mr. Carter is Medisim's damages expert.  He will tell you about

25    his financial analysis of the harm that was caused to Medisim

D1T5med3                    Opening - Mr. Christie

1    by BestMed from the infringement of the '668 patent and the

2    other legal claims and provide guidance as to what damages

3    figure should be awarded to Medisim at the end of the day.

4           You will also hear, as the Judge indicated, that

5    BestMed will be claiming that the '668 patent is invalid for

6    one or more reasons.  However, Medisim is confident that at the

7    end of the evidence in this case, after you've heard and seen

8    all of the evidence, that that claim will not hold any water

9    and largely because Bestmed has a higher burden of proof.

10          You heard the Judge tell you and it is a matter of law

11   that patents are presumed to be valid and because patents are

12   presumed to be valid, BestMed has a higher burden to clear and

13   convincing standard to show you invalidity which is more

14   demanding than Medisim's burden of preponderance of the

15   evidence to show infringement.

16          So, despite their best efforts, BestMed will not be

17   able to demonstrate the evidence will show the invalidity of

18   any claims of the '668 patent.

19          Ladies and gentlemen, I will have an opportunity to

20   address you again after all the evidence has been admitted in

21   this case in my closing argument or summation.  At that point

22   in time I will demonstrate to you that the evidence has in fact

23   shown by the preponderance of the evidence that BestMed has

24   infringed the '668 patent, committed unfair business

25   competition, has been unjustly enriched, and has infringed

D1T5med3                        Opening - Mr. Christie

1   Medisim's copyright.  Furthermore, the evidence will show that

2   BestMed has not even come close to reaching its burden of

3   showing invalidity of any claim of the '668 patent by clear and

4   convincing evidence.

5          Thank you for your attention.

6          THE COURT:  Thank you, Mr. Christie.

7          Ladies and gentlemen, I'm anxious to get the other

8   opening statement in today so I would like to go right to it.

9   If you just want to stand up and stretch for a minute we can

10  all have a standing moment but then I would like to call on

11  Mr. Cepuritis to give his opening statement.

12         Do you want the podium to remain where it is?

13         MR. CEPURITIS:  Yes, your Honor.  And if I may, during

14  my presentation, use the ELMO?

15         THE COURT:  Sure.  That will be fine.

16         All right, Mr. Cepuritis.

17         MR. CEPURITIS:  Thank you, Judge.

18         Good afternoon.  I'm Tali Cepuritis, I represent

19  BestMed, and with us today is the president of BestMed, Michael

20  Edmonds -- Mike, would you please stand?  And Stan Cohen, the

21  CEO of BestMed.

22         This case is about a business opportunity that has

23  been squandered by Medisim.  Medisim dropped the ball and now

24  they cry foul.  This case is also about Medisim trying to take

25  away the market that BestMed developed through its own efforts.

D1T5med3                    Opening - Mr. Cepuritis

1          BestMed is a Colorado company founded in 2002 as a

2     successor to a company called K-Jump U.S.A. that was founded in

3     1999.  Mr. Edmonds was the president of K-Jump U.S.A. and

4     continued, through now, as president of BestMed.  Mr. Edmonds

5     has a long many years of experience in selling medical

6     instruments and it was Mr. Edmonds' efforts and expertise that

7     created this market.

8          BestMed distributes medical instruments throughout the

9     United States to drug store chains who then market these

10    instruments under their own labels to the customers of BestMed,

11    the typical ones you see on the slide there, and I'm sure you

12    all recognize these companies.

13         BestMed has an extensive product line, primarily

14    thermometers, but also nebulizers, blood pressure monitors and

15    similar devices.  You will notice that BestMed has its own

16    color code, the blue and white, unless one of BestMed's

17    customers insists that they want to use their own in-house

18    colors.  But BestMed's own color scheme is the blue and white

19    scheme.

20         BestMed is a highly respected distributor and it

21    enjoys its reputation and protects it diligently.  BestMed's

22    reputation is based on contacts and track record or

23    performance.  These are very important in this business.

24         Now, the principal issues in this case are, as you

25    heard, unfair competition and unjust enrichment on the one hand

D1T5med3                          Opening - Mr. Cepuritis

1    and patent infringement on the other.  I will address these two

2    in turn.

3            Medisim complains that BestMed is competing unfairly

4    in the State of New York while selling a templar thermometer.

5    Well, competition is a good thing.  Competition keeps the

6    prices down for the ultimate consumer.  Competition is the

7    foundation of American economy.  There is nothing wrong with

8    competition unless the competition is not fair.

9            Ladies and gentlemen, you will not hear any evidence

10   of unfairness as to how BestMed has treated Medisim or as to

11   how BestMed has competed with Medisim.

12           Medisim, as you heard, is a small startup company that

13   had no United States market exposure.  They wanted to sell

14   products in the United States and they looked for a well-known

15   distributor that would help them do that.  They approached

16   BestMed, BestMed had discussions with them, there were several

17   products that Medisim wanted to introduce in the United States.

18   Some of the products were similar, like a stick thermometer

19   that was similar to what BestMed already had; they had the high

20   quality stick thermometer so they were not interested.

21           Medisim did elicit interest in its forehead

22   thermometer.  There were several meetings and the technology

23   sounded interesting at the time.  Medisim labeled it the

24   R-A-T-E or the R.A.T.E. technology as something revolutionary.

25   Well, it is a nice selling approach.  BestMed accepted it and

D1T5med3                        Opening – Mr. Cepuritis

1    decided that this was something worth a try.  Samples were sent

2    by Medisim to BestMed and there was a business opportunity, a

3    window of opportunity with Walgreen's, a long-standing customer

4    of BestMed to make a sales presentation.  Walgreen's liked the

5    product, they committed to purchase more than -- slightly more

6    than 10,000 units of this product.  BestMed reported back to

7    Medisim, Medisim was excited and BestMed was happy.

8            Now, BestMed kept asking Medisim:  Are you sure you

9    can deliver?  Yes, they said; we can deliver.  Well, it didn't

10   quite turn out that way.

11           Now Medisim points that it is BestMed to blame as

12   being too hasty.  Not quite.  It was Medisim that was anxious

13   to enter into the United States market and BestMed was trying

14   to help them do so.

15           Several concerns are expressed by Mr. Cohen directed

16   to Medisim:  Are you sure you can deliver?  How is the process

17   coming?  Ultimately Medisim had to fess up and say we cannot

18   deliver, we cannot deliver on the schedule that we promised.

19   Now BestMed's reputation is at stake with one of their best

20   customers, one of their major customers.  Well, BestMed had no

21   choice but eat crow, call Walgreen's, and say we won't be able

22   to deliver.

23           Now, you saw on the screen here a Walgreen's

24   thermometer that is a BestMed thermometer.  Evidence will show,

25   ladies and gentlemen, that it took 10 years after the

D1T5med3                          Opening - Mr. Cepuritis

1    Walgreen's fiasco before BestMed could introduce another

2    thermometer into Walgreen's.  These buyers at major drug chains

3    have long memories.

4              MR. CHRISTIE:  Sorry, your Honor.  I am going to

5    object quickly because the Walgreen's picture was not a Medisim

6    model, it was a BestMed model.

7              MR. CEPURITIS:  I apologize.

8              THE COURT:  All right.

9              MR. CEPURITIS:  So, there is a quiet period now.

10   Several months later Medisim approaches BestMed again:  Are you

11   still interested in our forehead thermometer?  BestMed liked

12   the product in the beginning, BestMed still likes that product,

13   so they decide they're going to give it one more try but now

14   they want to formalize this somewhat.  So, there is this

15   international distributorship agreement that is entered into

16   which spells out the respective duties and obligations of the

17   parties.  Contrary to what Medisim's counsel mentioned, that

18   was not a partnership agreement.  There was never a partnership

19   between Medisim and BestMed.  You will see copies of the

20   international distributorship agreement and you will see that

21   it is a straight forward Medisim sells/BestMed buys for resale.

22   It is a distributorship agreement, it is not a partnership

23   agreement.

24              But there is another problem that arises while

25   negotiating this agreement -- Medisim needs money for tooling

D1T5med3                      Opening – Mr. Cepuritis

1    to make these products that they are now committed to supply.

2    Medisim asks BestMed to buy the tooling for them.  As I said,

3    BestMed still likes the product so BestMed puts up $53,500 so

4    that Medisim can buy the tooling to make the product.  On top

5    of that, BestMed is investing its time and effort to put

6    together sales presentations to develop packaging, to develop

7    graphics that go with a package.  Mr. Edmonds is an expert of

8    long standing in writing instruction manuals.  Mr. Edmonds puts

9    in his time in preparing the instruction manual that you heard

10   about supposedly -- or I will say not supposedly, we know they

11   have claimed the copyright on that manual but you will, ladies

12   and gentlemen, you will be asked to decide who the author is of

13   that copyrighted material.  I submit that the evidence will

14   show that it is Mr. Edmonds, not anyone at Medisim.

15          Now, the international distributorship agreement is in

16   effect.  Finally products are arriving but we already are

17   experiencing delivery problems.  You would think that the

18   parties would have learned:  Partial shipments, mismarked

19   cartons, delayed shipments, incomplete packages, quality

20   problems.  Mr. Cohen has to field customer complaints.  There

21   are returns of faulty merchandise.  BestMed is trying to do

22   whatever they can to keep this deal going because the product

23   is good if it's manufactured right.  And there is a market for

24   it.  BestMed is doing its darnedest to make this deal work but

25   is frustrated by what is happening across the ocean.

D1T5med3                    Opening – Mr. Cepuritis

1          So, BestMed is concerned, as I mentioned to you

2    before, and reputation is extremely important in these

3    situations.  BestMed continues to be concerned about its

4    reputation so they're looking for a backup.  Yes, they have had

5    a long-standing relationship with K-Jump as a thermometer

6    manufacturer who BestMed knows is turning out high quality

7    product; they're also very innovative, they hold their own

8    patents, they've been around for a long time.  So, BestMed

9    inquires whether there is a possibility that K-Jump could come

10   to assistance.  Well, K-Jump is interested but the agreement is

11   what it is and BestMed is trying to and does live up to its

12   commitments on the international distributorship agreement.

13   The agreement expires, K-Jump is not yet ready with a

14   thermometer that BestMed could market, so BestMed continues to

15   buy Medisim's product on a purchase order basis, in other words

16   I place an order, you ship with no commitments as to future.

17   Well, this goes on for a while.

18         So, some time goes on, there is disagreement with the

19   international distributorship agreement that was renewed.  The

20   parties intend to renew it and Medisim and BestMed say, look,

21   we're all businessmen.  Let's let bygones be bygones, let's

22   enter into the new agreement, clarify the situation and if

23   something did go wrong in the past actually the purchase and

24   sale agreement has a special provision where in simple terms

25   the past is forgiven.  There is a special paragraph 12 in that

D1T5med3                          Opening – Mr. Cepuritis

1    agreement.

2           Well, this purchase and sale agreement is interesting.

3    If I could have the slide?  As we are looking for the slide I

4    will start telling you about it; it has a provision where both

5    parties agree that each can sell competitive product.  Now,

6    this agreement was entered into, paragraph 9, from May 1, 2008

7    onward.  Each party may, directly and through its distributors,

8    promote and sell products that compete with the product to

9    current customers.  And there is a proviso that you can't

10   deliver until after May 1, 2009, this is when this agreement

11   expires.  And the paragraph 10:  From and after the execution

12   of this agreement by both parties, both parties, directly and

13   through their agents and distributors, may freely offer and

14   sell products that compete with the product to customers that

15   are not current customers.

16          It was during this period when BestMed started

17   receiving K-Jump's thermometer that worked differently and

18   started selling that as well; all this with Medisim's

19   permission.

20          During that time period and thereafter the market was

21   available to both.  The difference was that Medisim no longer

22   had the benefit of BestMed's marketing expertise and customer

23   contacts and BestMed's reputation.

24          Now I would like to talk a little bit about the patent

25   aspects of this case.

1    Medisim's infringement charge is directed to BestMed's
2    thermometer, the same thermometer that it has been selling
3    during the purchase and sale agreement since 2008.  Selling it
4    with Medisim's permission.
5    BestMed's expert, Mr. Goldberg, will explain to you
6    the differences in technology that are involved in these two
7    thermometers; Medisim's purportedly new thermometer and the
8    thermometer that BestMed has been selling since 2008.
9    Mr. Goldberg has a lot of experience in the digital
10   thermometry art.  He will tell you about his qualifications.
11   He is even an inventor, he invented one of the commercially
12   successful ear thermometers.  So, he is well qualified, he
13   understands the technology and will explain in great detail to
14   you how each of these thermometers work and what the
15   differences are.  He will explain to you that the BestMed
16   thermometer does not calculate that the temperature of blood in
17   the pulmonary artery as it is called for in the patent.  By the
18   way, I take exception to counsel's characterization that the
19   human body is equivalent to a pot roast.  I think that is going
20   a little bit far.  But, be that as it may.
21   Mr. Goldberg will explain to you how the patented
22   thermometer does its calculation of what they call the core
23   body temperature.  Now, Judge Scheindlin has addressed this
24   issue -- this is a proceeding that precedes the trial -- where
25   she interpreted what does the term core body temperature mean.

D1T5med3                    Opening - Mr. Cepuritis

1   According to Judge Scheindlin's ruling it means the temperature

2   of blood in the pulmonary artery.

3          So, it is clear that the '668 patent has to calculate

4   the temperature of blood in the pulmonary artery.  The evidence

5   will show, also, that the '668 patent never should have been

6   granted by the patent office.

7          You heard about the FHT thermometer that BestMed was

8   selling under its own designation DTT.  That, by the way, was

9   BestMed's designation for the DTT but the inside is the same as

10  the FHT-1.

11          Now, Medisim applied for its patent, the '668 patent,

12  on May 31, 2006 but Medisim never told the patent office that

13  the FHT-1 thermometer that BestMed has been selling on behalf

14  of Medisim since early 2005 was prior art.  What I'm talking

15  about is the FHT thermometer -- and I will put it on the ELMO

16  here -- this, ladies and gentlemen, was prior art that the

17  patent office was not told about.  Yet, the patent, the '668

18  patent itself shows a picture that is strikingly similar.  Now,

19  it would seem that Medisim should have realized that perhaps

20  the patent examiner should have been told about this one.  The

21  evidence will show that they did not.

22          Now, you saw the video and the sort of overview as to

23  what is required for a valid patent.  It is clearly the patent

24  cannot take back from the public domain something that is

25  already there.  That's the prior art.  If it is the prior art

D1T5med3                    Opening – Mr. Cepuritis

1    the patent claims may not cover that.  Well, we submit that in

2    this case the claims, as Medisim is interpreting them, fully

3    cover this thermometer as well.

4         The patent law also requires, as you heard, that the

5    specification should provide some contribution that's new to

6    the technology, enhance the field, enhance the information in

7    the field.

8         Now, we saw slides that counsel projected on the

9    screen and when you look at those slides and consider them

10   carefully what did we hear?  We heard that prediction is all in

11   the art.  This prior art device also uses heat flux technology,

12   the R.A.T.E. technology for operation, so what is the

13   difference between this prior art and the purported new

14   invention?  Well, you saw it on the slides, it is the

15   correction.

16        Ladies and gentlemen, Medisim has progressed

17   considerably over the last 20, 30 years and people in the

18   medical profession at least realize that there is, indeed, a

19   difference between oral temperature and pulmonary artery

20   temperature and it is not a question of treating the body like

21   a pot roast.  Surgeons are extremely interested what the

22   pulmonary artery blood temperature is, especially in cardiac

23   patients.  It is very important to monitor that to the tenth of

24   a degree if not closer.

25        So, it is known, I submit, and the evidence will show,

D1T5med3                     Opening - Mr. Cepuritis

1    that these temperature differences between pulmonary blood

2    artery temperature -- it is a tongue twister -- and oral

3    temperature, rectal temperature, actual temperature is known.

4    So, what is the correction?  Let's go to a handbook and look it

5    up.  It is very easy to program that.  Yet that is supposedly

6    the enhanced contribution to technology that is provided by the

7    '668 patent.

8            Members of the jury, the evidence in this case will

9    establish that Medisim failed to take advantage of the

10   marketing opportunities that BestMed developed for them using

11   its own marketing efforts, knowledge, expertise.  In short,

12   Medisim utilized BestMed's blood, sweat and tears to get

13   foothold in a marketplace but due to their own deficiencies or

14   inabilities they couldn't and didn't take advantage of it.

15   BestMed could do hand-holding for only so long.  They wanted to

16   stay in this business and they had no choice but to look for a

17   more reliable supplier.  The evidence will also show that

18   BestMed's temporal thermometer is based on technology that

19   Medisim knew was different from Medisim's technology.

20   Nevertheless, here we are.  Despite this knowledge we have this

21   lawsuit today.

22           This is a straight forward case, ladies and gentlemen.

23   The evidence will show that BestMed has not competed unfairly

24   with Medisim and has not been unjustly enriched.  They earned

25   what they made.  The temporal thermometers sold by BestMed do

D1T5med3                        Opening - Mr. Cepuritis

1    not violate Medisim's patent.  Mr. Goldberg, BestMed's expert,

2    will explain that to you in great detail and, furthermore,

3    Medisim's new patent, the '668 patent, seeks to cover much,

4    much more than the technology that it contributed.

5            Thank you very much.

6            THE COURT:  Thank you, Mr. Cepuritis.

7            MR. CEPURITIS:  Thank you, your Honor.

8            THE COURT:  We do have time for our first witness and

9    we want to use all of our time because I promised you we would

10   finish a week from Friday.  So, with that, we will start with

11   our first witness.

12           MR. CHRISTIE:  Can I move the podium?

13           THE COURT:  Yes, while someone else gets the witness.

14           MR. CHRISTIE:  Yes, Judge; Mr. Yarden.

15           THE COURT:  Just don't cut the cord because if we cut

16   it the government can't afford a new one.

17           MR. CHRISTIE:  Okay, Judge.  I will be very careful

18   then.

19    MOSHE YARDEN,

20        called as a witness by the Plaintiff,

21        having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MR. CHRISTIE:

24   Q.  Mr. Yarden, where are you currently employed?

25   A.  Medisim Ltd.

D1T5med3                    Yarden - direct

1   Q.   What is your position at that company?

2   A.   I am the CEO and the R&D manager of the company.

3   Q.   Who were the founders of Medisim LTD?

4   A.   We were three; Mr. Ilan Vadai, Dr. Sorin Teich and myself;

5   I-L-A-N  V-A-D-A-I and the other one is Sorin, S-O-R-I-N, and

6   his last name is Teich, which is T-E-I-C-H.

7   Q.   I just remind you, Mr. Yarden, to keep your voice up so

8   that we can hear you please?

9   A.   Okay.

10  Q.   So, this company Medisim that you were one of the founders

11  of, how did this company get started?

12  A.   I met Dr. Sorin Teich and he told me about an infrared

13  thermometer measuring in the ear, it was a tympanic thermometer

14  done by Thermoscan and he said that it was a very interesting,

15  revolutionary thermometer in the market at that time and he

16  asked me if we could do something that will be able to compete

17  such a product.

18  Q.   What was your reaction to that suggestion?

19  A.   Well, I asked him to give me a couple of days to think

20  about it and to read some material concerning the infrared

21  technology.

22  Q.   And after you completed your efforts, what did you decide

23  to do with regard to that suggestion?

24  A.   I realized that the infrared, although it is very fast and

25  much easier to use than those days' other alternatives like the

D1T5med3                      Yarden – direct

1   stick thermometers, the infrared suffers of several shortcomes

2   like the sensitivity to the ambient temperature and there is a

3   fuse.

4   Q.   What is the ambient temperature, Mr. Yarden?

5   A.   It is the room temperature where you use the thermometer.

6           So, at that time I said we better, if we want to have

7   a product to be able to compete then we must have it fast as

8   the infrared but I then recommend to try take the conductive

9   approach rather than the infrared.

10  Q.   So, Mr. Yarden, did you study thermometry in school?

11  A.   Well, there is no school for thermometry but in my

12  background as an aeronautical engineer I worked for the Israeli

13  Defense Industry and part of it was dealing with heat transfer.

14  Q.   How does that knowledge of heat transfer that you learned

15  as an aeronautical engineer transfer to making thermometers?

16  A.   Well, every thermometer deals with heat which is

17  transferred from the body to the sensor whatever sensor you

18  use, so this background helped me a lot in dealing with

19  thermometry, plus also the fact that you need to have a very

20  strong background in physics and math also could help you in

21  development of new technologies for thermometry measurement.

22  Q.   Mr. Yarden, you mentioned infrared technology; let me turn

23  your attention to a slide that you have prepared.  Using that

24  slide could you please explain to the jury your understanding

25  of infrared technology?

D1T5med3                    Yarden - direct

1   A.  Well, the sensor is like a camera having one pixel, naming

2   one point to capture information, so this is basically an

3   optical sensor and it could read only what it looks.  So, if

4   the sensor is directed now to an object so the infrared heat

5   radiated from that object will flow into that sensor and that

6   sensor will get a signal which is representing what it sees.

7           Basically infrared is just light as any other light

8   but the only difference is that it is in a range where our eye

9   can see it.

10          So, this is actually a light which is representing the

11  heat emitted from an object but that wavelength of the light is

12  in the infrared range where we can't see it in our eyes however

13  the sensor can sense it.

14          So, that's basically an infrared.  So, what we can see

15  here on the slide is that the infrared sees the skin

16  temperature because that's the only thing that has a direct

17  line of sight to it.

18  Q.  Mr. Yarden, you mentioned something called conduction

19  technology, correct?

20  A.  Correct.

21  Q.  Is that a form of infrared temperature measurement

22  technology?

23  A.  No.  Conduction is different than infrared and in

24  conduction we are talking about a direct mechanical contact

25  between the sensor and the object to be measured.  Also, there

D1T5med3                         Yarden - direct

1    is another difference that compared to the infrared that there

2    is actually no, other than the heat transfer from the object to

3    the sensor, with conduction there is an actually mutual heat

4    transfer or actually mutual effect between the sensor and the

5    body that it is measuring.  So, the way that we can see it here

6    is that the sensor is now being attached to the skin.  However,

7    since the sensor is cold and the heat in the deeper tissues

8    beneath the skin are hotter, heat will flow from the hot spot

9    or the hot area towards the cold sensor.

10          So, that's the dynamic that controls the heat transfer

11   of the conduction while with the infrared you can stay with

12   your sensor on the skin for hours, okay, there will be no

13   cross-effect between the sensor and the skin just as a camera.

14   I can take as much as I can photos of yourself without changing

15   your shape.  Right?  But if I will touch you that much maybe I

16   will spoil your look after so many times, okay?

17          So, that's the difference.

18   Q.  Okay.

19          So, in creating thermometer products through Medisim

20   what measurement technology did you begin exploring early on in

21   the formation of the company?

22          MR. CEPURITIS:  Objection, your Honor.  Assumes facts

23   not in evidence.

24          THE COURT:  What does that mean?  The evidence is

25   coming in.  He said what measurement technology did you begin

D1T5med3                          Yarden - direct

1    exploring early on in the formation of company.  I don't see

2    what is wrong with that.

3              MR. CEPURITIS:  It hasn't been established that there

4    is Medisim technology.

5              THE COURT:  Well, ask that then.  It seems to me he

6    can certainly lay that foundation.

7              MR. CHRISTIE:  I'm sorry, Judge.  I will certainly do

8    that.

9    BY MR. CHRISTIE:

10   Q.  Mr. Yarden, what types of products does Medisim

11   manufacture, if any?

12   A.  We are manufacturing thermometers that they might be

13   invasive and non-invasive thermometers.

14   Q.  How long has Medisim been manufacturing thermometers for?

15   A.  I think that our first product was launched somewhere in

16   1999.

17   Q.  So, getting back to my original question, Mr. Yarden, when

18   the company was formed what temperature measurement technology

19   were you focusing on for your company's thermometers?

20   A.  Okay.  At that time the idea was, as I said, let's make a

21   fast -- a really fast thermometer but then utilizing conductive

22   principle rather than radiation.  But the idea was that we will

23   not try to go for other locations than the traditional like

24   oral, underarm or rectal, but just give the fastest measurement

25   as we can in those locations.  And that's what we did.  We

D1T5med3                        Yarden - direct

1    developed an invasive but yet fast conductive thermometer that

2    was able to read somewhere like four seconds -- somewhere like

3    four to six seconds, the body temperature.

4    Q.  So, again, this was an invasive thermometer?

5    A.  Correct.

6    Q.  You would have to put it in a body cavity like the mouth,

7    rectum or underarm?

8    A.  Correct.

9    Q.  What models fall into that category of product that Medisim

10   manufactured?

11   A.  The first one was the Penguin followed by the Cello and

12   later we had a series called M5T and M3T.

13   Q.  So, Mr. Yarden, take a step backward.  Did you invent

14   conduction temperature measurement technology?

15   A.  Correct.

16   Q.  In what fashion?

17   A.  Well, Medisim actually was the first to introduce a heat

18   flux method to provide a fast conductive measurement.

19   Q.  So are you contending that you invented the whole concept

20   of the conduction or just a small part of conduction

21   technology?

22   A.  Well, conduction is a principle of heat transfer.  We never

23   claimed that we invented the principle -- a physical principle.

24   But, we did invent a method and devices that were utilizing

25   heat flux as a method for getting fast reading in invasive

D1T5med3                        Yarden - direct

1   locations like oral, underarm and rectum.

2   Q.  Mr. Yarden, in creating your thermometer products did you

3   use prediction measurement technology at all?

4   A.  No.  We -- our home technology, if I may say, our base

5   technology was the heat flux technology.  That's what we were

6   doing.

7   Q.  Even so, are you familiar with the prediction temperature

8   measurement technology?

9   A.  Oh yeah.  I mean, prediction is very well known and common

10  in the industry.  There are dozens of patents and products

11  utilizing prediction.  Prediction is well known since I think

12  early '80s.  The only thing that was changing with prediction

13  was the measurement time like '80s or '90s thermometers would

14  predict the body temperature within something like 60, 45

15  seconds.  Nowadays there are thermometers that will predict the

16  body temperature within less than 10 seconds.  But the

17  principle is the same; something for a short period of time

18  using that information in order to get the final equilibrium

19  steady state temperature.

20  Q.  So, Mr. Yarden, referring you to this screen, please

21  explain, as these slides are progressing, your general

22  understanding of prediction temperature measurement technology.

23  A.  Okay.

24          We can see that the time is running to the right and

25  the temperature is rising in the sensor.  At some point of time

D1T5med3                         Yarden - direct

there is enough information by the thermometer collected by the

thermometer where exactly the black line is crossing the

temperature rising curve, that's the point basically the

thermometer is able to give a reasonable or an acceptable

reading of the equilibrium temperature so that's the way it

works.

         So, the broken line is actually not an actual measured

temperature, it is just trying to emphasize the fact that this

would have been the temperature sensed by the sensor should it

stay on the place long enough time.  However, this is just done

or accomplished by computation rather than by actual sensor.

Q.  So, Mr. Yarden, what were your first efforts in using

conduction technology for your thermometer products?

A.  I'm sorry.  Can you repeat that question?

Q.  Sure.

         What were your first efforts in using conduction

temperature measurement technology in your company's

thermometer products?

A.  Well, as I said, we were dealing -- we used that technology

for invasive products.

Q.  Did you ever attempt to use that technology for a

non-invasive thermometer?

A.  Yes.  It was later on.  I mean, we started thinking of it

early 2002 or mid-2002, something like that.

Q.  I believe you also mentioned in your testimony, Mr. Yarden,

D1T5med3                          Yarden - direct

1   about something called heat flux, is that correct?

2   A.   Correct.

3   Q.   What is heat flux again?

4   A.   Well, heat is amount of energy.  Heat flux will be amount

5   of energy that passing across a given area for a given period

6   of time so this is exactly what we see in the slide.  I mean,

7   we are having a given area through that slab through which heat

8   is flowing and if we will have it through a period of time that

9   will be the heat flux.

10        Now, heat flux could be measured by using two spots

11   away each other along the line through which the heat is

12   flowing, and actually the difference between these two spots

13   will be a good representation of the heat flux at that point.

14   Q.   So, did Medisim invent the heat flux technology?

15   A.   No.  As I said before, heat flux is, again, is a given

16   principle and it is well known in the industry; however, I

17   believe that Medisim was the first to use the heat flux method

18   in the real-time and in the fast measurement because until that

19   time they were using the heat flux as a, I would say,

20   equilibrium or steady state thermometers where you put your

21   heat flux sensor long enough on the measurement spot until the

22   heat flux become stable or zero, it depends, and by that you

23   are getting very accurate temperature of the medium that you

24   are measuring.  However, Medisim was the first to introduce the

25   heat flux as a real-time in a fast measurement thermometer; I'm

D1T5med3                    Yarden - direct

1    talking about seconds versus minutes.  Okay?

2    Q.  So, Mr. Yarden, did Medisim obtain any patent protection

3    for its innovations in using heat flux technology in

4    thermometers?

5    A.  That's correct.

6    Q.  What did Medisim do in that regard?

7    A.  Well, as I said, we applied the patent and we got the '397

8    patent.

9    Q.  We are not talking about the '668 patent now, correct?

10   A.  Correct.

11   Q.  We are talking about the patent whose last digits are '397?

12   A.  Correct.

13   Q.  About when did you obtain the '397 patent, Mr. Yarden?

14   A.  As far as I remember it was late '90s, something like 1997.

15   Q.  So, how does the invention in the '397 patent work?

16   A.  Well, the idea was that in contradiction to the prediction

17   where you're staying at one spot seeing, observing the

18   temperature rising up and then asking what will be the

19   temperature within, say, 10 minutes, the heat flux basically is

20   you apply your heat flux sensor and you ask what's the amount

21   of heat per unit time per area that is coming into my sensor,

22   and then making this energy balance you are deriving the

23   temperature and at that time dealing with the invasive,

24   actually, we could derive the body temperature -- the core body

25   temperature.

D1T5med3                    Yarden - direct

1    Q.  Did Medisim have a commercial name for its heat flux

2    technology used in its thermometers?

3    A.  Yes.  We call it R.A.T.E., which is Rapid Accurate

4    Temperature Establishment.

5    Q.  Mr. Yarden, I'm going to show you what is marked as

6    Plaintiff's Exhibit 11; do you recognize that document, sir?

7    A.  Yes.

8    Q.  What do you recognize it to be?

9    A.  Well, this is an executive summary describing the business

10   of the company.

11   Q.  Can you tell approximately when it was written?

12   A.  I think somewhere about early 2000s like 2001, 2002.

13   Q.  What makes you come to that conclusion, Mr. Yarden?

14   A.  For some reason I see here something which is -- okay.  Now

15   it is better.

16   Q.  Perhaps if we look down at the bottom of the first page of

17   that exhibit?

18   A.  Yes.  Can we go down?

19       Okay.  So, here it says:  By year 2002, based on

20   professional recognition -- so, as we are talking here on 2002

21   as the future, I assume that it was before 2002.

22   Q.  So does this document, Plaintiff's Exhibit 11, describe

23   Medisim's R.A.T.E. technology?

24   A.  Well, it describes Medisim business including the R.A.T.E.

25   technology as we had at that time.

D1T5med3                          Yarden - direct

1    Q.  Does it describe the R.A.T.E. technology for invasive

2    purposes or for non-invasive purposes?

3    A.  Well, at that time the only technology that we had was

4    invasive so you could see that even we are talking about the

5    M5T in future terms which was an invasive -- our last invasive

6    model.

7    Q.  So, if we look further up that first page of that exhibit,

8    Mr. Yarden, or the center of the page, do you see a reference

9    to any particular Medisim products?

10   A.  Yes.  I see the Penguin, the Cello and the Up Grade Pro.

11   Q.  I believe you mentioned that those products used

12   temperature measured invasively, correct, in your prior

13   testimony?

14   A.  Correct.

15   Q.  Did you make commercial sales of the Penguin and Cello

16   models, Mr. Yarden?

17   A.  Yes, we did.

18   Q.  Were they commercially successful?

19   A.  I think so.

20   Q.  Even though they were successful were there any downsides

21   to the product?

22   A.  Yes.  End of the day, even if they were fast and we were

23   aiming to compete with infrared, because of the fact that they

24   were conductive they were compared to other conductive

25   thermometers that were much cheaper in price so we had

D1T5med3                              Yarden - direct

1    difficulties in competing in the marketplace.  And then it says

2    below in this document that we were thinking of the M5T at

3    later stage that was trying to cut down the cost of the product

4    and trying to compete with the stick thermometers.  However,

5    what has happened with that is that now that we came up with

6    this conductive four to six seconds, everybody was saying that

7    we are also 10 seconds so it was very hard for us to

8    communicate that to the public, that when we say four to six

9    seconds we really mean that.  But we were a little high with

10   the price because of our cost for the chip which requires more

11   computation power than the usual.

12            That was it around that time.

13   Q.  So, in light of the downsides of the Penguin and the Cello

14   brands, did you engage in any further innovation in the

15   technology you used for your thermometers?

16   A.  Yes, we did.

17   Q.  And what did you do?

18   A.  We were thinking of utilizing the advantage that we gained

19   a lot of experience with the R.A.T.E. technology -- with the

20   heat flux principle.  We tried to utilize it in a field where

21   customers are willing to pay more -- I mean premium

22   thermometers.  And when we analyzed the market situation we saw

23   that a forehead thermometer, which is based on heat flux, could

24   be a good idea where we can utilize our know-how and

25   technology.

D1T5med3                         Yarden - direct

1    Q.  And did you in fact pursue a forehead thermometer based

2    upon the heat flux technology?

3    A.  That's correct.

4    Q.  And what model was that?

5    A.  That was the FHT-1.

6    Q.  Showing you what's on the screen, Mr. Yarden; do you

7    recognize that picture?

8    A.  Yes.

9    Q.  What is that?

10   A.  What we see here is the FHT-1 model but it was named by our

11   distributors -- BestMed -- as the DTT.  So this was a given

12   name by them.  I would say that the last name was FHT-1 but the

13   given name was DTT, or the first name.

14   Q.  How did the FHT-1 thermometer work, generally?

15   A.  The FHT-1 model was basically utilizing the heat flux

16   technology in order to measure the core body temperature, so

17   what we did was we had a kind of reference line which represent

18   the lower end of the measurement range and we were using the

19   output of the heat flux algorithm to calculate the difference

20   between that fixed baseline to the core body temperature that

21   was represented by the oral temperature.

22   Q.  So, does the FHT-1 device practice the invention of the

23   '397 patent or not?

24   A.  Yes.  It did.

25   Q.  Well, how can it do that if it is a non-invasive

D1T5med3                    Yarden - direct

1    measurement device as opposed to an invasive measurement

2    device?

3    A.   Well, because it has a probe that you could use it also

4    underarm and, indeed, we had a model which is working the same

5    manner as the FHT-1, we call it the FHT-2, that was measuring

6    underarm and forehead as well.  So, at that time that's what we

7    have.

8    Q.   So, did you make commercial production models of the FHT-1

9    thermometer?

10   A.   Oh yeah.

11   Q.   And did you sell them?

12   A.   Yes.

13   Q.   And were they commercially successful?

14   A.   I believe so.

15   Q.   When did you first start producing and selling FHT-1

16   thermometers, approximately?

17   A.   It was June 2005, and I think that the first shipment that

18   we shipped to our distributors in the states, BestMed, was July

19   2005.

20   Q.   So, Mr. Yarden, at that time what was the wholesale price

21   of an FHT-1 thermometer about?

22   A.   $30.

23   Q.   That's the wholesale price?

24   A.   I'm sorry, the retail sale price.  The wholesale price was

25   around $8, $8.50.

D1T5med3                          Yarden - direct

1   Q.   And what about the retail price, what was the retail price

2   for those thermometers at that time?

3   A.   That was $30.

4   Q.   Finally, about how much per unit did it cause Medisim to

5   make the FHT-1 thermometer at about that time?

6   A.   Around half of the wholesale price.

7   Q.   So $3.50 to $4?

8   A.   Correct.

9   Q.   In 2005 did you sell the FHT-1 model to or through any

10  company other than BestMed?

11  A.   I don't think so.

12  Q.   When you produced FHT-1 thermometers did you have any other

13  distributor other than BestMed in 2005?

14  A.   I think that we had also a contract with Dorel but that was

15  around the FHT-2 model.

16  Q.   Okay, I'm specifically talking about the FHT-1 model.

17  Let's focus first on the FHT-1 model.

18          When Medisim was selling the FHT-1 model in 2005 was

19  it through any company other than BestMed?

20  A.   Not that I remember at the moment.

21  Q.   You also mentioned the FHT-2 model, correct?

22  A.   Correct.

23  Q.   Is that a production model of thermometer that Medisim

24  manufactured and sold?

25  A.   Correct.

D1T5med3                        Yarden - direct

1  Q.  Generally, what is a distinction between the FHT-1 model

2  and the FHT-2 model?

3  A.  The FHT-2 model was also including an underarm model where

4  you could switch into it by using the special button so the

5  thermometer would provide you with forehead and underarm

6  measurement ability.

7  Q.  So, does the FHT thermometer practice the invention of a

8  '397 patent?

9  A.  That's correct.

10  Q.  And did you sell FHT-2 model thermometers?

11  A.  Correct.

12  Q.  And who did you sell those to, Mr. Yarden?

13  A.  It was through Dorel Juvenile Group.

14  Q.  And under what brand name were those FHT-2 models sold?

15  A.  Safety First.

16  Q.  So, Mr. Yarden, were the wholesale retail and production

17  costs for the FHT-2 similar to those for the FHT-1, or were

18  they different?

19  A.  They were a little higher because it was a more fancy

20  product.

21  Q.  At that time in 2005 how did your FHT-1 product and your

22  FHT-2 product compare at the retail price level to infrared

23  thermometers?

24  A.  Well, I think that we did a very nice thing to the market

25  because at that time the only product that could be sold in the

D1T5med3                          Yarden - direct

```
 1    states was protected heavily by Exergen and they were selling
 2    their forehead thermometer for like $60, and the other well
 3    known infrared was done by Braun, ear, and it was also
 4    something like $45 to $50, and we brought up a cheaper
 5    technology which could be used for measurement -- forehead
 6    measurement for half of the price.
 7    Q.  So, Mr. Yarden, when you mentioned Exergen, what is
 8    Exergen?
 9    A.  The product that you hold in your hand.
10    Q.  Is Exergen a product or is it a company?
11    A.  Exergen -- okay.  I'm sorry about it.  I'm sorry.
12            Exergen is a company.
13    Q.  Okay.
14    A.  But their product in our industry is called the Exergen,
15    that's why.  Exergen is a company, it is an American company.
16    They are dealing mainly with infrared and the product that you
17    hold in your hand is their product and this is a forehead
18    infrared thermometer.
19            MR. CHRISTIE:  Your Honor, may I approach?
20            THE COURT:  Do you have an exhibit number?
21            MR. CHRISTIE:  Just for demonstrative purposes.
22            THE COURT:  I would still like to have a number for
23    the record.
24            MR. CHRISTIE:  Plaintiff's Exhibit XXX.
25            THE COURT:  Okay.
```

D1T5med3                          Yarden - direct

1    BY MR. CHRISTIE:

2    Q.   Mr. Yarden, let me show you Plaintiff's Exhibit XXX.

3    A.   Okay.

4    Q.   You mentioned that you recognize that, correct?

5    A.   Correct.

6    Q.   What do you recognize it to be?

7    A.   This is an infrared forehead thermometer by Exergen.

8    Q.   Do you know how it works?

9    A.   Yes.

10   Q.   Can you demonstrate for the jury?

11   A.   Sure.

12        You switch the device on -- no batteries, but

13   basically you switch it on and then have you to move it across

14   your forehead, and while you move it across your forehead it

15   will scan the temperature of the skin and it will take the

16   highest temperature and will correlate it to the core.

17        THE COURT:  Does it touch the skin?  Do you touch the

18   skin?

19        THE WITNESS:  Well, the probe is touch the skin but

20   the sensor, if you can see, it is a little bit beneath that

21   surface.

22        THE COURT:  I see.

23        THE WITNESS:  So, the sensor itself does not touch the

24   skin.

25        THE COURT:  I see.

D1T5med3                       Yarden – direct

 1   BY MR. CHRISTIE:

 2   Q.  So, Mr. Yarden, I'm going to show you what I'm going to

 3   mark Plaintiff's Exhibit YYY.  Do you recognize that, sir?

 4   A.  Well, this is a CVS thermometer as it is written here but

 5   it looks like an infrared ear thermometer.

 6           THE COURT:  What?

 7           THE WITNESS:  Ear.

 8   Q.  How does infrared technology work to take temperature

 9   measurement in the ear, if you know?

10   A.  Yes, I do.

11           Basically you switch the device on and then you put

12   the thermometer probe into the ear canal and the sensor looks

13   towards the tympanic membrane and capture its temperature.

14   Now, that temperature is being translated by the thermometer

15   into the body temperature which is displayed on the display.

16           THE COURT:  Okay.  It is 4:30, so we are going to stop

17   for today.

18           Ladies and gentlemen, please don't discuss the case

19   with each other or with anyone else.  Please leave your notes

20   in the jury room.  Tomorrow please be sure to get here at a

21   quarter to 10:00.  The reason I say quarter to 10:00 is

22   inevitably, having done this for so many years, one of you will

23   be later than the others, somebody will not be here by 10:00

24   and won't be finished by next Friday.  So, a quarter to 10:00,

25   that way we can make sure everybody will be here and we can get

D1T5med3                         Yarden – direct

1    a start.

2              (Continued on next page)

D1T5med3                          Yarden - direct

1              (Jury not present)

2              THE COURT:  All right.  Thank you, Mr. Yarden.  Be

3    back tomorrow, obviously at 10:00.

4              THE WITNESS:  Quarter to.

5              MR. KUO:  Your Honor, is Mr. Yarden sequestered?

6              THE COURT:  No.  What does that mean?

7              MR. KUO:  Is he able to talk back and forth with his

8    lawyers?

9              THE COURT:  We discussed that, he is still on direct.

10             MR. KUO:  Just clarifying.

11             THE COURT:  It doesn't kick in until cross.

12             MR. KUO:  Okay.

13             THE COURT:  We went over that.

14             Any other questions or are we ready for tomorrow?  We

15   are ready?

16             MR. CHRISTIE:  Yes.  I think we are ready, Judge.

17             THE COURT:  Can you try to clear as fast as possible?

18   I have a criminal case right now.  I know that is going to be

19   hard each day to move the stuff down.

20             (Adjourned to 9:45 a.m., Wednesday, January 30, 2013.)

21

22

23

24

25

<pre>
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    MOSHE YARDEN

4    Direct By Mr. Christie . . . . . . . . . . . .75
</pre>